***NOT FOR SOLICITATION PURPOSES***

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MUZAK HOLDINGS LLC, *et al.*, | ) | Case No. 09-10422 (KJC) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) |  |

---

## DISCLOSURE STATEMENT FOR SECOND MODIFIED
## JOINT PLAN OF REORGANIZATION OF MUZAK HOLDINGS LLC AND
## ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

**KIRKLAND & ELLIS LLP**

Edward O. Sassower
Joshua A. Sussberg
Sarah H. Seewer
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446–4800
Facsimile: (212) 446–4900

**KLEHR, HARRISON, HARVEY, BRANZBURG &
ELLERS LLP**

Domenic E. Pacitti
Michael W. Yurkewicz
919 Market Street
Wilmington, Delaware 19801-3062
Telephone: (302) 426-1189
Facsimile: (302) 426-9193

Attorneys for the Debtors and Debtors in Possession

Dated: October 26, 2009

---

**IMPORTANT INFORMATION FOR YOU TO READ**

---

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE SECOND MODIFIED JOINT PLAN OF REORGANIZATION OF MUZAK HOLDINGS LLC AND ITS AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS ATTACHED HERETO IS <u>HIGHLY SPECULATIVE</u>, AND THE DOCUMENTS SHOULD NOT BE RELIED UPON IN MAKING INVESTMENT DECISIONS WITH RESPECT TO THE DEBTORS OR ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THESE CHAPTER 11 CASES.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ("SEC") OR ANY STATE AUTHORITY AND NEITHER THE SEC NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN THE FORWARD LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED TO CREDITORS WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, AND WILL INSTEAD RELY UPON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE MAXIMUM EXTENT PERMITTED AND APPLICABLE. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SECURITIES.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS

DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. THE DEBTORS OR THE REORGANIZED DEBTORS MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF THESE DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF THESE EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT, HAS NOT BEEN AUDITED.

THE DEBTORS ARE GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS FILED. THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. IMPORTANTLY, BEFORE DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH

HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN SECTION VI HEREIN, "PLAN-RELATED RISK FACTORS."

**TABLE OF CONTENTS**

Page

I. EXECUTIVE SUMMARY ................................................................................................. i

II. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN ............. 3

III. BACKGROUND TO THESE CHAPTER 11 CASES ...................................................... 4
    A.    Muzak's Corporate History and Capital Structure .............................................. 4
    B.    Overview of Muzak's Business ......................................................................... 5
    C.    The Debtors' Prepetition Indebtedness .............................................................. 8
    D.    The Debtor's Management ............................................................................... 11
    E.    Events Leading to the Chapter 11 Filing .......................................................... 12

IV. EVENTS DURING THE CHAPTER 11 CASES ........................................................... 14
    A.    First Day Motions and Other Relief .................................................................. 14
    B.    Retention and Compensation of Debtors' Professionals ..................................... 18
    C.    The Statutory Committee of Unsecured Creditors ............................................. 18
    D.    Filing of the Schedules and Claims matters ...................................................... 19
    E.    Exclusive Period for Filing a Plan and Soliciting Votes ..................................... 20
    F.    Deadline to Assume or Reject Leases of Nonresidential Real Property ............... 20
    G.    Exit Financing Efforts .................................................................................... 21

V. SUMMARY OF THE PLAN .......................................................................................... 23
    A.    Administrative Claims .................................................................................... 23
    B.    Priority Tax Claims ........................................................................................ 24
    C.    Classification and Treatment of Classified Claims and Equity Interests ............. 24
    D.    Acceptance or Rejection of the Plan ................................................................ 29
    E.    Means for Implementation of the Plan .............................................................. 30
    F.    Treatment of Executory Contracts and Unexpired Leases .................................. 34
    G.    Provisions Governing Distributions ................................................................. 36
    H.    Procedures for Resolving Contingent, Unliquidated and Disputed Claims .......... 40
    I.    Conditions Precedent to Confirmation and Consummation of the Plan ............... 42
    J.    Settlement, Release, Injunction and Related Provisions ..................................... 43
    K.    Binding Nature of Plan ................................................................................... 47
    L.    Retention of Jurisdiction ................................................................................ 47
    M.    Miscellaneous Provisions ............................................................................... 48

VI. CONFIRMATION AND CONSUMMATION PROCEDURES ........................................ 51
    A.    Solicitation Procedures ................................................................................... 51
    B.    Voting Procedures .......................................................................................... 55
    C.    Confirmation Procedures ................................................................................ 58
    D.    Statutory Requirements for Confirmation of the Plan ....................................... 60
    E.    Consummation of the Plan .............................................................................. 64

VII. PLAN-RELATED RISK FACTORS ............................................................................ 65
    A.    Certain Bankruptcy Law Considerations .......................................................... 65
    B.    Risk Factors That May Affect the Value of Securities to be Issued Under the Plan and/or
          Recoveries Under the Plan .............................................................................. 67
    C.    Risk Factors that Could Negatively Impact the Debtors' Business ...................... 68
    D.    Disclosure Statement Disclaimer .................................................................... 73

VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ........................... 76

A.    Liquidation Under Chapter 7 of the Bankruptcy Code ............................................... 76
B.    Filing of an Alternative Plan of Reorganization .......................................................... 76

**IX. EXEMPTIONS FROM SECURITIES ACT REGISTRATION** ................................................... 77
A.    Section 1145 of the Bankruptcy Code ......................................................................... 77

**X. CERTAIN U.S. FEDERAL INCOME  TAX CONSEQUENCES OF THE PLAN** ........................ 79
A.    Certain U.S. Federal Income Tax Consequences to Holders of Allowed Claims .......... 79
B.    Certain U.S. Federal Income Tax Consequences to Reorganized Debtors .................... 84

**XI. RECOMMENDATION** .................................................................................................................. 86

## EXHIBITS

EXHIBIT A    Plan [To be added to solicitation version only]

EXHIBIT B    Disclosure Statement Order (including the Solicitation Procedures) [TO COME]

EXHIBIT C    The Reorganized Debtors' Financial Projections

EXHIBIT D    The Reorganized Debtors' Valuation

EXHIBIT E    Liquidation Analysis

THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO
THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.

# I.
# EXECUTIVE SUMMARY

Muzak Holdings LLC, a Delaware limited liability company, together with its debtor affiliates (collectively, "Muzak" or the "Debtors")[1] submit this Disclosure Statement[2] pursuant to section 1125 of the Bankruptcy Code to Holders of Claims in connection with (a) the solicitation of acceptances of the *Second Modified Joint Plan of Reorganization of Muzak Holdings LLC and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated September 9, 2009 (the "Plan"). A copy of the Plan is attached hereto as **Exhibit A**. The Plan constitutes a separate chapter 11 plan for each Debtor. Except for unclassified Claims, all Claims against a particular Debtor are placed in Classes for each of the Debtors (as designated by subclasses A through O for each of the 15 Debtors).

After several months of extensive and arms' length negotiations and discussions, the Debtors are one step closer to achieving their ultimate goal — a confirmed chapter 11 plan of reorganization that memorializes a restructuring that will enable Muzak to operate efficiently and effectively in a competitive market place. To that end, the Plan reflects a financial resolution of the Debtors' estates that is supported by Silver Point Capital Advisors L.P., the Debtors' largest secured and unsecured creditor ("Silver Point"), the statutory committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "Committee") and an ad hoc group of Holders of the Debtors' Senior Notes (the "Ad Hoc Group of Senior Noteholders"). Thus, the overwhelming majority of unsecured creditors support the Plan.

More specifically, the Plan, among other things, contemplates the following:

- secured lenders under the Prepetition Credit Agreement (with a principal amount outstanding of $95,537,500) will receive, in full and final satisfaction of such Secured Term Loan Claims, payment in full in cash with proceeds of the Exit Facility;

- the holders of the Debtors' $220 million 10% senior notes will receive (i) new senior notes at $135 million face amount (the "New Senior Notes") with a 15% coupon (8% cash and 7% payment-in-kind ("PIK")), a 4.5-year maturity and prepayable at par immediately with no change in control or call premium; and (ii) new redeemable PIK preferred units in an amount of $85 million, with dividends accruing at 10% and increasing 1% per year (capped at 15%) and a 7-year maturity;

- the holders of the Debtors' $115 million 9.875% senior subordinated notes will receive 100% of the new common units of Reorganized Muzak ((subject to dilution for up to 10% on account of a management incentive plan and warrants described below) (the "New Common Units");

- the holders of the Debtors $24,245,000 million 13% senior discount notes will receive warrants for 7.5% of the outstanding New Common Units (excluding management units) at market value based upon an enterprise value of $425 million with a term of five years; and

- the holders of general unsecured claims shall be paid in full in cash within 15 days after the Plan's effective date.

---

[1]   The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Muzak Holdings LLC (3730); Muzak Holdings Finance Corp. (3728); Muzak LLC (3729); Background Music Broadcasters, Inc. (3014); Muzak Capital Corporation (2302); MLP Environmental Music, LLC (6098); Business Sound, Inc. (9525); BI Acquisition, LLC (6049); Muzak Finance Corp. (7963); Electro-Systems Corporation (6059); Audio Environments, Inc. (4111); Telephone Audio Productions, Inc. (4894); Vortex Sound Communications Company, Inc. (3711); Muzak Houston, Inc. (9984); and Music Incorporated (3710).

[2]   All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

The following table provides a summary of the classification and treatment of Claims and Equity Interests and the potential distributions to Holders of Allowed Claims and Equity Interests under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

## SUMMARY OF EXPECTED RECOVERIES

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|-------|----------------------|-------------------------------------|-----------------------------------|
| 1 | Other Priority Claims | Payment in full in Cash. | 100% |
| 2 | Other Secured Claims | Payment in full in Cash, delivery of the respective secured creditor's collateral, or other treatment that renders the Class 2 Claims Unimpaired. | 100% |
| 3 | Secured Term Loan Claims | Allowed in the amount of $95,537,500; payment in full in cash with proceeds of the Exit Facility. | 100% |
| 4 | Senior Notes Claims | Allowed in the amount of $225,194,444.44; payment in full in the form of the New Senior Notes and the New Redeemable PIK Preferred Units | 100% |
| 5 | Senior Subordinated Notes Claims | Allowed in the amount of $119,574,045.14; payment in the form of 100% of New Common Units, subject to dilution for the Management and Director Incentive Plan of up to 10% and the Warrants. | 5.8% - 62.4% |
| 6 | Discount Notes | Allowed in the amount of $25,645,822.22; payment in the form of Warrants for 7.5% of the New Common Units (excluding management units) at market value based upon an enterprise value of $425 million with a five-year term. | N/A |
| 7 | General Unsecured Claims | Paid in full in Cash within 15 days after Effective Date. | 100% |
| 8 | Equity Interests | Canceled. | 0% |
| 9 | Intercompany Interests | Either retained or canceled. | N/A |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

As used throughout this Disclosure Statement, references to the "Bankruptcy Court" are to the United States Bankruptcy Court for the District of Delaware, the court in which the Debtors, filed voluntary petitions seeking relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). References to "Reorganized Muzak" are to Muzak Holdings LLC following emergence from chapter 11 of the Bankruptcy Code, and references to the "Reorganized Debtors" are to the reorganized Debtors following emergence from chapter 11 of the Bankruptcy Code.

References to the "Confirmation Date" are to the date upon which the Bankruptcy Court enters the order confirming the Plan pursuant to section 1129 of the Bankruptcy Code. "Confirmation Hearing" means the hearing held by the Bankruptcy Court on confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

References to the "Effective Date" are to the day that is the first Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in the Plan have been: (i) satisfied; or (ii) waived pursuant to the Plan.

References to the "Chapter 11 Cases" are to (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

i

References to the "Bankruptcy Rules" are to the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of title 28 of the United States Code, 28 U.S.C. §§ 1–4001 and the general, local, and chambers rules of the Bankruptcy Court.

References to a "Claim" are to any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

References to "Equity Interests" are to (i) any share of common stock, preferred stock or other instrument evidencing an ownership interest in Muzak Holdings LLC, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately before the Effective Date; *provided*, *however*, that Equity Interest does not include any Intercompany Interest.

References to the "Plan" and the "Plan of Reorganization" are to the *Second Modified Joint Plan of Reorganization of Muzak Holdings LLC and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code*, attached as Exhibit A hereto. All capitalized terms used but not otherwise defined herein will have the meaning ascribed to them in the Plan.

Unless the context requires otherwise, reference to "we," "our," and "us" are to the Debtors.

## II.
## QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

**1.      What is Chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 of the Bankruptcy Code promotes equality of treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy commencement date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other Entity as may be ordered by the bankruptcy court, in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's debt in accordance with the terms of the confirmed plan.

**2.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a Disclosure Statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  This Disclosure Statement is being submitted in accordance with such requirements.

**3.      Am I entitled to vote on the Plan? What will I receive from the Debtors if the Plan is consummated?**

Your ability to vote and your distribution under the Plan, if any, depend on what kind of Claim or Interest you hold.  A summary of the classes of Claims (each, a category of holders of Claims or Interests as set forth in Section V of this Disclosure Statement and Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, which we refer to as a "Class") and their respective voting statuses and anticipated recoveries is set forth below.

The chart in the Executive Summary portion of this Disclosure Statement is a summary of the classification and treatment of Claims and the potential distributions under the Plan.  Any estimates of Claims in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries received.  In addition, your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain confirmation of the Plan and meet the conditions to the Effective Date of the Plan.  The recoveries set forth in this Disclosure Statement are projected recoveries only and may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.  "Allowed" means with respect to Claims: (a) any Claim, proof of which is timely Filed by the applicable Claims Bar Date (or which by the Bankruptcy Code or Final Order is not or shall not be required to be Filed); (b) any Claim that is listed in the schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as may be amended, modified or supplemented from time to time (the "Schedules") as not contingent, not unliquidated and not disputed, and for which no Proof of Claim has been timely Filed; or (c) any Claim Allowed pursuant to the Plan.  A Claim described in (a) above is only an "Allowed Claim" if and to the extent that no objection to the allowance thereof has been interposed before the Claims Objection Bar Date, or such an

3

objection is so interposed and the Claim has been Allowed for distribution purposes only by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors or the Reorganized Debtors and without any further notice to or action, order or approval of the Bankruptcy Court.

4. **What happens to my recovery if the Plan is not confirmed, or does not go effective?**

In the event that the Plan is not confirmed, there is no assurance that the Debtors will be able to reorganize their business. If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated thereby could be implemented and what Holders of Claims and Interests would ultimately receive in respect of their Claims and Interests. It is possible that any alternative may provide Holders of Claims or Interests with less than they would have received pursuant to the Plan. Moreover, nonconfirmation of the Plan may result in an extended chapter 11 proceeding. For a more detailed description of the consequences of this or of a liquidation scenario, see "Statutory Requirements for Confirmation of the Plan – 'Best Interests' Test/Liquidation Analysis" set forth in Article VI.D.1 and the Liquidation Analysis attached as **Exhibit E** to this Disclosure Statement.

5. **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. "Confirmation" of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and go effective. References to the "Effective Date" mean the date that all conditions to the Plan have been satisfied or waived and the Plan has been fully consummated. Distributions will only be made on the Effective Date or as soon as practicable thereafter. See "Statutory Requirements for Confirmation of the Plan" and "Consummation of the Plan" for a discussion of the conditions to consummation.

6. **Where is the cash required to fund the Plan coming from?**

The proceeds of the Exit Facility will pay the Secured Term Loan Claims in full in cash on the Effective Date. A portion of the Exit Facility may be used to fund the Reorganized Debtors' working capital needs. As of August 31, 2009, the Debtors had approximately $40.4 million of cash on hand, which will fund all other cash payments pursuant to the Plan and the Reorganized Debtors' working capital needs.

7. **Are there risks to owning an interest in Muzak upon emergence from bankruptcy?**

Yes, please see "Plan-Related Risk Factors," which is set forth in Article VII.

8. **Is there potential litigation related to the Plan?**

Yes, in the event it becomes necessary to confirm the Plan over the objection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of certain Classes of Claims. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class of Claims if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. See "Risk Factors — The Debtors May Not Be Able to Secure Confirmation of the Plan" in Article VII.A.4.

9. **What are the contents of the solicitation packages to be sent to creditors who are eligible to vote on the Plan?**

All parties in interest will receive the notice of the hearing on the confirmation of the Plan. Additionally, creditors who are eligible to vote on the Plan will receive appropriate solicitation materials including ballots.

The notices sent to parties in interest will indicate that this Disclosure Statement, the Plan and all of the exhibits thereto are (and, in the future, the Plan Supplement will be) available for viewing by any party at: http://chapter11.epiqsystems.com/muzak.

10.     **What rights will Reorganized Muzak's new stockholders have?**

The Plan contemplates the conversion of the Senior Subordinated Notes into the New Common Units of Reorganized Muzak. The Plan also contemplates that Holders of Discount Notes will receive Warrants. The LLC Agreement and the Warrant Agreement will be negotiated and included in the Plan Supplement.

11.     **Will there be releases granted to parties in interest as part of the Plan?**

Yes, see "Releases" in Article X of the Plan.

12.     **What is the deadline to vote on the Plan?**

5:00 p.m. (prevailing Eastern Time)] on [December 7, 2009].

13.     **How do I vote for or against the Plan?**

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the holders of Claims entitled to vote on the Plan. If you are a holder of Claims in the following Classes, you may vote for or against the Plan by completing the ballot and returning it in the envelope provided:

    o   **Class 4 (Senior Notes Claims)**

    o   **Class 5 (Senior Subordinated Notes Claims)**

    o   **Class 6 (Discount Notes Claims)**

The Debtors, with the approval of the Bankruptcy Court, have engaged Epiq Bankruptcy Solutions, LLC; FDR Station, P.O. Box 5014; New York, NY 10150-5014, to serve as the voting agent and generally oversee the voting process (the "Voting and Claims Agent"). The Voting and Claims Agent will also process and tabulate ballots for each class entitled to vote to accept or reject the Plan.

---

**BALLOTS**

Ballots and Master Ballots must be actually received by the Voting Agent by the voting deadline of [5:00 p.m.] (prevailing Eastern Time) on [December 7], 2009 at the following address:

Muzak Holdings LLC Balloting Center
c/o Epiq Bankruptcy Solutions LLC
P.O. Box 5014
FDR Station
New York, NY 10150-5014

If service by courier or personal delivery, at:

Muzak Holdings LLC Balloting Center
c/o Epiq Bankruptcy Solutions LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

If you hold a Claim in Class 4, 5 or 6, please allow enough time when you return your ballot for your Nominee to cast your vote on a Master Ballot before the voting deadline.

If you have any questions on the procedure for voting on the Plan, please call the voting agent at the following telephone number:

**1-866-940-3607**

---

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be completed, signed and received by [5:00 p.m.] (prevailing Eastern Time), on [December 7], 2009.

Any ballot that is properly executed by the holder of a Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.

Each holder of a Claim may cast only one ballot per each Claim held. By signing and returning a ballot, each holder of a Claim in Classes 4, 5 and 6 will certify to the Bankruptcy Court and the Debtors that no other ballots with respect to such Claim and/or equity interest have been cast or, if any other ballots have been cast with respect to such class of Claims and/or equity interests, such earlier ballots are thereby superseded and revoked.

All ballots are accompanied by return envelopes. It is important to follow the specific instructions provided on each ballot.

14.     **Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

15.    **When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for [December 16], 2009 to take place at [●] (prevailing Eastern Time) before the Honorable Kevin J. Carey, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, 5th Floor, Courtroom #5, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

**Objections to confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than [December 7, 2009] at [12:00] (prevailing Eastern Time) (the "Objection Deadline") in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement. Unless objections to confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, which is attached to this Disclosure Statement as <u>Exhibit B</u>, they may not be considered by the Bankruptcy Court.**

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the *Wall Street Journal (South Atlantic Region)* and in certain regional newspapers and/or trade journals, including *The Enquirer Herald, Fort Mill Times, The Herald, The Charlotte Observer, Charlotte Business Journal, Billboard Magazine, R&R Magazine,* to provide notification to those persons who may not receive notice by mail.

16.    **What is the purpose of the Confirmation Hearing?**

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of the plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

17.    **What role does the Bankruptcy Court play after the Confirmation Hearing?**

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan. In addition, the Bankruptcy Court will have exclusive jurisdiction to ensure that distributions to holders of Claims are accomplished pursuant to the Plan.

18.    **What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code. As a result, the confirmation of the Plan means that the Debtors will not be liquidated or forced to go out of business. After the Plan is confirmed, the Debtors will continue to operate their business going forward using cash from operations and possibly cash proceeds of the Exit Facility.

19.    **Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

The Plan contemplates the issuance of 100% of the New Common Units of Reorganized Muzak (minus any equity distributed to the Reorganized Debtors' management pursuant to the Management and Director Incentive Program and any New Common Units issued to holders of Warrants) to Holders of Senior Subordinated Notes Claims. Reorganized Muzak will be controlled by such Holders.

**20.   Do the Debtors recommend voting in favor of the Plan?**

Yes.  In the opinion of the Debtors, the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which contemplates a significant deleveraging and conversion to equity of indebtedness necessary to operate Muzak's business, is in the best interest of all creditors and parties in interest.  Any other alternative, including a sale of substantially all of the Debtors' assets or liquidation under chapter 7 of the Bankruptcy Code, would not realize or recognize the value inherent under the Plan.  Thus, the Debtors recommend that Holders of Claims who are entitled to vote on the Plan vote to accept the Plan.

**III.**
**BACKGROUND TO THESE CHAPTER 11 CASES**

A.    **MUZAK'S CORPORATE HISTORY AND CAPITAL STRUCTURE**

Muzak has been the pioneer of business media services for over 70 years, and is presently a leading provider of business media services. Major General George Squier, a distinguished U.S. Army officer and inventor, founded the Debtors' indirect predecessor in 1934 when he developed a system for sending radio signals over power and telephone lines. Originally operating in a few territories in the United States, the business grew significantly through both licensing (franchising) activity and acquisitions over the years.

In September 1998, ABRY Partners, LLC ("ABRY"), a private equity investment firm focused on investments in media, communications, business and information services companies, formed ACN Holdings, LLC. On October 7, 1998, Audio Communications Network, LLC ("Audio LLC"), a wholly owned subsidiary of ACN Holdings, LLC and the predecessor to the Debtors, was formed by ABRY to, among other business purposes, acquire several independent licensee territories of the franchisor Muzak Limited Partnership ("Old Muzak"). In connection with the creation of Audio LLC, Audio LLC acquired eight independent licensee territories from Audio Communications Network, Inc., an independent licensee. Additionally, on January 15, 1999 and February 24, 1999, Audio LLC acquired two more independent licensees, Business Sound, Inc. and Electro Systems Corporation, respectively.

On March 18, 1999, Audio LLC merged with Old Muzak and changed its name to Muzak LLC. Similarly, ACN Holdings, LLC changed its name to Muzak Holdings LLC. On the same date, Muzak LLC acquired the assets of Capstar Broadcasting Corporation, an independent licensee. Between March 18, 1999 and December 31, 1999, Muzak LLC acquired assets and stock from twelve independent licensees.

Muzak LLC currently owns or licenses franchised territories throughout and beyond the United States, and holds direct or indirect ownership interests in thirteen domestic subsidiaries. One subsidiary, Muzak Heart & Soul Foundation, is a non-profit corporation founded in Washington and the only subsidiary of Muzak LLC that is not a debtor in these chapter 11 cases. Muzak Heart & Soul Foundation is a 501(c)(3) organization and has no customers. Additionally, the Muzak Heart & Soul Foundation is not a guarantor of Muzak LLC's Prepetition Credit Agreement or a guarantor under any of the Debtors' indebtedness.

Muzak LLC is the wholly owned subsidiary of Muzak Holdings LLC. Muzak Holdings LLC also directly owns Muzak Holdings Finance Corp.

As a result of the transactions described above, the Debtors' current organizational structure is as follows:



**B.      OVERVIEW OF MUZAK'S BUSINESS**

**1.      Muzak's Operations**

Muzak is a leading provider of business media services in the United States for companies seeking to promote their image, enhance their brand, and attract particular types of customers. Muzak retains a catalog of over 2.6 million songs, from which it creates a variety of music programming and produce targeted custom in-store and on-hold messaging. Muzak serves more than 250,000 business locations nationwide, including several large, brand name companies. In 2007 and 2008, the Debtors recorded revenue of approximately $250.2 million and $249.1 million, respectively. As of the Petition Date, the Debtors reported approximately $324.2 million in total assets and approximately $465.3 million in total current liabilities.

(a)      Products

Muzak's two core products are:

- Audio Architecture: Muzak's staff of audio architects creates business music programming, which involves the strategic assembly of a playlist of songs (which are pre-screened for lyrical content and offensive themes) to match a client's image and influence their customers' mood. In addition, the audio architects can create programming so as to result in an increase in tempo in a certain store location as the day progresses. The audio architects produce programming for the Debtor's core music playlists in various genres, including classic rock, jazz, urban, and country. Audio architects also create customized music programs for certain larger, national clients. The audio architects use propriety computer software to access Muzak's extensive media library and develop high quality programming.

5

- Voice: Voice products are customized music and marketing messages for telephone on-hold time and in-store messaging. Muzak's staff creates customized music and messages that allow clients' telephone systems to deliver targeted music and messaging during their customers' time on hold. Additionally, they also provide customized in-store messages that allow clients to deliver targeted music and messaging to support their in-store point of sale merchandising.

In connection with the sale of Audio Architecture and Voice products, Muzak also sells or provides audio equipment, such as sound systems and music receiving or playback equipment to their clients. Additionally, Muzak sells, installs and maintains non-music related equipment, such as restaurant drive-thru systems, and television, intercom and paging systems for business music and other clients. As part of its sales of drive-thru systems, Muzak offers maintenance and repair of intercom systems, headsets and radio transmitters.

In addition, Muzak installs and provides subscription television programming packages to commercial clients through DISH Network Corporation (f/k/a Echostar Satellite Corporation) ("DISH Network"). Muzak also furnishes approximately 50 channels of music programming to commercial and residential subscribers through DISH Network. Pursuant to Muzak's contracts with DISH Network, DISH Network will not provide programming via direct broadcast frequencies to certain of Muzak's competitors and Muzak will not enter into agreements for the delivery of services via direct broadcast frequencies with any competitor of DISH Network. These restrictions, however, do not prohibit DISH from distributing Sirius XM Radio, Inc. programming, which DISH Network has been distributing since 2004.

Muzak is are also developing and offering digital signage technology to its clients. Digital signage uses electronic displays to convey information, entertainment and advertisements to customers in a wide variety of indoor and outdoor settings.

(b)     Product Distribution Systems

Muzak transmits its Audio Architecture and Voice products using various media, including direct broadcast satellite transmission, local broadcast transmission, and recorded media consisting of videotapes, compact discs, and hard drives. Transmissions to clients via direct broadcast satellite are primarily from transponders leased from Microspace Communications Corporation and DISH Network. In 2008, Muzak served its music client locations through direct broadcast satellite transmission (82%), recorded media consisting of tapes, compact discs and hard drives (16%) and through local broadcast transmissions (2%).

(c)     Employees

Headquartered in Fort Mill, South Carolina, Muzak employs 1,164 employees as of July 20, 2009, of whom approximately 1,141 are full-time employees and 23 are part-time, hourly employees. Muzak's employees include a team of approximately 113 installation and services technicians. These personnel belong to 14 bargaining units, 13 of which are represented by the International Brotherhood of Electrical Workers and one of which is represented by the Communication Workers of America. Muzak also receives services from temporary employees who are employed through a temporary employment agency and a contractor.

(d)     Music Licensing Payments

As part of its business media operations, Muzak pays performance royalties to songwriters and publishers through contracts negotiated with performing rights societies such as the American Society of Composers, Authors and Publishers ("ASCAP"), Broadcast Music, Inc. ("BMI"), and SESAC. Muzak also licenses rights to re-record and distribute music from a variety of sources such as record companies and publishers when Muzak's services are provided via recorded media.

(e)     Government Regulations

Muzak provides music services in a few areas in the United States through 928 to 960 megahertz frequencies, as well as subcarrier transmissions via FM radio channels, licensed by the Federal Communications

6

Commission ("FCC"). Additionally, the FCC licenses the frequencies used by satellites on which Muzak transmits direct broadcast satellite services in the United States.

### 2. The Debtors' Nationwide Franchise Network

Muzak operates a nationwide network of independent affiliates (hereinafter, the "Licensees"). Specifically, Muzak has license agreements with approximately 56 Licensees that operate in approximately 115 business locations (the "License Agreements"). Pursuant to these License Agreements, the Licensees provide services to the Debtors' customers and to the Licensees' own customers using the Debtors' proprietary trademarks, and generate sales of the Debtors' products and services in their respective defined territories. The Licensees are critical to the Debtors' business because they have a unique knowledge of the Debtors' business and are not easily replaceable.

#### (a)   National Clients

Muzak considers a client to be a "national client" if it has at least 50 business locations that use Muzak products spanning across at least four of Muzak's defined sales territories. The Licensee Agreements between Muzak and the Licensees provide that before entering into an agreement with a new national client, Muzak must first present the national client and the proposed terms of the agreement to a national sales committee (the "National Sales Committee") comprised of representatives appointed by the International Planned Music Association (the "IPMA") and the Debtors. The National Sales Committee votes on whether to accept or reject a new national client, as well as whether to accept or reject the proposed terms of the agreement with the new national client.

National clients include major retail and restaurant chains. To simplify the billing process and make it more convenient for their clients, as well as the Licensees, Muzak utilizes centralized billing for national clients. Specifically, and as opposed to sending payments to each regional Licensee or Muzak location in which a national customer conducts business, national customers consolidate their payments for various locations throughout the country and make one payment to Muzak LLC.

As part of this centralized billing system, all of the Debtors' and Licensees' national customers send their payments to a Muzak LLC cash deposit account (the "National Deposit Account"). Following receipt of payments from national customers and on a (bi)monthly basis, the Debtors issue checks from the National Deposit Account to the Licensees on account of (a) recurring monthly music service charges, applicable to national client locations situated in the Licensee's sales territories (the "Recurring Monthly Charges") and (b) non-recurring charges related to service, upgrades and installation (the "One-Time Charges," and together with the Recurring Monthly Charges, the "Licensee Charges").

Pursuant to Multi-Territory Account Service Agreements (the "Multi-Territory Agreements") entered into by the national clients and Muzak, Muzak acts as "agent" for the Licensees in the collection of the Licensee Charges. Before remitting the Recurring Monthly Charges to the Licensees, Muzak deducts a series of charges as set forth in the License Agreement between Muzak and the applicable Licensee. These deductions include: (i) services fees (e.g., a central billing fee, which is intended to compensate Muzak for the centralized billing service they provide to the Licensees and national customers); (ii) fees for the production and delivery of custom music or voice messages, (iii) amounts that Muzak was unable to collect from clients or refunded to clients but on account of which the Licensees had already been reimbursed; (iv) sales and similar taxes; and (v) such other deductions as agreed to by the Licensees (collectively, the "Deductions").

#### (b)   Local Clients

In addition to the national clients, the Licensees also provide services to local clients, which are generally considered clients whose business locations cover a smaller geographic area than national clients and/or who have fewer than 50 business locations that utilize Muzak's music products. Some of the local clients do business solely with the Licensees and have no direct relationship with Muzak; other local clients do business solely with Muzak through their regional offices and have no relationship with the Licensees. Some of the local clients, however, do business with both Muzak and one or more Licensees (a "Cross-Territory Client"). Much like the national clients,

the Debtors offer the Cross-Territory Clients centralized billing, whereby the clients remit a single monthly payment to the Debtors for services rendered by both Muzak and the Licensees.

The Cross-Territory Clients and Muzak enter into Cross-Territory Account Service Agreements (the "Cross-Territory Agreements") pursuant to which Muzak acts as "agent" for the Licensees in the collection of the Licensee Charges from the local clients. Except for the centralized bill fee, which is held by the Debtors in a Muzak LLC local deposit account (which is separate and distinct from the National Deposit Account) (the "Local Deposit Account") and swept into the Debtors' main concentration account on a monthly basis, the funds received in the Local Deposit Account from the Cross-Territory Clients are held by the Debtors on behalf of the Licensees. The Cross-Territory Clients remit their payments to the Local Deposit Account. Following applicable Deductions, Muzak issues checks from their accounts payable account to the Licensees for all Licensee Charges due and owing to the Licensees.

(c)    Subcontract Services

In addition to the services provided to national clients and Cross-Territory Clients, the Licensees also provide installation, service, maintenance, conversions and upgrade support to Muzak's clients that are located in the respective Licensee's defined geographic territory but are not within the Licensee's book of clients (the "Subcontract Services"). The Licensees perform the Subcontract Services on a one-off, order-by-order basis and send Muzak an invoice upon completion. As such, certain Licensees held prepetition claims on account of the Subcontract Services.

3.    **Muzak's Customers and Competition**

Muzak sells its products to a wide variety of businesses, including restaurants, health and fitness centers, department stores, specialty retailers, hotels, supermarkets, business offices, convenience stores, financial institutions, drug stores, manufacturing facilities, medical centers and many other businesses. Muzak has a strong and diverse client base, consisting of over 70% "local" accounts. An account is considered local if the client has fewer than 50 locations, although most of Muzak's local accounts consist of clients with fewer than ten locations. In 2008, Muzak's top twenty clients represented approximately 21% of Muzak's revenues with no single client accounting for more than 4% of revenues. Muzak's clients typically enter into non-cancelable five-year contracts that renew automatically for five-year terms unless specifically terminated at the initial contract expiration date.

Muzak's national competitors include, but are not limited to, PlayNetworks, In-Store Broadcasting Network, Trusonic, DMX, Inc. ("DMX"), Premier Retail Networks, Sirius XM Radio, Inc. and the Private Label Radio Division of DMI Music and Media Solutions. In addition to direct competition, Muzak competes with radio broadcasters that provide workplace listening, video services that provide music videos or television programming, and performing rights organizations that license businesses to play CDs, MP3s and satellite radio, among others. Muzak also encounters local competition from music consultants who use technologies such as MP3 players and playlist management software. Muzak provides clients with full service, including delivery, installation, and 24/7 emergency service for questions and product maintenance.

C.    **THE DEBTORS' PREPETITION INDEBTEDNESS**

Before the Petition Date, the Debtors had outstanding aggregate long term indebtedness of approximately $462.3 million, consisting primarily of approximately $101.3 million of borrowings under the Prepetition Credit Agreement, $220.0 million in Senior Notes, $115.0 million in Senior Subordinated Notes and $24.245 million in Discount Notes. (Each of the foregoing amounts do not include interest accrued and outstanding as of the Petition Date.) Approximately $436.6 million of the Debtors' long term funded debt was scheduled to mature in the first quarter of 2009, a fact that contributed heavily to the Debtors' decision to file the Chapter 11 Cases. For a further discussion of the Debtors' prepetition indebtedness and its role in the filing of these Chapter 11 Cases, *see* Article III.E of this Disclosure Statement.

### 1.    The Prepetition Credit Agreement

On April 15, 2005, Muzak LLC, as borrower, and Muzak Holdings LLC, as parent guarantor, entered into the Prepetition Credit Agreement with Bear Stearns & Co. as sole lead arranger and sole bookrunner, and Bear Stearns Corporate Lending Inc. as administrative and collateral agent (the "Original Agent") and the Prepetition Lenders. As part of the Prepetition Credit Agreement, the Prepetition Lenders agreed, subject to the terms and conditions set forth in the Prepetition Credit Agreement, to make certain loans to Muzak LLC, including a $105.0 million senior secured term loan facility (the "Prepetition Facility").[3] The obligations of Muzak LLC under the Prepetition Credit Facility are guaranteed by Muzak Holdings LLC and substantially all of Muzak LLC's direct and indirect subsidiaries, with the exception of Electro-Systems Corporation and Muzak Heart & Soul Foundation, which is a nonprofit organization pursuant to 26 U.S.C. § 501(c)(3).

The obligations under the Prepetition Facility are secured by a first priority security interest in substantially all of Muzak LLC's assets and the capital stock of Muzak LLC's subsidiaries (except for Electro-Systems Corporation and the Muzak Heart & Soul Foundation). As of the Petition Date, approximately $101,325,000 remained outstanding under the Prepetition Facility (this amount, in addition to any applicable fees and expenses as required by the Prepetition Facility, the "Prepetition Obligations").

The Prepetition Facility provides for quarterly installment payments of 0.25% of the original outstanding balance of $105.0 million, beginning in September 2005 until the final maturity date. Before being amended on March 16, 2007, indebtedness under the term loan bore interest at a per annum rate equal to Muzak LLC's choice of (i) base rate (which is the highest of prime rate and the Federal Funds Rate plus .5%) plus a margin of 3.75% or (ii) LIBOR of one, two or three months, as selected by Muzak LLC, plus a margin of 4.75%.

On March 16, 2007, Muzak LLC amended the Prepetition Facility to extend the maturity date from April 15, 2008 to January 19, 2009 and reduce the applicable margin by 1.0%. The amendment also included a provision for a prepayment penalty of 1.0% if certain events occur before the one year anniversary of the amendment.

On January 18, 2009, Muzak LLC, Muzak Holdings LLC, the Prepetition Agent and the Prepetition Lenders amended the Prepetition Facility for a second time to further extend the maturity date to February 10, 2009. As part of this second amendment, Muzak and the Prepetition Lenders agreed to, among other things, the following: (a) the Eurodollar interest rate was increased from 3.75% to 5.75%, and the base rate was increased from 2.75% to 4.75%, with the increased portions of interest to be paid in kind ("PIK Interest"); *provided, however*, that PIK Interest would be waived if the Prepetition Obligations were satisfied before July 31, 2009; (b) the Prepetition Lenders waived the right to collect interest at the default rate; (c) the parties agreed to Muzak's use of the Prepetition Lenders' cash collateral to the extent a chapter 11 case was commenced (described in more detail in Article IV.A.3); and (d) the Debtors agreed to prepay additional interest in an amount equal to 0.75% of the outstanding principal amount as of January 19, 2009.

As of the Petition Date, the Debtors were current on their scheduled quarterly payments and prepayments under the Prepetition Facility.

### 2.    The Senior Notes

On May 20, 2003, Muzak LLC and Muzak Finance Corp. issued $220 million in principal amount of 10% senior notes due February 15, 2009, pursuant to the Senior Notes Indenture (the "Senior Notes"). Muzak LLC and Muzak Finance Corp. agreed to pay interest semi-annually on May 15th and November 15th of each year (commencing on November 15, 2003) at a rate of 10% per year. The Senior Notes were scheduled to mature on February 15, 2009.

---

[3]    On November 12, 2008, the Original Agent resigned as administrative and collateral agent and JPMorgan Chase Bank was appointed successor. Before the Petition Date, The Bank of New York Mellon (the "Prepetition Administrative Agent") was appointed successor administrative and collateral agent under the Prepetition Credit Facility.

The Senior Notes are general unsecured obligations of Muzak LLC and Muzak Finance Corp. and are subordinate in right of payment to all existing and future secured debt, but senior to the Senior Subordinated Notes and the Discount Notes. The Senior Notes are guaranteed by all of the other Debtors, except Muzak Holdings Finance Corp. and Electro Systems Corporation.

### 3.    The Senior Subordinated Notes

On March 18, 1999, Muzak LLC (then Audio LLC) and Muzak Finance Corp. issued $115.0 million in principal amount of 9 $^7/_8$% senior subordinated notes due March 15, 2009, pursuant to the Senior Subordinated Notes Indenture (the "Senior Subordinated Notes"). Muzak LLC and Muzak Finance Corp. agreed to pay interest semi-annually on March 15th and September 15th of each year, commencing on September 15, 1999, at a rate of 9 $^7/_8$% per year. The Senior Subordinated Notes were scheduled to mature on March 15, 2009.

The Senior Subordinated Notes are general unsecured obligations of Muzak LLC and Muzak Finance Corp. and are subordinated in right of payment to all existing and future senior indebtedness of Muzak LLC and Muzak Finance Corp., including the Senior Notes. The Senior Subordinated Notes are not subordinate to trade payables or other general unsecured claims. The Senior Subordinated Notes are guaranteed by all of the other Debtors, except Muzak Holdings Finance Corp. and Electro-Systems Corporation.

### 4.    The Discount Notes

On March 18, 1999, Muzak Holdings LLC and Muzak Holdings Finance Corp. issued 13% senior discount notes due March 15, 2010, pursuant to the Senior Discount Notes Indenture (the "Discount Notes"), of which $24.245 million in principal amount was outstanding as of the Petition Date. Interest payments are payable semi-annually on March 15th and September 15th of each year to holders of record of the Discount Notes at the close of business on the immediately preceding March 1 and September 1. The Discount Notes were scheduled to mature on March 15, 2010.

The Discount Notes are general unsecured obligations of Muzak Holdings LLC and Muzak Holdings Finance Corp. and are subordinated in right of payment to all existing and future secured debt, the Senior Notes and the Senior Subordinated Notes.

Since Muzak Holdings LLC does not have any operations or assets other than ownership of Muzak LLC and Muzak Holdings Finance Corp., Muzak Holdings LLC is dependent upon distributions from Muzak LLC to pay interest under the Discount Notes. The Prepetition Facility, the Senior Notes and the Senior Subordinated Notes impose restrictions on Muzak LLC's ability to make distributions to Muzak Holdings LLC; however, these instruments permit Muzak LLC to make payments and distributions to Muzak Holdings LLC in an amount sufficient for Muzak Holdings LLC to make cash interest payments when due, subject, in the case of the Prepetition Facility, to the satisfaction by Muzak LLC of certain financial covenant levels.

### 5.    Promissory Notes

On February 24, 1999, Muzak LLC (then Audio LLC) assumed approximately $2.4 million in principal amount of promissory notes (the "Promissory Notes") in connection with the acquisition of Electro Systems Corporation by Audio LLC, pursuant to that certain Stock Purchase Agreement entered into on February 18, 1999 between Audio LLC, as buyer, and Carolina Georgia Sound, Inc., as seller. The Promissory Notes assumed are payable to six individuals (Bronwen Dukate, Laurence Dukate, Daphne Dukate, Daphne Clark, Adrian L.D. Cameron and Alyssa Davis (the "Individual Shareholders")), each bearing interest at 9.887% (except for the Promissory Note payable to Laurence Dukate, which bears interest at 8.0%). Interest and principal payments are required in equal monthly installments for 125 months beginning on the first payment date of June 10, 1996. Following that 125 month period, the interest rate increases to 10% per annum, to be paid in equal monthly installments for a period of 115 consecutive months until payment is made in full.

The Promissory Notes are secured by a grant to the Individual Shareholders of a first priority lien upon all of Electro Systems Corporation's personal property, including accounts receivable, general intangibles, inventory, equipment and contract rights and the products and proceeds thereof.

### 6.     Preferred Stock

Muzak Holdings LLC's Fourth Amended and Restated LLC Agreement authorized the issuance of Series A Preferred Units, other Preferred Units, Class A Units, Class A-1 Units, Class A-2 Units, Class B-1 Units, Class B-2 Units, Class B-3 Units, Class B-4 Units and Class B-5 Units. As of the Petition Date, approximately 85,000 Series A Preferred Units and approximately 145,000 common units remained outstanding. The Debtors do not trade any of their securities on an established trading market.

## D.     THE DEBTOR'S MANAGEMENT

### 1.     The Debtors' Board of Directors

Each of Muzak Holdings LLC, Muzak LLC, Muzak Holdings Finance Corporation and Muzak Finance Corporation have a five-member board of directors, consisting of two appointees of ABRY (which holds common shares), two appointees of Banc of America Capital Investors, L.P. (which holds preferred shares) and the Chief Executive Officer.

### 2.     The Debtors' Principal Officers

The Debtors' management team is comprised of the following individuals:

<u>Stephen P. Villa</u>. Mr. Villa has been Muzak's Chief Executive Officer since July 2006 and a director since October 2001. Before July 2006, he served as Muzak's Chief Operating Officer since October 2001, and had been Muzak LLC's Chief Financial Officer since September 2000. He has also served as Muzak LLC's Treasurer since September 2005. He served as the Chief Financial Officer and Treasurer of Frisby Technologies, Inc., from April 1998 to September 2000. From January 1997 to March 1998, Mr. Villa was the controller of Harman Consumer Group, an operating company of Harman International, Inc., which sells consumer electronic products. Mr. Villa also held numerous positions with Price Waterhouse LLP in their New York and Paris offices.

<u>Dodd Haynes</u>. Mr. Haynes has served as Muzak's Chief Financial Officer since December 2006. He served as Vice President of Internal Audit and Loss Prevention at Family Dollar Stores, a NYSE listed retailer, from December 2004 to December 2006. Before Family Dollar, Mr. Haynes also served in various executive and managerial positions within Goodrich Corporation of Charlotte. From January 2003 to July 2004 he was the Vice President of Finance and Controller for the Customer Service Division, Director of Business Development (Mergers and Acquisitions) from December 2000 to December 2002 and Director of Accounting, Engineered Industrial Products Segment from July 1999 to December 2000. Mr. Haynes also held numerous positions with Price Waterhouse LLP.

<u>Thomas J. Gantert</u>. Mr. Gantert has been Muzak LLC's Chief Operating Officer since July 2006. He previously served as the Senior Vice President of Operations from October 2004 to July 2006 and served as Muzak LLC's Vice President of Field Operations from May 2004 to October 2004. From October 2002 to May 2004, he served as the regional general manager of Muzak LLC's Denver, Dallas, Houston, Kansas City, and Omaha offices. From March 1999 to October 2002, Mr. Gantert served as the Regional Vice President of Muzak LLC's California, Portland, Seattle, Denver, Phoenix, Salt Lake City and Boise offices. From December 1986 to March 1999, he held various positions at Old Muzak.

<u>Frank Messana</u>. Mr. Messana accepted the position of Muzak LLC's General Counsel, Vice President and Secretary effective September 2009. From January 2006 to August 2009, Mr. Messana served as Muzak LLC's Vice President, Client & Team Member Services and from July 2000 to December 5005, he served as the Vice President of Team Member Services. Before joining Muzak LLC, Mr. Messana spent over 20 years in the automotive and aerospace industries on a national and international basis in a variety of executive and managerial

positions, including serving as the General Counsel and Vice President of Human Relations for a multinational company in the automotive industry.

## E.    EVENTS LEADING TO THE CHAPTER 11 FILING

From an operational standpoint, the filing of the Chapter 11 Cases was largely unnecessary. Although the global economic crisis caused a reduction in business spending and overall demand for business media products, Muzak continued to generate positive cash flow from operations in 2008. The Chapter 11 Cases, however, were the result of significant legacy indebtedness and the maturity of nearly all of Muzak's funded indebtedness in the first quarter of 2009, which happened to coincide with a nearly unprecedented economic recession and saw access to credit for many businesses essentially disappear.

### 1.    Acquisition Financing Left the Debtors Over-Leveraged

The Debtors' capital structure was formed in connection with the merger of Audio LLC and Old Muzak and the creation of Muzak LLC. The proceeds from the issuance of the Senior Subordinated Notes and the Discount Notes were used primarily to (i) finance the merger consideration and repurchase or repay outstanding indebtedness of Old Muzak and certain of its affiliates, (ii) pay consideration for acquisitions of franchises, and (iii) to pay related fees and expenses. The proceeds from the issuance of the Senior Notes were used primarily to (i) repay existing outstanding term and revolving loans and associated interest under the then existing senior credit facility, (ii) pay related fees and expenses, and (iii) to repurchase outstanding indebtedness of Muzak. This accumulation of acquisition financing coupled with the Debtors' borrowing under the then exiting senior credit facility left the Debtors with a significant amount of indebtedness.

A portion of the proceeds from borrowings under the Prepetition Credit Agreement was used to repay the then existing outstanding term and revolving loans and associated interest and to collateralize outstanding letters of credit under the then existing senior credit facility, and to pay related fees and expenses. The then existing senior credit facility was subsequently terminated.

Though the Debtors repaid the existing senior credit facility with a portion of the borrowings made under the Prepetition Credit Agreement, this additional debt increased pressure on the Debtors' already highly-leveraged balance sheet, leaving them increasingly vulnerable to adverse market conditions and the unanticipated consequences of any unsuccessful mergers or combinations.

### 2.    Proposed Merger Transaction with DMX.

Before the Petition Date, the Debtors explored several restructuring alternatives, including a potential merger involving Muzak's competitor, DMX, and subsequent sale to a third party. The Debtors planned to address the impending maturities of their funded debt as part of their proposed consolidation or combination with DMX.

On April 12, 2007, Muzak announced that it was exploring a potential merger or combination with DMX, contingent on a sale of the combined entity to a third-party buyer following clearance by federal regulators. The parties submitted a request to the Department of Justice ("DOJ") for antitrust clearance under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended. On April 7, 2008, the DOJ authorized the merger.

With the antitrust review complete and preliminary interest high, Muzak, together with its financial advisor Moelis & Company LLC, began contacting interested parties in June 2008 and coordinating a formal solicitation process for the combined Muzak/DMX entity. Muzak provided various parties with a confidential information memorandum and access to an electronic dataroom that included confidential financial and operations information concerning Muzak and DMX.

In August and September of 2008, Muzak met with several interested parties to discuss the merged entity and sale, answer specific questions relating to financial and operational performance and provided access to additional confidential financial and operational information. During this time, Muzak and DMX operated

12

independently and continued to compete and to provide their respective products and services to current customers and clients.

Following the diligence period, several bids emerged for the combined Muzak/DMX entity. As the Debtors and their advisors moved forward with the sale process, however, the downturn in the U.S. credit markets and the global economy worsened. As a result, the proposals for the combined Muzak/DMX entity either disappeared entirely or were drastically reduced. Despite the fact that Muzak and DMX pursued a sale for over two years, and the ultimate sale could have resulted in the extinguishment and/or refinancing of Muzak's outstanding indebtedness, with various debt maturities approaching, the pursuit of the sale no longer made business sense for Muzak or its stakeholders. Thus, Muzak abandoned its proposed merger efforts and turned its attention to the upcoming indebtedness maturities.

### 3.    Maturity of the Debtors' Indebtedness

Approximately $436.6 million of the Debtors' long term debt was scheduled to mature in the first quarter of 2009. As previously stated, the Debtors planned to address these impending maturities as part of the proposed consolidation or combination with DMX. It became evident that pursuing the DMX transaction was not a prudent option at that time, however, because of the overall global economic condition and loss of value in proposed offers. Thus, beginning in late 2008 and into January 2009, the Debtors shifted their focus to the approaching maturities of their funded debt.

As stated above, the second amendment to the Prepetition Facility extended the maturity date through February 10, 2009. The Debtors used this period of time to attempt to jumpstart discussions regarding a consensual restructuring of their financial obligations.

Although the Debtors and their advisors engaged in extensive discussions with their Prepetition Lenders and holders of the Senior Notes and the Senior Subordinated Notes about the possibility of extending scheduled debt maturities, the Debtors were unable to reach an agreement that would avoid a default under their indebtedness obligations. Unable to garner support from their debt holders for a maturity extension to outlast the economic downturn and potentially realize the merger and sale of the combined Muzak/DMX entity when the credit markets revitalized, the Debtors were left with no choice but to pursue a restructuring through chapter 11.

**IV.**
**EVENTS DURING THE CHAPTER 11 CASES**

**A.    FIRST DAY MOTIONS AND OTHER RELIEF**

On February 10, 2009, in the face of the maturity of the Prepetition Credit Agreement, each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. Well in advance of and immediately following the Petition Date, the Debtors devoted substantial efforts to stabilizing their operations and preserving and restoring their relationships with, among others, vendors, customers, employees and utility providers that the Debtors believed could be impacted by the commencement of these Chapter 11 Cases. As a result of these initial efforts, and through a well designed communications plan and package of "first-day" relief as part of the Chapter 11 Cases, the Debtors were able to minimize, as much as practicable, the negative impacts resulting from the commencement of these Chapter 11 Cases.

On the Petition Date, the Debtors filed a number of motions (collectively referred to herein as the "First Day Motions") with the Bankruptcy Court. At a hearing on February 12, 2009, the Bankruptcy Court entered several orders to, among other things: (i) prevent interruptions to the Debtors' business; (ii) ease the strain on the Debtors' relationships with certain essential constituents, including employees, vendors, customers and utility providers; (iii) provide access to much needed working capital; and (iv) allow the Debtors to retain certain advisors to assist them with the administration of the Chapter 11 Cases (each, a "First Day Order").

Further, to facilitate a smooth and efficient administration of these Chapter 11 Cases, the Bankruptcy Court entered certain "procedural" First Day Orders, including an order directing the joint administration of the Debtors' Chapter 11 Cases.

**The summaries of the motions and orders described throughout this Disclosure Statement are not a substitute for a complete understanding of the underlying motions, applications or the resulting orders. You are urged to review the full text of all motions and orders, which are available for your review by visiting http://chapter11.epiqsystems.com/muzak.**

**1.    Stabilizing Operations**

Recognizing that any interruption of the Debtors' business, even for a brief period of time, would negatively impact their operations, customer relationships, revenue and profits, the Debtors filed a number of First Day Motions to help facilitate a stabilization of their business operations and effectuate, as much as possible, a smooth transition into operations as debtors in possession. Specifically, in addition to certain orders discussed in greater detail below, the Debtors sought and obtained First Day Orders authorizing the Debtors to:

- maintain and administer customer programs and honor their obligations arising under or relating to those customer programs, including promotional offers, refunds, and equipment maintenance, warranty and trade-in programs;

- pay prepetition wages, salaries, commissions, bonuses and other compensation, reimbursable employee expenses and employee medical and similar benefits, and continue employee compensation and benefits programs;

- determine adequate assurance for future utility service and establish procedures for utility providers to object to the proposed assurance;[4]

---

[4]    On February 12, 2009, the Bankruptcy Court entered an interim order determining adequate assurance of payment for future utility services, which was made final on March 12, 2009.

- continue insurance coverage and enter into new insurance policies, if necessary, and continue existing premium financing agreements and enter into new premium financing agreements, if necessary;

- maintain their existing Cash management systems, bank accounts and other business forms; and

- remit and pay certain taxes and fees.

## 2.    Critical Trade Relief

To prevent the imposition of the automatic stay from disrupting their business and to ensure continued deliveries on favorable credit terms, the Debtors sought and obtained Bankruptcy Court approval to pay a portion of the prepetition claims of certain vendors, licensors, lien claimants and third-party service providers (the "Critical Vendors") whom the Debtors believed were essential to the ongoing operation of their business.  The Debtors were able to condition payments of these prepetition claims on the execution by the recipient vendor or service provider of a trade agreement, which, among other things, included certain provisions to ensure that the Debtors would receive customary trade terms throughout the pendency of these Chapter 11 Cases (and which would not be the case if the Debtors had been forced to wait until Plan Confirmation to make such payments).  On February 12, 2009, the Bankruptcy Court entered an interim order authorizing payment of prepetition claims to Critical Vendors in an amount not to exceed $850,000.  On March 12, 2009, the Bankruptcy Court entered a final order authorizing payment of prepetition claims to Critical Vendors in an amount not to exceed $1.7 million (the "Critical Vendor Order").

### (a)    The Critical Vendors

The Critical Vendors are generally sole source vendors that supply, among other things, computer hardware and software, such as satellite receivers, speakers and voice equipment that are used in the Debtors' products and are only available from the identified supplier.  The Debtors also designated as Critical Vendors music licensors (the "Licensors"), who grant the Debtors various music licenses that are required in order for the Debtors to create and deliver their music products, and certain lien claimants that are essential to the Debtors' day-to-day operations and that may have liens on assets of the Debtors or of the Debtors' clients under applicable non-bankruptcy law.  To that end, the Debtors identified the following three categories of Critical Vendors with prepetition claims for potential payment:

- approximately 12 Sole Source Vendors who are critical to the Debtors' business operations;

- approximately 12 Licensors; and

- contractors, maintenance providers, shippers and warehousemen who may be entitled to assert various lien claims under applicable non-bankruptcy laws in the event of non-payment by the Debtors (the "Lien Claimants").

### (b)    Licensees

In addition to the foregoing Critical Vendors, the Critical Vendor Order also granted the Debtors express authority to honor any and all prepetition payments due and owing to their Licensees.  As discussed in Article III.B.2, the Licensees provide services to the Debtors' customers and to the Licensees' own customers using the Debtors' proprietary trademarks, and generate sales of the Debtors' products and services in their respective defined territories.  The Critical Vendor Order enabled the Debtors to preserve their ordinary course relationship with the Licensees by permitting the Debtors to honor all payments, both pre- and postpetition, due and owing to the Licensees.

The Debtors believe that, following applicable Deductions (defined in Article III.B.2), the Debtors hold the cash in the National Deposit Account and Local Deposit Account in trust for the Licensees, and that these funds are not property of the Debtors' estates.  Moreover, the Prepetition Lenders have acknowledged this as part of Amendment No. 2 to the Senior Secured Credit Agreement, dated as of January 18, 2009.  As of the Petition Date,

the Debtors owed the Licensees approximately $2.3 million.  The Critical Vendor Order permitted the Debtors to honor this amount to the Licensees. .

Since obtaining Bankruptcy Court approval to pay the Licensees, Muzak has undertaken discussions with the IPMA, the Licensees' representative body, about the terms and conditions of a new franchise agreement that will govern the fee structure between Muzak and the Licensees.  Muzak believes that the continuation of Muzak's franchise system is important to its future success, and toward that end, Muzak recommends the assumption of the Licensee's current agreements.  Such assumption is an expression of confidence by Muzak in the progress and general tenor of the current negotiations and discussions between Muzak, the Licensees, and the IPMA on the terms and conditions that will govern their go-forward relationship upon expiration of the current agreements.  Both the Licensees and Muzak are focused on insuring that their future relationship recognizes the need for efficiency, responsiveness and flexibility in order to best serve existing and future clients of the franchise system.  While negotiations are on-going and Muzak cannot assure the ultimate outcome of such negotiations, the IPMA's recognition of both Muzak's goals and the realities of the current marketplace suggest that these negotiations will continue to be fruitful.

The Debtors continue to make efforts to maintain its longstanding relationship with its Licensees.  Most recently, on April 22, 2009, Muzak held a "national sales meeting" at its Fort Mill headquarters and many key Licensees, including those instrumental in the IPMA leadership, were in attendance.  The Debtors continue to provide Mr. Hood, their consultant, with the information necessary for him to complete his review of the fee structure so that they can advance and conclude discussions with the Licensees and the IPMA.

### 3.    Use of Cash Collateral

A critical goal of the Debtors' business stabilization efforts was to ensure the Debtors maintained sufficient liquidity to operate their business during the pendency of these Chapter 11 Cases.  Since the Debtors had cash on hand of approximately $22.4 million before the filing of the chapter 11 petitions, the Debtors did not believe postpetition financing was necessary.  The Prepetition Lenders, however, had a security interest in the Debtors' cash accounts, and therefore substantially all of the Debtors' cash on hand was considered "cash collateral" under section 363 of the Bankruptcy Code and, therefore, required the Prepetition Lenders' consent or an order of the Bankruptcy Court for continued use.

In connection with their prepetition discussions of a possible consensual restructuring of the Debtors' funded debt, the Debtors and the Prepetition Lenders agreed on the terms of the use of the Debtors' cash collateral during the Chapter 11 Cases.  At the interim hearing held on February 12, 2009, the Bankruptcy Court approved a consensual interim order for the use of cash collateral and related adequate protection provisions for the benefit of the Prepetition Lenders [Docket No. 31] (the "Interim Order").  The terms of the Interim Order included, without limitation, (i) priority adequate protection liens and superpriority Allowed Administrative Claims, (ii) current Cash payments of interest accruing under the Prepetition Credit Agreement at the non-default rate and (iii) payment of the fees, costs and expenses of the Prepetition Administrative Agent and certain of the Prepetition Lenders, such as attorneys' fees and financial advisor fees.

The Interim Order also included the following "milestones": (a) obtain a final order authorizing the use of cash collateral on or before 40 days after the Petition Date; (b) file a plan and disclosure statement, the form and substance of which are acceptable to the Prepetition Agent and certain of the Prepetition Lenders, on or before May 5, 2009; (c) obtain an order approving a disclosure statement, the form of which order and the form and substance of which disclosure statement shall be acceptable to the Prepetition Agent and certain of the Prepetition Lenders, on or before June 15, 2009; and (d) obtain a final order confirming a plan, the form and substance of which order and plan shall be acceptable to the Prepetition Agent and certain of the Prepetition Lenders, on or before August 9, 2009 (the "Milestones").

Following entry of the Interim Order and appointment of the Committee, the Debtors, Prepetition Lenders and the Committee engaged in a discussion and negotiation concerning the terms of the proposed final order authorizing the Debtors' use of cash collateral.  These discussions were fruitful and, after incorporating comments from the Committee, the parties were able to achieve a consensual order authorizing use of cash collateral on a final basis, which was approved by the Bankruptcy Court on March 12, 2009 [Docket No. 133] (the "Final Cash

Collateral Order"). Among other things, the Final Cash Collateral Order granted the Committee the right, upon written notice, to extend the Milestones as follows: (a) file a plan and disclosure statement on or before June 9, 2009; (b) obtain an order approving a disclosure statement on or before July 20, 2009; and (c) obtain a final order confirming a plan on or before September 14, 2009 (the "Amended Milestones"). On April 20, 2009, the Committee notified the Debtors and the Prepetition Lenders in writing of the extension of the Milestones.

The Final Cash Collateral Order also requires the Debtors to use commercially reasonable efforts to find the necessary capital on reasonable terms, through exit financing or otherwise, to pay the prepetition claims of the Prepetition Lenders in full in cash on the effective date of any plan. *See* Final Cash Collateral Order, ¶ 11(e).

Following entry of the Final Cash Collateral Order, the Debtors pursued discussions with their case constituencies in an effort to effectuate a restructuring of their outstanding indebtedness. With the first of the Amended Milestones approaching, the Debtors approached the Prepetition Lenders to request additional time to negotiate the terms of their chapter 11 reorganization and to continue their efforts – which were well underway – to canvass the credit market (as required by the Final Cash Collateral Order) to find the necessary capital on reasonable terms to pay the Prepetition Obligations in full in cash on the effective date of any Plan. With the Prepetition Lenders' support and consent, on June 5, 2009, the Debtors filed a motion to approve a consensual amendment to the Final Cash Collateral Order. On June 16, 2009, the Bankruptcy Court entered an order, among other things, amending the final order approving the cash collateral and related adequate protection provisions for the benefit of the Prepetition Lenders extending the Amended Milestones [Docket No. 344] (the "Amended Cash Collateral Order"). The Amended Milestones were extended as follows: (a) file a plan and disclosure statement by August 10, 2009; (b) obtain approval of a disclosure statement on or before September 21, 2009; (c) obtain a final order confirming a plan by November 16, 2009.

In addition, the Amended Cash Collateral Order provides that if the Debtors did not file a chapter 11 plan and related disclosure statement on or before August 10, 2009, the Debtors were required to make a cash payment to the Prepetition Lenders in the amount of $5 million to be applied towards the principal balance outstanding under the Prepetition Facility. The Amended Cash Collateral Order further provides that, upon the Debtors' payment of the $5 million, the plan milestones will be extended by an additional 30 calendar days. Finally, the Amended Cash Collateral Order provides that in no event will the period in which the Debtors may use cash collateral extend beyond December 50, 2009.

On August 11, 2009, in accordance with the foregoing terms and conditions of the Amended Cash Collateral Order, the Debtors made a $5 million cash payment to the Prepetition Lenders after the Debtors determined, in consultation with the board of directors and certain of their major creditor constituencies, not to file a chapter 11 plan and disclosure statement. As a result, the "milestones" under the Amended Cash Collateral Order were each extended 30 days. As a result, the Debtors were required under the Amended Cash Collateral Order to file the Plan and Disclosure Statement on or before September 9, 2009.

On October 6, 2009, the Debtors filed a motion requesting that the Court enter an order (the "Second Amended Cash Collateral Order") further extending the use of cash collateral and the "milestone" deadlines [Docket No. 542]. [If granted, the Debtors will have until November 21, 2009 to obtain approval of a disclosure statement and until January 15, 2010 to obtain a final order confirming a plan. The Court is scheduled to hear the motion requesting entry of the Second Amended Cash Collateral Order on October 27, 2009.]

The use of cash collateral has allowed the Debtors to, among other things: (a) continue their business in an orderly manner; (b) maintain their valuable relationships with vendors, licensees, licensors, suppliers, customers and employees; and (c) support their working capital, general corporate and overall operational needs—all of which were necessary to preserve and maintain the going-concern value of the Debtors' business and, ultimately, help ensure a successful reorganization.

4.    **Removal of Civil Actions**

On April 24, 2009, the Debtors filed a motion seeking entry of an order extending the Debtors' time period to remove certain civil actions pending in various state and federal courts (the "Civil Actions") through and including September 8, 2009 (the "Removal Period"), without prejudice to the Debtors' right to request further

extensions of the Removal Period as the circumstances may require (the "First Removal Motion") [Docket No. 260]. On May 13, 2009, the Bankruptcy Court entered an order approving the First Removal Motion [Docket No. 287].

On September 8, 2009, the Debtors filed a motion seeking entry of an order further extending the Removal Period through and including December 7, 2009, without prejudice to the Debtors' right to request further extensions of the Removal Period as the circumstances may require [Docket No. 461].

## B.    RETENTION AND COMPENSATION OF DEBTORS' PROFESSIONALS

To assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases, the Bankruptcy Court approved the retention of the following advisors:

- Kirkland & Ellis LLP ("K&E"), as lead bankruptcy counsel, *nunc pro tunc* to the Petition Date [Docket No. 142, March 16, 2009].

- Klehr, Harrison, Harvey, Branzburg & Ellers LLP ("Klehr Harrison"), as bankruptcy co-counsel, *nunc pro tunc* to the Petition Date [Docket No. 216, April 7, 2009].

- Moelis & Company LLC ("Moelis"), as investment banker and financial advisor [Docket No. 215, April 7, 2009].

- PricewaterhouseCoopers LLP ("PWC"), as accounting and tax advisor [Docket No. 244, April 16, 2009].

- Epiq Bankruptcy Solutions, LLC ("Epiq"), as Voting and Claims Agent in these Chapter 11 Cases [Docket No. 40, February 12, 2009].

- KPMG LLP ("KPMG"), as tax and accounting advisor [Docket No. 492, September 18, 2009].

On March 12, 2009, the Debtors obtained an order approving and establishing procedures for the retention and compensation of certain professionals utilized in the ordinary course of the Debtors' business and certain service providers in the ordinary course of business [Docket No. 128]. Also on March 12, 2009, the Court entered an order authorizing the interim compensation and reimbursement of expenses for the Debtors' professionals, professionals retained by the Committee and Committee Members [Docket No. 127], which was amended on April 24, 2009 [Docket No. 252].

On June 17, 2009, the Bankruptcy Court entered the *Order Establishing A Fee Review Committee and Approving Protocols Related Thereto* [Docket No. 346] (the "Fee Review Order"). The Fee Review Order established a fee review committee for the purpose of review fee applications submitted by the Retained Professionals, "in furtherance of the goal to regulate and maintain professional fees incurred in the Chapter 11 Cases without compromising the quality of the representation provided by each Retained Professional." *See* Exhibit A to Fee Review Order.

## C.    THE STATUTORY COMMITTEE OF UNSECURED CREDITORS

### 1.    Appointment of the Committee

On February 20, 2009, the U.S. Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code. The members of the Committee include: (a) Bronwen M. DuKate; (b) MFC Global Investment Management; (c) Wells Fargo Bank, N.A., as Indenture Trustee; (d) U.S. Bank National Association, as Indenture Trustee; (e) HSBC Bank USA, N.A., as Indenture Trustee; (f) Dish Network LLC; and (g) Monarch Alternative Capital LLC.

On April 16, 2009, the Committee retained the following professionals to assist in these Chapter 11 Cases: (a) Akin Gump Strauss Hauer & Feld LLP, as co-counsel [Docket No. 241]; (b) Dorsey & Whitney LLP, as

co-counsel [Docket No. 240]; (c) FTI Consulting, Inc., as financial advisor [Docket No. 242]; and (d) The Garden City Group, Inc., as website administration agent [Docket No. 243].

### 2.    Meeting of Creditors

The meeting of creditors pursuant to section 341 of the Bankruptcy Code was held on March 12, 2009 at the J. Caleb Boggs Federal Building in Wilmington, Delaware. The meeting was continued and completed on April 15, 2009. In accordance with Bankruptcy Rule 9001(5) (which requires, at a minimum, that one representative of the Debtors appear at the meeting of creditors for the purpose of being examined under oath by a representative of the U.S. Trustee and by any attending parties in interest), R. Dodd Haynes, Chief Financial Officer of the Debtors, as well as counsel to the Debtors, attended the meeting and answered questions posed by the U.S. Trustee and other parties in interest present at the meeting.

### 3.    Committee Participation Throughout These Chapter 11 Cases

Since the formation of the Committee, the Debtors have kept the Committee informed about their business operations and have sought the concurrence of the Committee in connection with certain actions and transactions taken by the Debtors outside of the ordinary course of business. Most importantly, the Debtors and the Plan Sponsors, engaged in extensive, arm's-length discussions and negotiations concerning the Debtors' restructuring and the Plan, including the allocation of recoveries under the Plan, and reached consensus that led to the Committee's agreement to support the Plan.

## D.    FILING OF THE SCHEDULES AND CLAIMS MATTERS

### 1.    Filing of the Schedules

On March 27, 2009, each of the Debtors filed Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code. On May 18, 2009, Muzak LLC filed Amended Schedules of Assets and Liabilities and Amended Schedules of Executory Contracts and Unexpired Leases.

### 2.    Establishment of the Claims Bar Date

On May 13, 2009, the Bankruptcy Court entered an order establishing (i) July 2, 2009 as the Bar Date for filing proofs of claim and requests for payment of administrative claims under section 503(b)(9) of the Bankruptcy Code and (ii) August 10, 2009 as the Governmental Bar Date [Docket No. 286] (the "Claims Bar Date Order").

In accordance with the Claims Bar Date Order, written notice of the Bar Date and Governmental Bar Date was mailed to, among others, all known creditors listed on the Schedules. The Claims Bar Date Order was served on all parties who had filed requests for notices under Bankruptcy Rule 2002 as of the date the Claims Bar Date Order was entered. In addition to providing mailing the actual notice to all parties in interest, the Debtors also published notice of the Claims Bar Date in the *Wall Street Journal (South Atlantic Region)* and in certain regional newspapers and/or trade journals, including *The Enquirer Herald, Fort Mill Times, The Herald, The Charlotte Observer, Charlotte Business Journal, Billboard Magazine, R&R Magazine.*

### 3.    Administrative Claims Bar Date

A deadline by which Parties asserting Claims with administrative expense priority must be filed with the Bankruptcy Court has not been established as of the date of this Disclosure Statement (with the exception of claims asserted pursuant to section 503(b)(9) of the Bankruptcy Code, which, as noted above, are subject to the Claims Bar Date). Instead, the Debtors are requesting that the Bankruptcy Court fix such a date as part of the Confirmation of the Plan.

4.    **Objections to Claims**

The Debtors are in the process of reviewing all claims filed in the Chapter 11 Cases.  In connection with this review, on September 25, 2009, the Debtors filed (i) the *First Omnibus Objection to Claims (Non-Substantive) to Claims Pursuant to 11 U.S.C. § § 501(a) and 502(b) and Fed. R. Bankr. P. 3003(c)(2) and 3007 to Certain Duplicate Claims, Amended Claims, Wrong Debtor Claims, Satisfied Claims and Equity Claims* [Docket No. 520] (the "First Claims Objection") and (ii) the *Second Omnibus Objection (Substantive) to Claims Pursuant to 11 U.S.C. § § 501(a) and 502(b), Fed. R. Bankr. P. 3003(c)(2) and 3007 to Certain No Liability Claims, Reduced Claims and Insufficient Documentation Claims* [Docket No. 521] (the "Second Claims Objection").  Both the First Claims Objection and the Second Claims Objection are scheduled to be heard by the Court at the omnibus hearing on October 27, 2009.

E.    **EXCLUSIVE PERIOD FOR FILING A PLAN AND SOLICITING VOTES**

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief.  If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the commencement date to solicit acceptances to the plan.  During these exclusive periods, no other party in interest may file a competing plan of reorganization.  Pursuant to section 1122 of the Bankruptcy Code, however, a court may extend these periods upon request of a party in interest and "for cause."  The 120-day exclusive filing period cannot be extended beyond a date that is 18 months after an order for relief is entered (in this case, the Petition Date), and the 180-day exclusive solicitation period cannot be extended beyond a date that is 20 months after an order for relief is entered.

The Debtors' initial exclusive periods to file a plan and solicit acceptances of a plan were set to expire on June 10, 2009 and August 10, 2009, respectively.  On May 29, 2009, the Debtors filed a motion with the Bankruptcy Court seeking to extend their exclusive filing period to September 8, 2009 and their exclusive voting period to November 9, 2009 [Docket No. 317].  The Court entered an order approving this motion on June 15, 2009 [Docket No. 337].

On September 8, 2009, the Debtors filed a motion seeking entry of an order extending the Exclusive Periods for 90 days, through and including December 7, 2009 and February 8, 2010, respectively, in each instance without prejudice to the Debtors' right to request further extensions of the Exclusive Periods as the circumstances may require [Docket No. 460].  A hearing to consider the Debtors' most recent extension of the Exclusive Periods is scheduled for October 27, 2009.  Pursuant to Local Bankruptcy Rule 9006-2, the Debtors' exclusive period to file a chapter 11 plan is automatically extended the Court acts on the motion without the necessity for the entry of a bridge order.

F.    **DEADLINE TO ASSUME OR REJECT LEASES OF NONRESIDENTIAL REAL PROPERTY**

Pursuant to section 365(d)(4) of the Bankruptcy Code, the time within which the Debtors have to assume or reject unexpired leases of nonresidential real property was scheduled to expire on June 10, 2009, unless extended by order of the Bankruptcy Court.  To that end, on May 12, 2009, the Debtors filed a motion with the Bankruptcy Court requesting authority to extend this deadline through September 10, 2009 [Docket No. 284].  The Court entered an order approving this motion on June 23, 2009 [Docket No. 367].

On August 14, 2009, the Debtors filed a motion seeking entry of an order pursuant to section 365 of the Bankruptcy Code (a) authorizing the Debtors to assume, or amend and assume certain unexpired leases of nonresidential real property, (b) setting cure amounts with respect to the Assumed Leases and (c) extending the time period within which the Debtors must assume or reject certain unexpired leases of nonresidential real property [Docket No. 437] (the "First Assumption Motion").  The First Assumption Motion included 48 leases that the Debtors sought to assume, or amend and assume.  The Court entered an order granting the First Assumption Motion on September 9, 2009 [Docket No. 465].

On August 21, 2009, the Debtors filed a motion seeking entry of an order (a) authorizing the Debtors to assume certain unexpired leases of nonresidential real property and (b) setting cure amounts with respect thereto [Docket No. 447] (the "Second Assumption Motion"). The Second Assumption Motion included three leases that the Debtors sought to assume. The Court entered an order granting the Second Assumption Motion on September 9, 2009 [Docket No. 464].

On August 28, 2009, the Debtors filed a motion seeking entry of an order authorizing the Debtors to amend and assume an unexpired lease of nonresidential real property with Lakemont Industrial Holding Company and setting the cure amount with respect thereto [Docket No. 453] (the "Home Office Motion"). The Home Office Motion sought approval of the fourth amendment to the lease agreement with respect to the Debtors' corporate headquarters in Fort Mill, South Carolina, which provides the Debtors with ten months of free rent in exchange for assumption of the lease and a six month lease term extension. The Court entered an order granting the Home Office Motion on September 18, 2009 [Docket No. 491].

In addition, and as set forth in the First Assumption Motion, the Debtors negotiated the consent of 25 landlords to extend the time period within which the Debtors may assume or reject leases of nonresidential real property, as required by Bankruptcy Code section 365(d)(4)(B)(ii). On September 8, 2009, the Debtors filed a certification of counsel regarding the consent to extension of the time period within which the Debtors must assume or reject certain unexpired leases of nonresidential real property [Docket No. 459] (the "Lease COC"). As part of the Lease COC, the Debtors represented to the Court that, with respect to the 25 landlords who consented to extend the time period during which the Debtors may assume or reject leases of nonresidential real property, the consent requirements of section 365(d)(4)(B)(ii) of the Bankruptcy Code had been satisfied.

On October 9, 2009, the Debtors filed a motion to assume five of the leases of nonresidential real property that were listed on the Lease COC as being subject to an extension of the time period within which the Debtors must assume certain unexpired leases of nonresidential real property [Docket No. 545] (the "Third Assumption Motion"). [The Court entered an order granting the Third Assumption Motion on [TO COME], 2009 [Docket No. TO COME].

## G.    EXIT FINANCING EFFORTS

As noted above, the Final Cash Collateral Order requires the Debtors to use commercially reasonable efforts to find the necessary capital on reasonable terms, through exit financing or otherwise, to pay the prepetition claims of the Prepetition Lenders in full in cash on the effective date of any plan. *See* Final Cash Collateral Order, ¶ 11(e). The Debtors are also required to advise the Prepetition Lenders of their efforts to locate a source of this funding.

Mindful of their obligations, and as part of their overall goal of achieving a consensual restructuring, Moelis, the Debtors' financial advisor, began a targeted campaign to canvass the market for potential exit lenders. Shortly after the Petition Date, Moelis, with the input of the advisors to the Prepetition Lenders, formulated a list of 62 potential lenders, including traditional institutional lenders and private funds. Moelis contacted each of the 62 lenders to describe the opportunity in general terms and assess overall interest. In addition, Moelis was approached by approximately seven potential lenders requesting information. Parties who expressed interest were asked to execute a confidentiality agreement and were sent a teaser that included summary financial and background information.

Several confidentiality agreements were executed. Parties who signed confidentiality agreements were immediately provided access to the Debtors' online dataroom so that they could begin their diligence. Moelis and the Debtors also participated in diligence calls and meetings with some parties upon request. Of the parties who executed confidentiality agreements, Moelis received certain non-binding letters of intent (the "LOIs") from institutional lenders and hedge funds.

Following the filing of the *Joint Plan of Reorganization of Muzak Holdings LLC and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* on September 9, 2009 [Docket No. 466], Moelis reached out to a subset of the initial group of 62 potential exit lenders, including each of those who executed confidentiality agreements, to resolicit interest in a potential transaction in light of the Debtors' proposed Plan. Based on these renewed efforts, the Debtors received several revised LOIs.

In accordance with the terms of the Amended Cash Collateral Order, on June 25, 2009, the Debtors filed the *Motion of the Debtors for Entry of an Order Authorizing, But Not Directing, the Debtors to Pay Certain Exit Financing-Related Diligence Fee and Expenses* [Docket No. 325], pursuant to which the Debtors sought authority to pay work fees (the "Work Fees") and reasonable expenses to potential exit lenders in connection with their search to procure financing that would satisfy the Claims of the Prepetition Lenders in full in cash on the Effective Date. The *Order Authorizing, But Not Directing, the Debtors to Pay Exit Financing Diligence Fees and Expenses* was entered on September 22, 2009 [Docket No. 507]. Pursuant to this Order, on September 29, 2009, the Debtors provided electronic notice to the U.S. Trustee, counsel to the Committee, counsel to the Prepetition Lenders, counsel to the Ad Hoc Group of Senior Noteholders and counsel to Silver Point of its intent to pay Work Fees.

The Debtors continue the process of engaging each of the potential lenders that submitted LOIs in their attempt to procure exit financing. The Debtors expect these efforts to continue for the next several weeks.

# V.
## SUMMARY OF THE PLAN

THIS SECTION IV IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE MATERIAL TERMS OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS SECTION IV AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL GOVERN.

## A.    ADMINISTRATIVE CLAIMS

Each Holder of an Allowed Administrative Claim shall be paid the full unpaid amount of such Claim in Cash (a) on or as soon as reasonably practicable after the Effective Date, (b) if such Claim is Allowed after the Effective Date, on or as soon as reasonably practicable after the date such Claim is Allowed, or (c) upon such other terms as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and such Holder or otherwise upon an order of the Bankruptcy Court; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred by the Debtors in the ordinary course of business during the chapter 11 cases, other than those liabilities constituting or relating to commercial tort claims or patent, trademark or copyright infringement claims, shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents related to such transactions, and holders of claims related to such ordinary course liabilities are not required to File or serve any request for payment of such Administrative Claims.

### 1.    Bar Date for Administrative Claims

Except as otherwise provided in Article II.A of the Plan, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors no later than 45 days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims, including, without limitation, Holders of Claims for liabilities constituting or relating to commercial tort claims or patent, trademark or copyright infringement claims who assert that such claims constitute Administrative Claims, that do not File and serve such a request by the applicable Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or any Reorganized Debtors or their Estates and property and such Administrative Claims shall be deemed discharged as of the Effective Date. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.F of the Plan. Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 120 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by the Bankruptcy Court and/or on motion of a party in interest approved by the Bankruptcy Court.

### 2.    Professional Compensation and Reimbursement Claims

Retained Professionals or other Entities asserting a Fee Claim for services rendered before the Confirmation Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court (including the Fee Review Committee) an application for final allowance of such Fee Claim no later than 60 days after the Effective Date; provided that the Reorganized Debtors shall pay Retained Professionals or other Entities in the ordinary course of business for any work performed after the Confirmation Date; *provided, further*, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order. Objections to any Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 45 days after the Effective Date and (b) 30 days after the Filing of the applicable request for payment of the Fee Claim; *provided, however*, that the Fee Review Protocols will continue in place until the Effective Date. To the extent

23

necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims; *provided*, *however*, that the Fee Review Protocols will continue as to fees incurred prior to Confirmation. Each Holder of an Allowed Fee Claim shall be paid by the Reorganized Debtors in Cash within five Business Days of entry of the order approving such Allowed Fee Claim.

## B.    PRIORITY TAX CLAIMS

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, as soon as reasonably practicable after the Effective Date, on account of such Claim: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an amount agreed to by the applicable Debtor or Reorganized Debtor, as applicable, and such Holder; *provided*, *however*, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (3) at the option of the Debtors, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period not more than five years after the Petition Date, plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to by a particular taxing authority, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such claim shall be paid in full in cash in accordance with the terms of any agreement between the Debtors and such holder, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

## C.    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

### 1.    Summary

The Plan constitutes a separate chapter 11 plan of reorganization for each of the 15 Debtors. Except for the Claims addressed in Article II of the Plan (or as otherwise set forth therein), all Claims against a particular Debtor are placed in Classes for each of the Debtors (as designated by subclasses A through O for each of the 15 Debtors). A list of subclasses for each Class is attached to the Plan as Exhibit A. Class 8 consists of Equity Interests, which relate only to the plan of reorganization for Muzak Holdings LLC. Neither Electro-Systems Corporation nor Muzak Holdings Finance Corporation issued or guaranteed the Senior Term Loan, the Senior Notes or the Senior Subordinated Notes; therefore neither Electro-Systems Corporation nor Muzak Holdings Finance Corporation have Classes 3, 4 or 5. Additionally, Electro-Systems did not guarantee the Discount Notes and, therefore, does not have a Class 6. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims and Priority Tax Claims, as described in Article II.

The Debtors reserve their rights to withdraw the chapter 11 plan of reorganization for each of the 15 Debtors and/or convert such Debtor's chapter 11 case to a case under chapter 7 of the Bankruptcy Code at any time before the Voting Deadline.

The categories of Claims, Equity Interests and Intercompany Interests listed below classify Claims, Equity Interests and Intercompany Interests for all purposes, including, without limitation, voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim, Equity Interest and Intercompany Interest to be classified in a particular Class only to the extent that the Claim, Equity Interest or Intercompany Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim, Equity Interest or Intercompany Interest qualifies within the description of such different Class. A Claim, Equity Interest or Intercompany Interest is in a particular Class only to the extent that any such Claim, Equity Interest or Intercompany Interest is Allowed in that Class and has not been paid or otherwise settled before the Effective Date.

**Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Secured Term Loan Claims | Unimpaired | Deemed to Accept |
| 4 | Senior Notes Claims | Impaired | Entitled to Vote |

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 5 | Senior Subordinated Notes Claims | Impaired | Entitled to Vote |
| 6 | Discount Notes Claims | Impaired | Entitled to Vote |
| 7 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 8 | Equity Interests | Impaired | Deemed to Reject |
| 9 | Intercompany Interests | Unimpaired | Deemed to Accept |

2.     **Classification and Treatment of Claims, Equity Interests and Intercompany Interests**

(a)     Class 1 – Other Priority Claims (Subclasses 1A through 1O)

(1)     *Classification*: Class 1 consists of the Other Priority Claims against the Debtors.

(2)     *Treatment*: The legal, equitable and contractual rights of the Holders of Allowed Class 1 Claims are unaltered. Except to the extent that a Holder of an Allowed Class 1 Claim has been paid by the Debtors before the Effective Date or otherwise agrees to different treatment, each Holder of an Allowed Class 1 Claim shall receive, in full and final satisfaction of such Allowed Class 1 Claim, payment of the Allowed Class 1 Claim in full in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date such Allowed Class 1 Claim becomes Allowed and (iii) such other date as may be ordered by the Bankruptcy Court.

(3)     *Voting*: Class 1 is an Unimpaired Class, and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan.

(b)     Class 2 – Other Secured Claims (Subclasses 2A through 2O)

(1)     *Classification*: Class 2 consists of the Other Secured Claims against the Debtors.

(2)     *Treatment*: Except to the extent that a Holder of an Allowed Class 2 Claim has been paid by the applicable Debtor before the Effective Date, on or as soon as reasonably practicable after the Effective Date, Holders of Allowed Class 2 Claims shall receive one of the following treatments, in the sole discretion of the Debtors, in consultation with the Plan Sponsors, in full and final satisfaction of such Allowed Other Secured Claims: (i) the applicable Debtor or the Reorganized Debtors shall pay such Allowed Other Secured Claims in full in Cash including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; (ii) the applicable Debtor or the Reorganized Debtors shall deliver the collateral securing any such Allowed Other Secured Claim; or (iii) the applicable Debtor or the Reorganized Debtors shall otherwise treat any Allowed Other Secured Claim in any other manner such that the Claim shall be rendered Unimpaired.

(3)     *Voting*: Class 2 is an Unimpaired Class, and the Holders of Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan.

25

(c)    Class 3 – Secured Term Loan Claims (Subclasses 3A, 3C through 3I and 3K through 3O)

    (1)    *Classification*: Class 3 consists of Secured Term Loan Claims against the Debtors.

    (2)    *Allowance*:  The Secured Term Loan Claims shall be Allowed and deemed to be Allowed Claims in the amount of $95,537,500, plus any other amounts due and owing as of the Effective Date to the Prepetition Lenders pursuant to the Final Cash Collateral Order.

    (3)    *Treatment*:  Each Holder of Allowed Class 3 Claims shall receive, in full and final satisfaction of such Allowed Class 3 Claim, payment in full in cash of its Allowed Class 3 Claim with proceeds of the Exit Facility.

    (4)    *Voting*: Class 3 is an Unimpaired Class, and the Holders of Class 3 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject the Plan.

(d)    Class 4 – Senior Notes Claims (Subclasses 4A, 4C through 4I and 4K through 4O)

    (1)    *Classification*: Class 4 consists of Senior Notes Claims against the Debtors.

    (2)    *Allowance of Senior Notes Claims*:  The Senior Notes Claims shall be Allowed and deemed to be Allowed Claims for principal and interest in the amount of $225,194,444.44, comprised of $220,000,000 in principal and $5,194,444.44 in prepetition interest.

    (3)    *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 4 Claim shall receive, in full and final satisfaction of such Allowed Class 4 Claims, its Pro Rata share of (i) the New Senior Notes and (ii) the New Redeemable PIK Preferred Units.

    (4)    *Voting*: Class 4 is an Impaired Class, and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

(e)    Class 5 – Senior Subordinated Notes Claims (Subclasses 5A, 5C through 5I and 5K through 5O)

    (1)    *Classification:* Class 5 consists of Senior Subordinated Notes Claims against the Debtors.

    (2)    *Allowance of Senior Subordinated Notes Claims:*  The Senior Subordinated Notes Claims shall be Allowed and deemed to be Allowed Claims for principal and interest in the amount of $119,574,045.14, comprised of $115,000,000 in principal and $4,574,045.14 in prepetition interest.

    (3)    *Treatment:*  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 5 Claim shall receive, in full and final satisfaction of such Allowed Class 5 Claims, its Pro Rata share of 100% of New Common Units of the Reorganized Debtors

(subject to dilution for (i) up to 10% of New Common Units issued on account of the Management and Director Incentive Program and (ii) the Warrants)

    (4)    *Voting:* Class 5 is an Impaired Class, and Holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

(f)    <u>Class 6 – Discount Notes Claims</u> (Subclasses 6A through 6I and 6K through 6O)

    (1)    *Classification:* Class 6 consists of Discount Notes Claims against the Debtors.

    (2)    Allowance:  The Discount Notes Claims shall be Allowed and deemed to be Allowed Claims for principal and interest in the amount of $25,645,822.22, comprised of $24,245,000 in principal and $1,400,822.22 in prepetition interest.

    (3)    *Treatment:*  On or as soon as reasonable practicable after the Effective Date, each Holder of an Allowed Class 6 Claim shall receive, in full and final satisfaction of such Allowed Class 6 Claims, its Pro Rata share of Warrants for 7.5% of the fully-diluted New Common Units (excluding management units) at market value based upon an enterprise value of $425 million with a term of five years, as more fully set forth in the Warrant Agreement.

    (4)    *Voting:* Class 6 is an Impaired Class, and Holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

(g)    <u>Class 7 – General Unsecured Claims</u> (Subclasses 7A through 7O)

    (1)    *Classification:* Class 7 consists of General Unsecured Claims against the Debtors.

    (2)    *Allowance of General Unsecured Claims:*  General Unsecured Claims shall be determined and Allowed in accordance with the procedures set forth in Article VIII of the Plan.

    (3)    *Treatment:*  Except to the extent that a Holder of an Allowed General Unsecured Claim has been paid by the Debtors before the Effective Date or agrees to alternate treatment, each Holder of an Allowed Class 7 Claim shall receive, in full and final satisfaction of such Allowed Class 7 Claim, payment in full in Cash, in an aggregate amount not to exceed $18,000,000, as follows:

    (a)    Each Holder of a Class 7 Claim Allowed <u>on or before</u> the Effective Date shall receive payment of the Allowed Class 7 Claim on the Effective Date.

    (b)    Each Holder of a Class 7 Claim Allowed <u>after</u> the Effective Date shall receive payment on the first Periodic Distribution Date immediately following the date on which such Allowed Class 7 Claim is Allowed or deemed Allowed.  Holders of Allowed Class 7 Claims whose Claims are Allowed within 180 days of the Effective Date shall receive payment no later than 185 days after the Effective Date.  To the extent a Class 7

Claim is Allowed on the date that is 180 days after the Effective Date as a result of the Debtors' not filing an objection to such Claim by that date, such Claim will be paid no later than 185 days after the Effective Date.

(4)    *Voting:* Class 7 is an Unimpaired Class, and the Holders of Class 7 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 7 Claims are not entitled to vote to accept or reject the Plan.

(h)    <u>Class 8 – Muzak Equity Interests</u>

(1)    *Classification:* Class 8 consists of all Equity Interests.

(2)    *Treatment:* On the Effective Date, all Class 8 Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the Holders of Class 8 Equity Interests.

(3)    *Voting:* Class 8 is Impaired, and Holders of Class 8 Equity Interests are conclusively deemed to reject the Plan. Therefore, Holders of Class 8 Equity Interests are not entitled to vote to accept or reject the Plan.

(i)    <u>Class 9– Intercompany Interests</u>

(1)    *Classification:* Class 9 consists of all Intercompany Interests in the Debtors.

(2)    *Treatment:* Subject to any Restructuring Transactions, Intercompany Interests shall be retained and the legal, equitable and contractual rights to which Holders of such Allowed Intercompany Interests are entitled shall remain unaltered.

(3)    *Voting:* Class 9 is an Unimpaired Class, and Holders of Class 9 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 9 Claims are not entitled to vote to accept or reject the Plan.

3.    **Intercompany Claims**

Notwithstanding anything herein or in the Plan to the contrary, all Intercompany Claims on the Effective Date or as soon thereafter as is reasonably practicable, will be eliminated or waived based on accounting entries in the Debtors' or Reorganized Debtors' books and records and other corporate activities by the Debtors or Reorganized Debtors with the consent of the Plan Sponsors, such consent to not be unreasonably withheld or delayed. No distribution will be made to holders of Intercompany Claims.

4.    **Special Provision Governing Unimpaired Claims**

Except as otherwise provided herein or in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

5.    **Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims**

The classification and treatment of Allowed Claims under the Plan takes into consideration all Allowed Secondary Liability Claims. On the Effective Date, the Allowed Secondary Liability Claims arising from or related to any Debtor's joint or several liability for the obligations under any (1) Allowed Claim that is being reinstated under the Plan or (2) Executory Contract or Unexpired Lease that is being assumed or deemed assumed by another Debtor or under any Executory Contract or Unexpired Lease that is being assumed by a Debtor (whether or not assigned to another Debtor or any other Entity) shall be reinstated.

6.    **Discharge of Claims**

Pursuant to section 1141(c) of the Bankruptcy Code, all Claims and Equity Interests that are not expressly provided for and preserved pursuant to the Plan shall be extinguished upon the Effective Date. Upon the Effective Date, the Debtors and all property dealt with in the Plan shall be free and clear of all such claims and interests, including, without limitation, liens, security interests and any and all other encumbrances.

D.    **ACCEPTANCE OR REJECTION OF THE PLAN**

1.    **Presumed Acceptance of Plan**

Classes 1, 2, 3, 7 and 9 are Unimpaired under the Plan, and are, therefore, presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

2.    **Voting Classes**

Each Holder of an Allowed Claim as of the Record Date in each of the Voting Classes shall be entitled to vote to accept or reject the Plan.

3.    **Acceptance by Impaired Classes of Claims**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

4.    **Presumed Rejection of Plan**

Class 8 is Impaired and Holders of Class 8 Interests shall receive no distribution under the Plan and are, therefore, presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

5.    **Cramdown**

The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code or that is deemed to reject the Plan. The Debtors reserve the right to modify the Plan in accordance with Article XIII.E of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification

6.    **Elimination of Voting Classes**

Any Class of Claims that is not occupied by the Holder of an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018, or for which no votes are cast by the Holder an Allowed Claim or Claim temporarily Allowed under Bankruptcy Rule 3018 (i.e., no Ballots are cast in a Class to vote on the Plan) as of the commencement of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to

accept or reject the Plan and for purposes of determining acceptances or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## E.    MEANS FOR IMPLEMENTATION OF THE PLAN

### 1.    General Settlement of Claims

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases and other benefits provided under the Plan, and as a result of arms'-length negotiations among the Debtors and the Plan Sponsors, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.

### 2.    Corporate Existence

Each Debtor shall continue to exist after the Effective Date as a separate corporate entity or limited liability company, with all the powers of a corporation or limited liability company pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents in the case of a limited liability company) in effect prior to the Effective Date.

### 3.    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or in any agreement, instrument or other document relating thereto, on or after the Effective Date, all property of each Estate (including, without limitation, Causes of Action) shall vest in each respective Reorganized Debtor, free and clear of all liens, Claims, charges or other encumbrances. Except as may be provided in the Plan, on and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors shall pay the charges that they incur after the Effective Date for Retained Professionals' and Indenture Trustees' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Retained Professionals' fee applications) without application to the Bankruptcy Court.

### 4.    Exit Facility

One or more the Reorganized Debtors will enter into the Exit Facility on the Effective Date. The commitment letter for the Exit Facility will be filed as part of the Plan Supplement. On the Effective Date, the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Facility. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the Exit Facility.

### 5.    New Senior Notes

On the Effective Date or as soon as practicable thereafter, Muzak Holdings LLC shall issue the New Senior Notes, which shall be guaranteed by the Subsidiary Debtors and transferred to Holders of Allowed Senior Notes Claims as more fully specified in the Plan. The following summarizes certain additional terms of the New Senior Notes. The New Senior Notes shall be prepayable at par immediately with no change in control or call premium. Subject to customary and/or minor carve-outs, the governing documents for the New Senior Notes shall contain covenants similar to those contained in the Senior Notes Indenture with certain exceptions including, without limitation, limitations and/or prohibitions on (1) additional indebtedness (including no additional indebtedness other than permitted refinancings), (2) certain payments (including no cash dividends on capital stock), (3) certain asset sales, (4) liens and secured debt, (5) investments, (6) transactions with affiliates, (7) mergers and acquisitions, and (8) conduct of business. The governing documents for the New Senior Notes shall also include a supermajority (75%) voting requirement for waivers and consents.

30

6.      **New Redeemable PIK Preferred Units**

On the Effective Date or as soon as practicable thereafter, Muzak Holdings LLC shall issue the New Redeemable PIK Preferred Units, which shall be issued to Holders of Allowed Senior Notes Claims as more fully specified in the Plan. The following summarizes certain additional terms of the New Redeemable PIK Preferred Units. The New Redeemable PIK Preferred Units shall be prepayable at par immediately with no change in control or call premium but shall be subject to a liquidation preference equal to par plus accrued and unpaid or PIK dividends. The provisions in the LLC Agreement relating to the New Redeemable PIK Preferred Units shall include, without limitation, the following:

o    a supermajority (75%) voting requirement for waivers or consents;

o    covenants similar to those contained in the documents governing the New Senior Notes, with the following revisions: (1) 5.0x debt incurrence test (excluding refinancings); (2) no cash dividends on junior capital units; (3) change in control put on similar triggers as the existing Senior Notes (with the threshold requirements to be triggered by a sufficient change in either voting or economic interests), provided, however, that a change of control event shall not be triggered by reason of a merger of the Debtors with DMX in which no property other than common units are received or retained by the holders of New Common Units, and provided further that in connection with the any such DMX transaction, Silver Point will not sell any of the New Common Units distributed to it under the Plan;

o    remedies for events of default to include, without limitation, further tightening of restrictive covenants (including further prohibitions on restricted payments, additional indebtedness (other than indebtedness incurred to redeem the New Redeemable PIK Preferred Units)) and investments; provided, in the event of a payment default upon maturity of the New Redeemable PIK Preferred Units, (1) all voting rights shall transfer to the holders of the New Redeemable PIK Preferred Units to the maximum extent permitted by law (with the supermajority voting requirement (75%) set forth above remaining in effect), (2) non-Silver Point affiliated holders of New Redeemable PIK Preferred Units shall have the right to elect one additional representative to the Board of Directors of Reorganized Muzak, and (3) Reorganized Muzak shall have the ongoing obligation to redeemed the New Redeemable PIK Preferred Units to the extent of funds legally available therefor; and

o    other customary terms, including prohibitions on charter amendments that relate to the New Redeemable PIK Preferred Units provisions or that otherwise adversely affect the rights of the New Redeemable PIK Preferred Units, including, without limitation, authorization of senior or pari passu capital units, without the consent of a supermajority of the holders of New Redeemable PIK Preferred Units.

7.      **Sources of Cash for Plan Distributions and Transfers of Funds Among Debtors**

All Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan will be obtained from the Debtors' then current Cash balances, including Cash from operations and the proceeds of the Exit Facility. Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors; *provided, however,* that the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth in the Plan, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

8.      **New Common Units**

On the Effective Date, and pursuant to the terms set forth in the Plan, Reorganized Muzak shall issue the New Common Units to Holders of Allowed Claims in Class 5. The New Common Units shall represent all of the

31

equity interests in Reorganized Muzak as of the Effective Date. The New Common Units shall be subject to dilution on account of the Management and Director Incentive Program and the Warrants. The Reorganized Debtors shall not be obligated to list the New Common Units on a national securities exchange.

The New Common Units issued under the Plan are issued under Section 1145 of the Bankruptcy Code and will be freely tradable, subject to any applicable restrictions of the federal and state securities laws and subject to the LLC Agreement. All other New Common Units will be tradable only to the extent described under Article V.K of the Plan. All of the New Common Units issued pursuant to the Plan shall be duly authorized, validly issued and, if applicable, fully paid and non-assessable. Each distribution and issuance referred to in Article VII of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

In connection with the distribution of New Common Units to current or former employees of the Debtors, the Reorganized Debtors may take whatever actions are necessary to comply with applicable federal, state, local and international tax withholding obligations, including withholding from distributions a portion of the New Common Units and selling such securities to satisfy tax withholding obligations including, without limitation, income, social security and Medicare taxes.

9.    **Director and Officer Liability Insurance**

The Debtors shall assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors as to which no Proof of Claim need be Filed.

10.    **Management and Director Incentive Programs**

The Management and Director Incentive Program will be implemented on and after the Effective Date and will be included in the Plan Supplement.

11.    **Securities Registration Exemption and LLC Agreement**

The New Common Units to be issued to Holders of Allowed Claims in Class 5 will be issued without registration under the Securities Act or any similar federal, state or local law in reliance upon the exemptions set forth in section 1145 of the Bankruptcy Code.

It is anticipated that awards under the Management and Director Incentive Program will be made without registration under the Securities Act or any similar federal, state or local law in reliance upon the exemption set forth in section 701 of the Securities Act or as a result of the issuance or grant of such equity award not constituting a "sale" under section 2(3) of the Securities Act. On the Effective Date, Reorganized Muzak and the Holders of Allowed Claims in Class 5 will enter into the LLC Agreement in the form set forth in the Plan Supplement.

12.    **Warrants**

On the Effective Date or as soon as reasonably practicable thereafter, Reorganized Muzak shall issue the Warrants to Holders of Allowed Claims in Class 6 pursuant to the terms set forth in the Plan and the Warrant Agreement.

### 13.    LLC Agreement for New Common Units

On or after the Effective Date, Reorganized Muzak and the Holders of Allowed Claims in Class 5 shall execute and deliver the LLC Agreement. Each Holder of an Allowed Claim in Class 5 shall be required to execute and be bound by the LLC Agreement as a condition precedent to receiving its allocation of New Common Units. In the event that a Holder of an Allowed Claim in Class 5 fails to execute the LLC Agreement within 180 days of the Effective Date, the New Common Units that would otherwise be allocable to such Holder of an Allowed Senior Subordinated Notes Claim shall be cancelled and the Holder shall forfeit its right to receive the New Common Units. The LLC Agreement shall contain reasonable minority shareholder protections.

### 14.    Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VII of the Plan, all liens, Claims, Equity Interests, mortgages, deeds of trust or other security interests against the property of any Estate shall be fully released and discharged, and all of the right, title and interest of any Holder of such liens, Claims, Equity Interests, mortgages, deeds of trusts or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

### 15.    Certificate of Incorporation and Bylaws

The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies) of the Debtors shall be amended as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code or as otherwise required by, and in a form reasonably acceptable to, the Plan Sponsor. On or as soon as reasonably practicable after the Effective Date, each of the Reorganized Debtors shall file new certificates of incorporation with the secretary of state (or equivalent state officer or entity) of the state under which each such Reorganized Debtor is or is to be incorporated, which, as required by section 1123(a)(6) of the Bankruptcy Code, shall prohibit the issuance of non-voting securities. After the Effective Date, each Reorganized Debtor may file a new, or amend and restate its existing, certificate of incorporation, charter and other constituent documents as permitted by the relevant state corporate law.

### 16.    Directors and Officers of Reorganized Muzak

The New Board shall consist of up to five directors, who shall be identified in the Plan Supplement, with Silver Point selecting three directors, the Ad Hoc Group of Senior Noteholders selecting one director and the then current Chief Executive Officer of Muzak serving as a director. Any directors elected pursuant to this section shall be entitled to serve on any and all committees formed by the New Board. Any directors elected pursuant to this section shall be subject to approval of the Bankruptcy Court pursuant to section 1129(a)(5) of the Bankruptcy Code. Existing officers and management will continue in their current positions, subject to the terms set forth in the Employee-Related Agreements to be included in the Plan Supplement.

### 17.    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The Debtors or the Reorganized Debtors, as applicable, may take all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the securities to be issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant to the Plan. The secretary and any assistant secretary of each Debtor shall be authorized to certify or attest to any of the foregoing actions.

Before, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtors shall be deemed to have been so approved and shall be in effect before, on or after the Effective Date (as appropriate) pursuant to applicable

law and without any requirement of further action by the shareholders, directors, managers or partners of the Debtors, or the need for any approvals, authorizations, actions or consents.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan, including the Exit Facility (and the providing of security therefor), the issuance of the New Senior Notes, the New Redeemable PIK Preferred Units and the New Common Units and the maintenance or creation of security as contemplated by the Exit Facility and Warrants.

**18.    Cancellation of Notes and Equity Interests**

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, stock, instruments, certificates and other documents evidencing the Senior Notes, the Senior Subordinated Notes, the Discount Notes and the Equity Interests shall be canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released and discharged. On the Effective Date, except to the extent otherwise provided in the Plan, the Senior Notes Indenture, the Senior Subordinated Notes Indenture and the Discount Notes Indenture shall be deemed to be canceled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder shall be fully released and discharged. Each Indenture shall continue in effect solely for the purposes of, as to each issuance, respectively: (1) allowing Holders of the Notes Claims to receive distributions under the Plan; and (2) allowing and preserving the rights of each respective Indenture Trustee to (a) make distributions in satisfaction of the applicable Notes Claims, (b) exercise its charging lien against such distributions and (c) seek compensation and reimbursement for any fees and expenses incurred in making such distributions. Upon completion of all such Distributions, the Indentures shall terminate completely. From and after the Effective Date, the Indenture Trustees shall have no duties or obligations under the applicable Indentures, other than to make distributions.

## F.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

(a)    Assumption of Executory Contracts and Unexpired Leases

Except as otherwise set forth in the Plan, each Executory Contract or Unexpired Lease shall be deemed automatically assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease:

(1)    has been previously rejected by the Debtors by Final Order of the Bankruptcy Court;

(2)    has been rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date;

(3)    is the subject of a motion to reject pending as of the Effective Date;

(4)    is listed on the schedule of "Rejected Executory Contracts and Unexpired Leases" in the Plan Supplement;

(5)    is otherwise rejected pursuant to the terms of the Plan.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. The Debtors reserve the right to

amend the schedule of Rejected Executory Contracts and Unexpired Leases at any time before the Effective Date with the consent of the Plan Sponsors.

(b)    Assumption of License Agreements

For the avoidance of doubt, the License Agreements shall be deemed automatically assumed on the Effective Date, and the Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumption pursuant to sections 365 and 1123 of the Bankruptcy Code. The Debtors will satisfy any monetary defaults under the License Agreements pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of any such cure amount in Cash on the Effective Date (or as soon as reasonably practicable thereafter) or on such other terms as the applicable Licensee may otherwise agree. All other provisions of the Plan relating to the assumption of Executory Contracts shall apply to the License Agreements. In addition, simultaneously with and as consideration for the assumption of the License Agreements (or, if applicable, the cure of any monetary defaults thereunder), all Claims of Licensees for amounts arising under the License Agreements shall be deemed resolved and expunged without any further action; *provided, however*, that the Reorganized Debtors shall reconcile, and to the extent deemed appropriate satisfy, any prepetition Claims of Licensees made in the ordinary course of business, whether such claims are asserted before or after the Effective Date.

(c)    Assumption of Indemnification Provisions

The Debtors shall assume all of the Indemnification Provisions in place on and before the Effective Date for Indemnified Parties for Claims related to or in connection with any actions, omissions or transactions occurring before the Effective Date.

(d)    Approval of Assumptions

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions described in Article VI of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption of such Executory Contract or Unexpired Lease will be deemed to have consented to such assumption. Each Executory Contract and Unexpired Lease assumed pursuant to this section or by any order of the Bankruptcy Court, which has not been assigned to a third party before the Effective Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

(e)    Rejection of Executory Contracts or Unexpired Leases

All Executory Contracts and Unexpired Leases listed on the schedule of "Rejected Executory Contracts and Unexpired Leases" in the Plan Supplement shall be deemed rejected as of the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections described in Article VI of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

2.    **Claims on Account of the Rejection of Executory Contracts or Unexpired Leases**

All proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against any Debtor or any Reorganized Debtor or their Estates and property, and the Debtors or the Reorganized Debtors and their Estates and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy

35

Court or as otherwise provided in the Plan. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.F of the Plan.

### 3.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date (or as soon as reasonably practicable thereafter) or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. At least 10 days before the Confirmation Hearing, the Debtors shall serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, which will: (1) list the applicable cure amount, if any; (2) describe the procedures for filing objections thereto; and (3) explain the process by which related disputes will be resolved by the Bankruptcy Court; additionally, the Debtors shall file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assumed and the proposed cure amounts.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption or related cure amount must be filed, served and actually received by the Debtors at least five days before the Confirmation Hearing. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such matters. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. If an objection to Cure is sustained by the Bankruptcy Court, the Reorganized Debtors after consultation with the Plan Sponsors, may elect to reject such executory contract or unexpired lease in lieu of assuming it.

### 4.    Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## G.    PROVISIONS GOVERNING DISTRIBUTIONS

### 1.    Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed before the Effective Date on or as soon as practicable after the Initial Distribution Date.

### 2.    Distributions on Account of Claims Allowed After the Effective Date

#### (a)    Payments and Distributions on Disputed Claims

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made on the first Periodic Distribution Date after the Disputed Claim becomes an Allowed Claim.

#### (b)    Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. In the event that

36

there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtors shall establish appropriate reserves for potential payment of such Claims.

**3.      Delivery and Distributions and Undeliverable or Unclaimed Distributions**

(a)      Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim is transferred 20 or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(b)      Delivery of Distributions in General

Except as otherwise provided in the Plan, the Debtors or the Reorganized Debtors, as applicable, shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided, however,* that the manner of such distributions shall be determined at the discretion of the Debtors or the Reorganized Debtors, as applicable; and *provided further,* that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

All distributions to Holders of Secured Term Loan Claims shall be deemed completed when made to the Prepetition Administrative Agent.

All distributions to Holders of Notes Claims shall be governed by the applicable Indenture and shall be deemed completed when made to the applicable Indenture Trustee.  Notwithstanding any provisions in the Plan to the contrary, the Indentures shall continue in effect to the extent necessary to (a) allow the applicable Indenture Trustee to receive and make distributions pursuant to the Plan on account of the Notes Claims, (b) exercise its charging lien against such distributions and (c) seek compensation and reimbursement for any fees and expenses incurred in making such distributions.

Each Indenture Trustee may effect any distribution to the applicable Holders of Notes Claims through the book-entry transfer facilities of The Depository Trust Company, which shall distribute the same to its participants in accordance with their respective holdings of Senior Notes, Senior Subordinated Notes or Discount Notes, as applicable, as of the Distribution Record Date.

(c)      Distributions by Distribution Agents

The Debtors and the Reorganized Debtors, as applicable, shall have the authority, in their sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required by the Plan.  As a condition to serving as a Distribution Agent, a Distribution Agent must (a) affirm its obligation to facilitate the prompt distribution of any documents, (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required by the Plan and (c) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required by the Plan that are to be distributed by such Distribution Agent; *provided, however,* that each Indenture Trustee shall retain the right of setoff against the distributions required by the Plan.  The Debtors or the Reorganized Debtors, as applicable, shall pay to the Distribution Agents all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions or consents.  The Distribution Agents shall submit detailed invoices to the Debtors or the Reorganized Debtors, as applicable, for all reasonable fees and expenses for which the Distribution Agent seeks reimbursement and the Debtors or the Reorganized Debtors, as applicable, shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Reorganized Debtors, as applicable, deem to be unreasonable.  In the event that the Debtors or the Reorganized Debtors, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice,

the Debtors or the Reorganized Debtors, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Debtors or the Reorganized Debtors, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

    (d)  <u>Minimum Distributions</u>

    Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall not be required to make distributions or payments of less than $10 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar or share of New Common Units under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar or share of New Common Units (up or down), with half dollars and half units of New Common Units or less being rounded down.

    No Distribution Agent shall have any obligation to make a distribution on account of an Allowed Claim if: (a) the aggregate amount of all distributions authorized to be made from the Periodic Distribution Date in question is or has an economic value less than $25,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Periodic Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $10, which shall be treated as an undeliverable distribution under Article VII.C.5 of the Plan.

    (e)  <u>Undeliverable Distributions</u>

      (1)  Holding of Certain Undeliverable Distributions

    If any distribution to a Holder of an Allowed Claim made in accordance herewith is returned to the Reorganized Debtors (or their Distribution Agent) as undeliverable, no further distributions shall be made to such Holder unless and until the Reorganized Debtors (or their Distribution Agent) are notified in writing of such Holder's then current address, at which time all currently due missed distributions shall be made to such Holder on the next Periodic Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors, subject to Article VII.C.5(b) of the Plan, until such time as any such distributions become deliverable. Undeliverable distributions shall not be entitled to any additional interest, dividends or other accruals of any kind on account of their distribution being undeliverable.

      (2)  Failure to Claim Undeliverable Distributions

    No later than 90 days after the Effective Date, the Reorganized Debtors shall File with the Bankruptcy Court a list of the Holders of undeliverable distributions. This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open. Any Holder of an Allowed Claim, irrespective of when a Claim becomes an Allowed Claim, that does not notify the Reorganized Debtors of such Holder's then current address in accordance herewith within the latest of (i) 180 days after the Effective Date, (ii) 60 days after the attempted delivery of the undeliverable distribution or (iii) 180 days after the date such Claim becomes an Allowed Claim, shall have its Claim for such undeliverable distribution discharged and shall be forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property. In such cases, (i) any Cash or New Common Units held for distribution on account of Allowed Claims shall be redistributed to Holders of Allowed Claims in the applicable Class on the next Periodic Distribution Date and (ii) any Cash held for distribution to other creditors shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and become property of the Reorganized Debtors, free of any Claims of such Holder with respect thereto. Nothing contained herein or in the Plan shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

      (3)  Failure to Present Checks

Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 180 days after the issuance of such check. In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, no later than 180 days after the issuance of such checks, the Reorganized Debtors shall File with the Bankruptcy Court a list of the Holders of any un-negotiated checks. This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open. Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued. Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 240 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property. In such cases, any Cash held for payment on account of such Claims shall be property of the Reorganized Debtors, free of any Claims of such Holder with respect thereto. Nothing contained herein or in the Plan shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

(4)    Failure to Execute LLC Agreement

As set forth in Article V.M of the Plan, each Holder of an Allowed Senior Subordinated Notes Claim shall be required to execute and be bound by the LLC Agreement as a condition precedent to receiving its allocation of New Common Units. In the event that a Holder of an Allowed Senior Subordinated Notes Claim fails to execute the LLC Agreement within 180 days of the Effective Date, the New Common Units that would otherwise be allocable to such Holder of an Allowed Senior Subordinated Notes Claim shall be cancelled and the Holder shall forfeit its right to receive the New Common Units.

**4.    Compliance with Tax Requirements/Allocations**

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

**5.    Timing and Calculation of Amounts to Be Distributed**

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant thereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

6.    **Setoffs**

The Debtors and the Reorganized Debtors may withhold (but not setoff except as set forth below) from the distributions called for by the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim except for distributions to Classes 3, 4 and 5.  In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount.  Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, equity interests, rights and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such Holder, except as specifically provided in the Plan.

7.    **Surrender of Canceled Instruments or Securities**

As a condition precedent to receiving any distribution on account of its Allowed Claim, each record Holder of a Notes Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled pursuant to Article V.R of the Plan, except to the extent otherwise provided to the Plan.  Each Indenture Trustee may (but shall not be required to) request that registered Holders of the Senior Notes, Senior Subordinated Notes or Discount Notes, as applicable, surrender their notes for cancellation.

**H.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS**

1.    **Resolution of Disputed Claims**

(a)    <u>Allowance of Claims</u>

After the Effective Date, the Reorganized Debtors shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.  All settled claims approved before the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

(b)    <u>Prosecution of Objections to Claims</u>

After the Confirmation Date but before the Effective Date, the Debtors (in consultation with the Plan Sponsors), and after the Effective Date until the Claims Objection Bar Date, the Reorganized Debtors, shall have the exclusive authority to File objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; provided, however, this provision shall not apply to Fee Claims.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court.  The Reorganized Debtors shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.  With respect to all Tort Claims, an objection is deemed to have been Filed timely, thus making each such Claim a Disputed Claim as of the Claims Objection Bar Date.  Each such Tort Claim shall remain a Disputed Claim unless and until it becomes an Allowed Claim.

(c)    Claims Estimation

Before the Effective Date, the Debtors (in consultation with the Plan Sponsors), and after the Effective Date, the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

(d)    Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied or superseded may be expunged on the Claims Register by the Reorganized Debtors, and any Claim that has been amended may be adjusted thereon by the Reorganized Debtors, in both cases without a claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

(e)    Individual Claims in Class 3, 4, 5 and 6

Any proof of claim that is filed by a holder of a Class 3 Claim: (a) shall be deemed paid, satisfied or superseded by virtue of the treatment afforded on account of such Claim pursuant to Article III.B.3 of the Plan, which treatment shall be remitted to the Prepetition Administrative Agent and (b) will be expunged without the need for the filing of a claims objection and without any further notice to or action, order or approval of the Bankruptcy Court.

Any proof of claim that is filed by a holder of a note or notes constituting a Claim in Class 4, 5 or 6 and which is held through a Nominee: (a) shall be deemed paid, satisfied or superseded by virtue of the treatment afforded on account of such Claim pursuant to Article III.B.4, Article III.B.5 or Article III.B.6, as applicable, which treatment shall be remitted to the applicable Indenture Trustee and (b) will be expunged on the Claims Register by the Reorganized Debtors without a claims objection having to be Filed and without any future notice to or action, order or approval of the Bankruptcy Court.

(f)    Deadline to File Objections to Claims

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

2.    **Disallowance of Claims**

All Claims of any Entity from which property is sought by the Debtors or the Reorganized Debtors under section 542, 543, 550 or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code shall be disallowed if (i) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (ii) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

**EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED FOR**

PURPOSES OF DISTRIBUTION OR ANY OTHER TREATMENT UNDER THE PLAN AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS, ON OR BEFORE THE DATE OF THE CONFIRMATION HEARING, SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A BANKRUPTCY COURT ORDER.

      3.      **Amendments to Claims**

On or after the Effective Date, except as otherwise provided herein, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such prior authorization is not received, any such new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

## I.      CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

      1.      **Conditions Precedent to Confirmation**

It shall be a condition to Confirmation that all provisions, terms and conditions of the Plan are approved in the Confirmation Order.

      2.      **Conditions Precedent to Consummation**

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan.

      (a)      The Plan and all Plan Supplement documents, including any amendments, modifications or supplements thereto, shall be reasonably acceptable to the Debtors and the Plan Sponsors.

      (b)      The Confirmation Order shall have been entered and become a Final Order in a form and in substance reasonably satisfactory to the Debtors and the Plan Sponsor. The Confirmation Order shall provide that, among other things, the Debtors or the Reorganized Debtors, as appropriate, are authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with or described in the Plan.

      (c)      All documents and agreements necessary to implement the Plan, including all Plan Supplement documents, shall have (a) been tendered for delivery and (b) been effected or executed. All conditions precedent all to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

      (d)      All actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

      (e)      The promissory notes assumed by Muzak LLC in connection with its acquisition of Electro Systems Corporation shall compromised and/or treated in a manner acceptable to the Debtors and the Plan Sponsors.

3.      **Waiver of Conditions**

The conditions to Confirmation of the Plan and to Consummation of the Plan set forth in Article IX of the Plan may be waived by the Debtors with the consent of the Plan Sponsors without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

4.      **Effect of Non Occurrence of Conditions to Consummation**

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

**J.      SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS**

1.      **Compromise and Settlement**

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code or otherwise. As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments under the Plan are settled, compromised, terminated and released pursuant to the Plan.

The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (1) in the best interests of the Debtors, their estates and all Holders of Claims, (2) fair, equitable and reasonable, (3) made in good faith and (4) approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019. **In addition, the allowance, classification and treatment of Allowed Claims take into account any Causes of Action, whether under the Bankruptcy Code or otherwise under applicable non-bankruptcy law, that may exist: (1) between the Debtors, on the one hand, and the Debtor Releasees, on the other; and (2) as between the Releasing Parties and the Third Party Releasees (to the extent set forth in the Third Party Release); and, as of the Effective Date, any and all such Causes of Action are settled, compromised and released pursuant to the Plan.** The Confirmation Order shall approve the releases by all Entities of all such contractual, legal and equitable subordination rights or Causes of Action that are satisfied, compromised and settled pursuant to the Plan.

In accordance with the provisions of the Plan, including Article VIII of the Plan, and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date (1) the Reorganized Debtors may, in their sole and absolute discretion, compromise and settle Claims against them and (2) the Reorganized Debtors may, in their respective sole and absolute discretion, compromise and settle Causes of Action against other Entities.

2.      **Debtor Release**

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES, INCLUDING, WITHOUT LIMITATION, THE DISCHARGE OF DEBT AND ALL OTHER GOOD AND VALUABLE CONSIDERATION PAID PURSUANT TO THE PLAN; AND THE SERVICES OF THE DEBTORS' PRESENT AND FORMER OFFICERS, DIRECTORS, MEMBERS (INCLUDING *EX OFFICIO* MEMBERS) AND ADVISORS, IN EACH CASE IN THEIR CAPACITY AS SUCH, IN FACILITATING THE

EXPEDITIOUS IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED IN THE PLAN, EACH OF THE DEBTORS PROVIDE A FULL DISCHARGE AND RELEASE TO EACH DEBTOR RELEASEE AND TO EACH THIRD PARTY RELEASEE (AND EACH SUCH DEBTOR RELEASEE AND THIRD PARTY RELEASEE SO RELEASED SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE DEBTORS) AND THEIR RESPECTIVE PROPERTIES FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, INCLUDING, WITHOUT LIMITATION, THOSE THAT ANY OF THE DEBTORS OR THE REORGANIZED DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE DEBTORS OR ANY OF THEIR ESTATES, AND FURTHER INCLUDING THOSE IN ANY WAY RELATED TO THE CHAPTER 11 CASES OR THE PLAN; *PROVIDED, HOWEVER,* THAT THE FOREGOING "DEBTOR RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CAUSES OF ACTION OF ANY DEBTOR: (1) AGAINST A THIRD PARTY RELEASEE (OTHER THAN THE PREPETITION ADMINISTRATIVE AGENT, THE PREPETITION LENDERS, THE INDENTURE TRUSTEES AND EACH HOLDER OF THE NOTES CLAIMS, EACH IN THEIR CAPACITIES AS SUCH) ARISING FROM ANY CONTRACTUAL OBLIGATIONS OWED TO THE DEBTORS; (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS; OR (3) WITH RESPECT TO THE DEBTORS' CURRENT AND FORMER OFFICERS, DIRECTORS, MEMBERS (INCLUDING *EX OFFICIO* MEMBERS), ARISING FROM CLAIMS FOR FRAUD, GROSS NEGLIGENCE, WILLFUL MISCONDUCT, CRIMINAL CONDUCT, VIOLATION OF FIDUCIARY DUTY, INCLUDING THE UNAUTHORIZED USE OF CONFIDENTIAL INFORMATION, THAT CAUSES DAMAGES OR FOR PERSONAL GAIN, TO (AND ONLY TO) THE EXTENT SUCH PERSONS ARE NOT EXCULPATED THEREFROM BY ANY PROVISION OR APPLICABLE LAW OR ANY CERTIFICATE OF INCORPORATION OR SIMILAR ORGANIZATIONAL DOCUMENT OF MUZAK, REORGANIZED MUZAK, ANY OTHER DEBTOR OR ANY OTHER REORGANIZED DEBTOR, OR ULTRA VIRES ACTS.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES, A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (2) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS; (3) FAIR, EQUITABLE AND REASONABLE; (4) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (5) A BAR TO ANY OF THE DEBTORS OR THE REORGANIZED DEBTORS ASSERTING ANY CLAIM RELEASED BY THE DEBTOR RELEASE AGAINST ANY OF THE DEBTOR RELEASEES.

### 3.    Third Party Release

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES (REGARDLESS OF WHETHER A RELEASING PARTY IS A THIRD PARTY RELEASEE) PROVIDE A FULL DISCHARGE AND RELEASE (AND EACH ENTITY SO RELEASED SHALL BE DEEMED RELEASED BY THE RELEASING PARTIES) TO THE THIRD PARTY RELEASEES AND THE DEBTOR RELEASEES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, INCLUDING, WITHOUT LIMITATION, THOSE IN ANY WAY RELATED TO THE CHAPTER 11 CASES OR THE PLAN; *PROVIDED, HOWEVER,* THAT THE FOREGOING "THIRD PARTY RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE

ANY CAUSES OF ACTION OF ANY RELEASING PARTY: (1) AGAINST A THIRD PARTY RELEASEE (OTHER THAN THE PREPETITION ADMINISTRATIVE AGENT, THE PREPETITION LENDERS, EACH HOLDER OF THE NOTES CLAIMS, THE INDENTURE TRUSTEES AND ALL OF THE CURRENT AND FORMER MEMBERS (INCLUDING *EX OFFICIO* MEMBERS), OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, ATTORNEYS, FINANCIAL ADVISORS, ACCOUNTANTS, MANAGED FUNDS, INVESTMENT BANKERS, INVESTMENT ADVISORS, ACTUARIES, PROFESSIONALS, AGENTS, AFFILIATES FIDUCIARIES AND REPRESENTATIVES OF EACH OF THE FOREGOING ENTITIES, EACH IN THEIR RESPECTIVE CAPACITIES AS SUCH) ARISING FROM ANY CONTRACTUAL OBLIGATIONS OWED TO THE RELEASING PARTY; (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS; OR (3) WITH RESPECT TO THE DEBTORS' PRESENT AND FORMER OFFICERS, DIRECTORS, MEMBERS (INCLUDING *EX OFFICIO* MEMBERS), ARISING FROM CLAIMS FOR FRAUD, GROSS NEGLIGENCE, WILLFUL MISCONDUCT, CRIMINAL CONDUCT, VIOLATION OF FIDUCIARY DUTY, INCLUDING THE UNAUTHORIZED USE OF CONFIDENTIAL INFORMATION, THAT CAUSES DAMAGES OR FOR PERSONAL GAIN, TO (AND ONLY TO) THE EXTENT SUCH PERSONS ARE NOT EXCULPATED THEREFROM BY ANY PROVISION OR APPLICABLE LAW OR ANY CERTIFICATE OF INCORPORATION OR SIMILAR ORGANIZATIONAL DOCUMENT OF MUZAK, REORGANIZED MUZAK, ANY OTHER DEBTOR OR ANY OTHER REORGANIZED DEBTOR, OR ULTRA VIRES ACTS.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED THEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE THIRD PARTY RELEASEES, A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (2) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS; (3) FAIR, EQUITABLE AND REASONABLE; (4) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (5) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED BY THE THIRD PARTY RELEASE AGAINST ANY OF THE THIRD PARTY RELEASEES.

4.       **Exculpation**

The Exculpated Parties shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, Plan Supplement documents or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; *provided, however,* that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined by a Final Order to have constituted fraud, gross negligence or willful misconduct; *provided, further,* that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; *provided, still further,* that the foregoing Exculpation shall not apply to any acts or omissions expressly set forth in and preserved by the Plan, the Plan Supplement or related documents.

5.       **Preservation of Rights of Action**

(a)       Maintenance of Causes of Action

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Reorganized Debtors shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in one or more of the Chapter 11 Cases.

45

(b)    Preservation of All Causes of Action Not Expressly Settled or Released

Unless a claim or Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), the Debtors expressly reserve such claim or Cause of Action for later adjudication by the Debtors or the Reorganized Debtors (including, without limitation, claims and Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Causes of Action upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such claims or Causes of Action have been expressly released in the Plan (including, without limitation, and for the avoidance of doubt, the Debtor Release contained in Article X.B. of the Plan) or any other Final Order (including, without limitation, the Confirmation Order). In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

**Notwithstanding the foregoing, as of the Effective Date, the Debtors discharge, release and waive all Avoidance Actions, with the exception of those expressly reserved in the Plan Supplement.**

6.    **Injunction**

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES THAT: (A) HAVE BEEN RELEASED PURSUANT TO ARTICLE X.B OF THE PLAN; (B) HAVE BEEN RELEASED PURSUANT TO ARTICLE X.C. OF THE PLAN; (C) HAVE BEEN DISCHARGED PURSUANT TO ARTICLE III.F OF THE PLAN; OR (D) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE X.D (BUT ONLY TO THE EXTENT OF THE EXCULPATION PROVIDED IN ARTICLE X.D) ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED (INCLUDING THE REORGANIZED DEBTORS) (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, DISCHARGED OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED (INCLUDING THE REORGANIZED DEBTORS) (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, DISCHARGED OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES; (3) CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM OR ENCUMBRANCE OF ANY KIND AGAINST ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED (INCLUDING THE REORGANIZED DEBTORS) (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, DISCHARGED OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED (INCLUDING THE REORGANIZED DEBTORS) (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, DISCHARGED OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF ON OR BEFORE THE CONFIRMATION DATE, AND NOTWITHSTANDING AN INDICATION IN A PROOF OF CLAIM OR INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO