SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; AND (5) COMMENCING OR
CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST ANY
ENTITY SO RELEASED, DISCHARGED OR EXCULPATED (INCLUDING THE REORGANIZED DEBTORS)
(OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED OR EXCULPATED)
ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED,
DISCHARGED OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES
RELEASED OR SETTLED PURSUANT TO THE PLAN.

**K.    BINDING NATURE OF PLAN**

THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS AND
INTERCOMPANY INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY
APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR
RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF
CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT
THE PLAN OR VOTED TO REJECT THE PLAN.

**L.    RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the
Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities
with respect to all matters related to the Chapter 11 Cases, the Debtors and the Plan as legally permissible,
including, without limitation, jurisdiction to:

1.  allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of
    any Claim, including, without limitation, the resolution of any request for payment of any Administrative Claim
    and the resolution of any and all objections to the allowance or priority of any Claim;

2.  grant or deny any applications for allowance of compensation or reimbursement of expenses authorized
    pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Confirmation Date;

3.  resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired
    Lease to which a Debtor is party or with respect to which a Debtor or Reorganized Debtor may be liable and to
    adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those
    matters related to any amendment to the Plan after the Effective Date to add Executory Contracts or Unexpired
    Leases to the list of Executory Contracts and Unexpired Leases to be assumed;

4.  resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

5.  ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

6.  decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of
    Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any
    applications involving a Debtor that may be pending on the Effective Date or instituted by the Reorganized
    Debtors after the Effective Date, *provided* that the Reorganized Debtors shall reserve the right to commence
    actions in all appropriate forums and jurisdictions;

7.  enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan
    and all other contracts, instruments, releases, indentures and other agreements or documents adopted in
    connection with the Plan, the Plan Supplement or the Disclosure Statement;

8.  resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation,
    interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;
    *provided, however,* that any dispute arising under or in connection with the Exit Facility, the New Senior Notes

indenture and the Warrant Agreement shall be dealt with in accordance with the provisions of the applicable document;

9.  hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

10. issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan, except as otherwise provided in the Plan;

11. enforce Article X.A, Article X.B, Article X.C, Article X.D, and Article X.E of the Plan;

12. enforce the injunction set forth in Article X.F of the Plan;

13. resolve any cases, controversies, suits or disputes with respect to the Debtor Release, the Third Party Release, the Exculpation, the Indemnification and other provisions contained in Article X of the Plan and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

14. enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

15. resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; *provided, however,* that any dispute arising under or in connection with the Exit Facility, the New Senior Notes indenture, the New Redeemable PIK Preferred Units, the LLC Agreement and the Warrant Agreement shall be dealt with in accordance with the provisions of the applicable document; and

16. enter an order concluding the Chapter 11 Cases.

## M.   MISCELLANEOUS PROVISIONS

### 1.   Dissolution of Committee

Upon the occurrence of the Effective Date, the Committee shall be deemed to be dissolved with respect to the Debtors and its respective members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to the Chapter 11 Cases; *provided, however,* that the Committee and its Retained Professionals shall be retained with respect to (1) applications Filed pursuant to sections 330 and 331 of the Bankruptcy Code, (2) motions, appeals or other litigation seeking the enforcement of the provisions of the Plan and the transactions contemplated by the Plan or the Confirmation Order and (3) pending appeals and adversary proceedings.

### 2.   Payment of Statutory Fees

All fees payable pursuant to section 1930 of title 28 of the United States Code after the Effective Date shall be paid before the closing of the Chapter 11 Cases when due or as soon thereafter as practicable.

### 3.   Payment of Fees and Expenses of Indenture Trustees

On the Effective Date (and, thereafter, upon request by any Indenture Trustees with respect to fees and expenses, including counsel fees, of such Indenture Trustee relating to post-Effective Date service under the Plan), the Reorganized Debtors shall pay in full in Cash all outstanding reasonable and documented fees and expenses of the Indenture Trustees and their respective counsel and indemnification claim amounts, if any.

4.      **Return of Security Deposits**

Unless the Debtors have agreed otherwise in a written agreement or stipulation approved by the Bankruptcy Court, all security deposits provided by the Debtors to any Person or Entity at any time after the Petition Date, including security deposits provided pursuant to the Final Order Determining Adequate Assurance of Payment for Future Utility Services entered on March 12, 2009 [Docket No. 126], shall be returned to the Reorganized Debtors within 20 days after the Effective Date, without deduction or offset of any kind except as permitted under the aforementioned order.

5.      **Modification of Plan**

Effective as of the date hereof and subject to the limitations and rights contained in the Plan: (a) the Debtors reserve the right, in consultation with the Plan Sponsors, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

6.      **Revocation of Plan**

The Debtors, in consultation with the Plan Sponsors, reserve the right to revoke or withdraw the Plan before the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors, in consultation with the Plan Sponsors, revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant the Plan shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

7.      **Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

8.      **Payment of Fees and Expenses of Silver Point and the Ad Hoc Group of Senior Noteholders**

Muzak shall promptly pay in Cash in full reasonable and documented fees and expenses incurred by (i) Willkie Farr & Gallagher LLP, Young Conaway Stargatt and Taylor, and Perella Weinberg Partners, as co-counsel and financial advisor to Silver Point, in accordance with their respective engagement letters; (ii) Brown Rudnick and Saul Ewing LLP, as co-counsel to the Ad Hoc Group of Senior Noteholders, in accordance with their respective engagement letters; and (iii) the Prepetition Administrative Agent (x) that are payable in accordance with the Cash Collateral Order and (y) that are incurred in connection with distributions under the Plan and in accordance with the terms of the Plan.

9.      **Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any other Entity with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or Plan Sponsors with respect to the Holders of Claims or Equity Interests before the Effective Date.

49

10.    **Further Assurances**

The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims receiving distributions under the Plan and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

11.    **Service of Documents**

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtors shall be sent by overnight mail to:

Muzak LLC
3318 Lakemont Boulevard
Fort Mill, South Carolina 29708
Attn:  R. Dodd Haynes

**with copies to**:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:  Edward O. Sassower and Joshua A. Sussberg

12.    **Entire Agreement**

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have been merged and integrated into the Plan.

13.    **Severability of Plan Provisions**

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted, *provided* that any such alteration or interpretation must be in form and substance reasonably acceptable to the Debtors and the Plan Sponsors; *provided, further,* that the Debtors and the Plan Sponsors (as applicable) may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing.    Notwithstanding any such order by the Bankruptcy Court, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect.    The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

14.    **Exhibits**

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted, *provided* that any such alteration or interpretation must be in form and substance reasonably acceptable to the Debtors and the Plan Sponsors; *provided, further,* that the Debtors and the Plan Sponsors (as applicable) may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing.    Notwithstanding any such order by the Bankruptcy Court, alteration or

interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 15.    Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors and the Plan Sponsors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and the Plan Sponsors and their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code and therefore will have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan.

### 16.    Conflicts

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control; *provided, however,* that if there is a conflict between the Plan and a Plan Supplement document, the Plan Supplement document shall govern and control.

### 17.    Filing of Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court all agreements and other documents (which documents shall be in form and substance satisfactory to the Plan Sponsors) that may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.


## VI.
## CONFIRMATION AND CONSUMMATION PROCEDURES


### A.    SOLICITATION PROCEDURES

#### 1.    The Solicitation Procedures

On [INSERT], 2009, the Bankruptcy Court entered the Disclosure Statement Order, which (a) approved, among other things, the dates, procedures and forms applicable to the process of soliciting votes on and providing notice of the Plan as well as the Solicitation Procedures and (b) establish the deadline for filing objections to the Plan and scheduling the hearing to consider Confirmation of the Plan.

**The discussion of the Solicitation Procedures below is a summary of the solicitation and voting process.** Detailed voting instructions are provided with each Ballot and Master Ballot, as applicable, and are also set forth in greater detail in the Solicitation Procedures annexed as **Exhibit 1** to the Disclosure Statement Order, which is attached as **Exhibit B** to this Disclosure Statement.

PLEASE REFER TO THE INSTRUCTIONS ACCOMPANYING THE BALLOTS AND MASTER BALLOTS, AS APPLICABLE, AND THE SOLICITATION PROCEDURES FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT YOUR BALLOT OR MASTER BALLOT, AS APPLICABLE, IS PROPERLY AND TIMELY SUBMITTED SUCH THAT YOUR VOTE MAY BE COUNTED.

THE DEADLINE TO VOTE ON THE PLAN IS [DECEMBER 7, 2009].  IF YOUR VOTE IS NOT RECEIVED BY THE VOTING AND CLAIMS AGENT BY 5:00 P.M. PREVAILING EASTERN TIME ON [DECEMBER 7, 2009], YOUR VOTE WILL NOT BE COUNTED.

2.      **The Voting and Claims Agent**

With the approval of the Bankruptcy Court, the Debtors retained Epiq as Voting and Claims Agent to, among other things, act as solicitation agent in connection with the solicitation of votes to accept the Plan.

Specifically, the Voting and Claims Agent will assist the Debtors with:  (a) distributing the Solicitation Packages; (b) soliciting, receiving and tabulating Ballots, pre-validated Ballots and Master Ballots, as applicable; (c) responding to inquiries from Holders of Claims and other Entities relating to the Disclosure Statement, the Plan, the Ballots and Master Ballots, the Solicitation Procedures (including procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan) and other matters relating thereto; (d) contacting creditors and Holders of Claims regarding the Plan, if necessary; and (e) filing a voting report before the Confirmation Hearing.

3.      **Holders of Claims Entitled to Vote on the Plan**

Under the provisions of the Bankruptcy Code, not all holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan.  The following table provides a summary of the status and voting rights of each Class (and, therefore, of each Holder of a Claim within the Class) under the Plan:

### SUMMARY OF STATUS AND VOTING RIGHTS

| Class | Claim/Equity Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Secured Term Loan Claims | Unimpaired | Deemed to Accept |
| 4 | Senior Notes Claims | Impaired | Entitled to Vote |
| 5 | Senior Subordinated Notes Claims | Impaired | Entitled to Vote |
| 6 | Discount Notes Claims | Impaired | Entitled to Vote |
| 7 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 8 | Equity Interests | Impaired | Deemed to Reject |
| 9 | Intercompany Interests | Unimpaired | Deemed to Accept |

Based on the foregoing, the Debtors **are** soliciting votes to accept the Plan only from Holders of Claims in Classes 4, 5 and 6 (collectively, the "Voting Classes") because Holders of Claims in the Voting Classes are Impaired under the Plan and, therefore, have the right to vote to accept or reject the Plan. The Debtors are **not** soliciting votes from (a) Holders of Unimpaired Claims in Classes 1, 2, 3, 7 and 9 because those parties are conclusively presumed to have accepted the Plan or (b) Holders of Equity Interests in Class 8 because those parties are conclusively presumed to have rejected the Plan.

4.    **The Voting Record Date**

**The Bankruptcy Court has approved [October 20, 2009] as the Voting Record Date**. The Voting Record Date is the date as of which it will be determined: (a) which Holders of Claims in Classes 4, 5 and 6 are entitled to vote to accept or reject the Plan and receive Solicitation Packages in accordance with the Solicitation Procedures, and (b) whether Claims have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of a Claim.

5.    **Contents of the Solicitation Package**

The following documents and materials will collectively constitute the Solicitation Package:

- the Plan;

- the Disclosure Statement (and exhibits annexed thereto, including the Plan);

- the Disclosure Statement Order (together with the Solicitation Procedures, which are annexed as Exhibit 2 thereto);

- the Confirmation Hearing Notice;

- an appropriate Ballot and/or Master Ballot, as applicable (together with detailed voting instructions and a pre-addressed, postage prepaid return envelope); and

- a cover letter from the Debtors explaining the solicitation process and urging Holders of Claims in the Voting Classes to vote to accept the Plan;.

In addition, Holders of Claims in Classes 4, 5 and 6 will receive a letter from the Plan Sponsors recommending that Holders of Claims in Classes 4, 5 and 6 vote in favor of the Plan.

6.      **Distribution of the Solicitation Package to Holders of Claims Entitled to Vote on the Plan**

With the assistance of the Voting and Claims Agent, the Debtors intend to distribute Solicitation Packages within five business days after entry of the Disclosure Statement Order. The Debtors submit that the timing of this distribution will provide Holders of Claims with adequate time within which to review the materials required to allow parties to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 3017(d) and 2002(b). The Debtors will make every reasonable effort to ensure that Holders who have more than one Allowed Claim in a single voting Class receive no more than one Solicitation Package.

The Debtors intend to distribute the Solicitation Packages in CD-ROM format to Holders of Claims entitled to vote on the Plan. However, as part of the same mailing, the Debtors will include copies of each of the Debtors' letter, the Confirmation Hearing Notice and the appropriate ballot in paper format <u>only</u>.[5] Additionally, any parties may request and obtain at the Debtors' expense (regardless of whether they are entitled to vote on the Plan, but excluding any form of ballots) a copy of documents in paper format.

7.      **Distribution of Notices to Holders of Claims in Non-Voting Classes**

As set forth above, certain Holders of Claims and Equity Interests are **not** entitled to vote on the Plan. As a result, these parties will <u>not</u> receive Solicitation Packages and, instead, will receive the appropriate form of Non-Voting Status Notice as follows:

- <u>Unimpaired Claims – Deemed to Accept</u>. Administrative Claims and Priority Tax Claims are unclassified, non-voting Claims and Claims in Classes 1, 2, 3, 7 and 9 are Unimpaired under the Plan and, therefore, are presumed to have accepted the Plan. As such, Holders of these Claims will receive the Confirmation Hearing Notice and a "Notice of Non-Voting Status With Respect to Classes Deemed to Accept the Plan" in lieu of a Solicitation Package.

- <u>Impaired Claims – Deemed to Reject</u>. Holders of Equity Interests in Class 8 are receiving no distribution under the Plan and, therefore, are conclusively presumed to reject the Plan. As such, Holders of Equity Interests will receive the Confirmation Hearing Notice and a "Notice of Non-Voting Status With Respect to Holders of Equity Interests Deemed to Reject the Plan" in lieu of a Solicitation Package.

- <u>Disputed Claims</u>. Subject to the procedures for the temporary allowance of Disputed Claims described in the Solicitation Procedures, Holders of Disputed Claims will receive the Confirmation Hearing Notice and a "Non-Voting Status Notice With Respect to Disputed Claims" in lieu of a Solicitation Package.

8.      **Additional Distribution of Solicitation Documents**

In addition to the distribution of Solicitation Packages to Holders of Claims in Voting Classes, the Debtors will also provide the Solicitation Package (minus any ballots) to: (a) the U.S. Trustee; (b) counsel for the Committee; (c) counsel to the Ad Hoc Group of Senior Note Holders; (d) counsel to the steering committee of Holders of Secured Term Loan Claims; (e) counsel to Silver Point; (f) counsel for the IPMA; (g) the IRS; and (h) parties who have filed requests for notices under Bankruptcy Rule 2002 as of the Voting Record Date. Additionally, parties may request (and obtain at the Debtors' expense) a copy of the Disclosure Statement (and any exhibits thereto, including the Plan) by: (i) calling the Debtors' restructuring hotline at 866-940-3607; (ii) writing to Epiq Bankruptcy Solutions LLC, P.O. Box 5014, FDR Station, New York, New York 10150-5014; and/or (iii) visiting the Debtors' restructuring website at: http://chapter11.epiqsystems.com/muzak. Parties may also obtain any documents filed in these Chapter 11 Cases <u>for a fee</u> via PACER at http://www.deb.uscourts.gov.

---

5       Holders of Claims in Classes 4, 5 and 6 will also receive the Plan Sponsors' letter.

9.    **Filing of the Plan Supplement**

The Debtors will file the Plan Supplement at least ten days before the Confirmation Hearing, and will serve the 2002 List with a courtesy notice that will (a) inform parties that the Plan Supplement was filed, (b) list the information contained in the Plan Supplement and (c) explain where copies of the Plan Supplement may be obtained. Parties may obtain a copy of the Plan Supplement by: (a) calling the Debtors' restructuring hotline at 866-940-3607; (b) visiting the Debtors' restructuring website at: http://chapter11.epiqsystems.com/muzak; and/or (c) writing to Epiq Bankruptcy Solutions LLC, P.O. Box 5014, FDR Station, New York, New York 10150-5014.

The Plan Supplement will include, without limitation, the following information:

- the new organizational documents;

- the identity of the members of the New Board and the nature of any compensation for any member of the New Board who is an "insider" under the Bankruptcy Code;

- the list of Executory Contracts and Unexpired Leases designated by the Debtors, with the consent of the Plan Sponsors, to be rejected on the Effective Date;

- the Exit Facility and related documents, to the extent available;

- the New Senior Notes;

- the LLC Agreement;

- the certificate of designation regarding the New Redeemable PIK Preferred Units;

- the Warrant Agreement;

- the Management and Director Incentive Program;

- the Employee-Related Agreements; and

- the Restructuring Transactions Notice.

**B.    VOTING PROCEDURES**

Holders of Claims entitled to vote on the Plan are advised to read the Solicitation Procedures, annexed as Exhibit 1 of the Disclosure Statement Order, which set forth in greater detail the voting instructions summarized herein.

1.    **The Voting Deadline**

**The Bankruptcy Court has approved [5:00 p.m.] prevailing Eastern Time on [December 7], 2009 as the Voting Deadline.** The Voting Deadline is the date by which all Ballots and Master Ballots, as applicable, must be properly executed, completed and delivered to the Voting and Claims Agent in order to be counted as votes to accept or reject the Plan.

2.    **Types of Ballots**

The Debtors will provide the following ballots to Holders of Claims in Classes 4, 5 and 6 entitled to vote on the Plan:

- "***Ballots***" will be sent to all Holders of Claims in Classes 4, 5 and 6;

- "*Master Ballots*" will be sent to the Nominees for, and voting on behalf of, Beneficial Holders of Class 4 Senior Notes Claims, Class 5 Senior Subordinated Notes Claims and Class 6 Discount Notes Claims, respectively.[6]

3.    **Voting Instructions**

Under the Plan, Holders of Claims in the Voting Classes (Classes 4, 5 and 6) are entitled to vote to accept or reject the Plan.  Ballots must be sent to the applicable Nominees in enough time such that the Nominee can compile a Master Ballot and submit it to the Voting and Claims Agent such that it is received by the Voting and Claims Agent on or before the Voting Deadline (and set forth in greater detail in the Solicitation Procedures). Holders of Claims in Classes 4, 5 or 6 who hold their Claims as a record holder in their own name can vote by submitting a Ballot directly to the Voting and Claims Agent so that it is received on or before the Voting Deadline.

---

**PLEASE REFER TO THE INSTRUCTIONS ATTACHED TO THE BALLOTS OR MASTER BALLOTS FOR MORE DETAILED INFORMATION REGARDING THE VOTING REQUIREMENTS, RULES AND PROCEDURES APPLICABLE TO VOTING YOUR CLAIM.**

---

To be counted as votes to accept or reject the Plan, all Ballots and Master Ballots, as applicable, (all of which will clearly indicate the appropriate return address) must be properly executed, completed and delivered by using the return envelope provided by (a) first class mail, (b) overnight courier or (c) personal delivery, so that they are **actually received** on or before the Voting Deadline by the Voting and Claims Agent at the following address:

| If delivered by mail: | If delivered by courier or hand delivery: |
|---|---|
| **Epiq Bankruptcy Solutions LLC** **Attn: Muzak Holdings LLC Balloting Center** **P.O. Box 5014** **FDR Station** **New York, New York 10150-5014** | **Epiq Bankruptcy Solutions LLC** **Attn: Muzak Holdings LLC Balloting Center** **757 Third Avenue, 3rd Floor** **New York, New York 10017** |
| If you have any questions on the procedures for voting on the Plan, please call the Voting and Claims Agent at: 1-866-940-3607. ||

4.    **Voting Instructions for Beneficial Holders of Class 4 Senior Notes Claims, Class 5 Senior Subordinated Notes Claims and Class 6 Discount Notes Claims Entitled to Vote on the Plan**

*Distribution of Solicitation Packages by Nominees as Record Holders.*  Before the Solicitation Deadline, the Securities Voting Agent will determine the identity of those Nominees holding Senior Notes, Senior Subordinated Notes and Discount Notes on behalf of Beneficial Holders as of the Record Date and will distribute an appropriate number of Solicitation Packages to Nominees to allow Nominees to forward one to each Beneficial Holder for whom the Nominee is the record holder.

*Nominees Voting on Behalf of Beneficial Holders.*  Before the Solicitation Deadline, the Securities Voting Agent will contact the Depository Trust Company to determine the identity of those Nominees holding Senior Notes, Senior Subordinated Notes and Discount Notes on behalf of Beneficial Holders as of the Record Date and, additionally, will contact Broadridge Securities Processing Solutions ("Broadridge") to determine the identity of those Nominees that use their service for the distribution and tabulation of votes. The Securities Voting Agent will then distribute an appropriate number of Solicitation Packages (which will each include Ballots to be completed by Beneficial Holders and a Master Ballot to be completed by the Nominee) to Broadridge (if applicable) and the

---

[6]    The Indenture Trustees will not vote on behalf of classes 4, 5 and 6.

56

appropriate Nominees who shall be entitled to receive reasonably sufficient numbers of Solicitation Packages to allow the Nominee to forward one to each Beneficial Holder for whom the Nominee is the record holder.

- Nominees who elect to pre-validate Ballots must deliver Solicitation Packages, including pre-validated Ballots, to Beneficial Holders along with (a) instructions for mailing pre-validated Ballots directly to the Debtors' Voting and Claims Agent and (b) a pre-addressed return envelope addressed to the Voting and Claims Agent. Beneficial Holders who receive pre-validated Ballots must complete, execute and deliver the Ballots directly to the Voting and Claims Agent so they are actually received on or before the Voting Deadline.

- Nominees who do not elect to pre-validate Ballots must deliver Solicitation Packages, including Ballots, pre-addressed return envelops addressed to the Nominee and instructions from each Nominee that clearly indicate the date by which their respective Beneficial Holders must return their completed and executed Ballots to Nominees, which date the Nominee must also insert in the blank on the first page of the Ballot before transmitting it to the Beneficial Holder. Upon such time as indicated by the Nominee for the return of completed Ballots, Nominees will: (a) promptly collect Ballots from each Beneficial Holder that voted on the Plan; (b) validate the votes cast and/or other information contained in the Ballots; (c) summarize and compile the votes cast and/or other relevant information onto the Master Ballots; and (d) return the Master Ballot(s) so that they are actually received on or before the Voting Deadline by the Voting and Claims Agent.

---

**THE FOLLOWING IS IMPORTANT INFORMATION
REGARDING VOTING WHICH YOU SHOULD READ CAREFULLY.**

---

- FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT OR MASTER BALLOT, AS APPLICABLE, MUST BE PROPERLY EXECUTED, COMPLETED AND DELIVERED SUCH THAT IT IS **ACTUALLY RECEIVED** ON OR BEFORE THE VOTING DEADLINE BY THE VOTING AND CLAIMS AGENT.

- A HOLDER OF A CLAIM MAY CAST ONLY ONE VOTE PER EACH CLAIM SO HELD. BY SIGNING AND RETURNING A BALLOT OR MASTER BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOT OR MASTER BALLOTS WITH RESPECT TO ITS CLAIM HAS BEEN CAST OR, IF ANY OTHER BALLOTS OR MASTER BALLOTS HAVE BEEN CAST WITH RESPECT TO ITS CLAIM, THEY ARE THEREBY SUPERSEDED AND REVOKED.

- **ANY BALLOT OR MASTER BALLOT THAT IS RECEIVED AFTER THE VOTING DEADLINE (UNLESS THE DEADLINE IS EXTENDED), WILL NOT BE COUNTED TOWARD CONFIRMATION OF THE PLAN.**

- **ADDITIONALLY, THE FOLLOWING BALLOTS AND MASTER BALLOTS WILL NOT BE COUNTED:**

  o any ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

  o any ballot cast by an entity that (x) does not hold a Claim in a Class that is entitled to vote on the Plan or (y) is not otherwise entitled to vote pursuant to the procedures described herein;

  o any ballot cast for a Claim listed in the Schedules as contingent, unliquidated or disputed for which no Proof of Claim was timely filed;

  o any ballot cast for a Claim that is subject to an objection and no Resolution Event has occurred before the Voting Record Date;

o   any ballot sent to the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent), the Indenture Trustees or the Debtors' financial or legal advisors;

o   any ballot transmitted by facsimile or other electronic means;

o   any unsigned ballot; or

o   any ballot not marked to accept or reject the Plan or any ballot marked both to accept and reject the Plan.

## C.    CONFIRMATION PROCEDURES

### 1.    Confirmation Hearing

**The Confirmation Hearing will commence at [●] prevailing Eastern Time on [December 16], 2009** before the Honorable Kevin J. Carey, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 5th Floor, Courtroom 5, Wilmington, Delaware 19801-3024. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

**The Plan Objection Deadline is [12:00 p.m.] prevailing Eastern Time on [December 7], 2009.**

All Plan Objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in accordance with the Disclosure Statement Order such that they are **actually received** on or before the Plan Objection Deadline in accordance with the Confirmation Hearing Notice.

> THE BANKRUPTCY COURT WILL <u>NOT</u> CONSIDER PLAN OBJECTIONS UNLESS THEY ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.

### 2.    Confirmation Hearing Notice

Following the Disclosure Statement Hearing, the Debtors will publish the Confirmation Hearing Notice, which will contain, among other things, the Plan Objection Deadline, the Voting Deadline and the date that the Confirmation Hearing is scheduled to commence. Specifically, the Confirmation Hearing Notice will be published one time in the following publications on a date no later than 15 days before the Voting Deadline to provide notification to those Entities that may not receive notice by mail: *Wall Street Journal (South Atlantic Region)* and in certain regional newspapers and/or trade journals, including *The Enquirer Herald*, *Fort Mill Times*, *The Herald*, *The Charlotte Observer*, *Charlotte Business Journal*, *Billboard Magazine*, *R&R Magazine*.

### 3.    Filing Objections to the Plan

All objections, if any, must (a) be made in writing, (b) state with particularity the grounds for such objection; (c) state the name and address of the objecting party; (d) conform to the Federal Rules of Bankruptcy Procedure, the Local Rules and (e) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that they are **actually received** on or before the Plan Objection Deadline by each of the parties listed in the table below:

| KIRKLAND & ELLIS LLP | KLEHR, HARRISON, HARVEY, |
|---|---|
| Attn: Edward O. Sassower | BRANZBURG & ELLERS LLP |
| Joshua A. Sussberg | Attn: Domenic E. Pacitti |
| 601 Lexington Avenue | Michael W. Yurkewicz |
| New York, New York 10022-4611 | 919 Market Street, Suite 1000 |
| | Wilmington, Delaware 19801-3062 |

*Co-Counsel to the Debtors*

| AKIN GUMP STRAUSS HAUER & FELD LLP | DORSEY & WHITNEY LLP |
|---|---|
| Attn: James R. Savin | Attn: Eric Lopez Schnabel |
| Attn: David M. Dunn | Attn: Robert W. Mallard |
| Robert S. Strauss Building | 1105 North Market Street, Suite 1600 |
| 1333 New Hampshire Avenue, N.W. | Wilmington, Delaware 19801 |
| Washington, D.C. 20036-1564 | |

*Co-Counsel to the Committee*

| WILLKIE FARR & GALLAGHER LLP | YOUNG CONAWAY STARGATT |
|---|---|
| Attn: Paul Shalhoub | & TAYLOR LLP |
| Attn: Robin Spigel | Attn: Robert S. Brady |
| 787 Seventh Avenue | Attn: Matthew B. Lunn |
| New York, New York 10019 | The Brandywine Building |
| | 1000 West Street, 17th Floor |
| | Wilmington, Delaware 19801 |

*Co-Counsel to Silver Point Capital Advisors, LLC*

| BROWN RUDNICK LLP | SAUL EWING LLP |
|---|---|
| Attn: William R. Baldiga | Attn: Mark Minuti |
| Attn: Andrew M. Sroka | 222 Delaware Avenue, Suite 1200 |
| One Financial Center | P.O. Box 1266 |
| Boston, Massachusetts 02111 | Wilmington, Delaware 19899 |

*Co-Counsel to the Ad Hoc Consortium of Non-Silver Point Holders of Senior Notes*

| BINGHAM MCCUTCHEN LLP | REED SMITH LLP |
|---|---|
| Attn: Andrew J. Gallo | Attn: Kurt F. Gwynne |
| One Federal Street | 1201 Market Street, Suite 1500 |
| Boston, Massachusetts 02110-1726 | Wilmington, Delaware 19801 |

*Co-Counsel to the Steering Committee of Senior Secured Lenders*

| MCGUIRE, CRADDOCK & STROTHER, P.C. |
|---|
| Attn: Jonathan Thalheimer |
| 500 North Akard, Suite 3550 |
| Dallas, TX 75201 |

*Co-Counsel to the Prepetition Agent*

| THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE DISTRICT OF DELAWARE |
|---|
| Attn: David Klauder |
| 844 King Street, Suite 2207 |
| Wilmington, Delaware 19801 |

**KLESTADT & WINTERS, LLP**
Attn: John E. Jureller, Jr.
Klestadt & Winters, LLP
292 Madison Avenue, 17th Floor
New York, New York 10017

*Counsel to the IPMA*

**THE INTERNAL REVENUE SERVICE**
31 Hopkins Plaza
Mail Stop Room 1150
Baltimore, Maryland 21201

4.    **Effect of Confirmation of the Plan**

Article X of the Plan contains certain provisions relating to (a) the compromise and settlement of Claims, (b) the release of the Debtors and related parties, certain third parties and the Plan Sponsors, (c) exculpation of certain parties and (d) the indemnification obligations of the Reorganized Debtors on and subsequent to the Effective Date. It is important to read these provisions carefully so that you understand the implications of these provisions with respect to your Claim such that you may cast your vote accordingly. Specifically:[7]

- **IF YOU VOTE TO <u>ACCEPT</u> THE PLAN, YOU ARE BOUND BY THE TERMS OF THE PLAN. YOU ARE AUTOMATICALLY DEEMED TO CONSENT TO THE THIRD PARTY RELEASE SET FORTH IN ARTICLE X OF THE PLAN;**

- **IF YOU VOTE TO <u>REJECT</u> THE PLAN, YOU ARE NOT BOUND BY THE THIRD PARTY RELEASE SET FORTH IN ARTICLE X OF THE PLAN; AND**

- **IF YOU <u>FAIL TO ACCEPT OR REJECT</u> THE PLAN AND THE BANKRUPTCY COURT CONFIRMS THE PLAN, YOU WILL BE BOUND BY THE TERMS OF THE PLAN, INCLUDING THE THIRD PARTY RELEASE SET FORTH IN ARTICLE X OF THE PLAN <u>UNLESS</u> YOU COMPLETE AND TIMELY SUBMIT THE RELEASE OPT-OUT INCLUDED IN EACH BALLOT.**

> THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS AND INTERCOMPANY INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT A HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (C) FAILED TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

D.    **STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

---

[7]    This Section is intended only as a brief summary of the release provisions contained in Article X of the Plan and is qualified by reference to all of Article X of the Plan. To the extent there are any inconsistencies between this summary and Article X of the Plan, Article X of the Plan shall govern.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (a) made before the Confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as reasonable, if payment for it is to be requested after Confirmation of the Plan.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- Either each Holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of its Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- The Debtors have paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

- In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Debtors will pay quarterly fees no later than the last day of the calendar month, following the calendar quarter for which the fee is owed in each of the Debtors' Chapter 11 Cases for each quarter (including any fraction thereof), to the Office of the U.S. Trustee, until the case is converted or dismissed, whichever occurs first.

1.    **"Best Interests" Test/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in a class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that a holder would receive or retain if the debtor is liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the bankruptcy court must: (a) estimate the Cash liquidation proceeds that a chapter 7 trustee would generate if each of the debtor's chapter 11 case were converted to a chapter 7 case and the assets of the debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from the liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare the holder's liquidation distribution to the distribution under the plan that the holder would receive if the plan were confirmed.

61

In chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

Accordingly, the Cash amount that would be available for satisfaction of Claims (other than Secured Claims) would consist of the proceeds resulting from the disposition of the unencumbered assets of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the commencement of the liquidation. This Cash would be reduced by the amount of the costs and expenses of the liquidation and by additional administrative and priority claims that may result from termination of the Debtors' business and the use of chapter 7 for purposes of a liquidation.

As described in more detail in the Liquidation Analysis, which is attached hereto as <u>Exhibit E</u>, the Debtors believe that confirmation of the Plan will provide each Holder of an Allowed Claim in Classes 4, 5 and 6 with a greater recovery than the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code because, among other reasons, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale of the Debtors' assets and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution. In addition, distributions in chapter 7 cases may not occur for a longer period of time than distributions under the Plan, thereby reducing the present value of distributions. In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a significant period while the chapter 7 trustee and its advisors become knowledgeable about, among other things, the Chapter 11 Cases and the Claims against the Debtors. As set forth in the Liquidation Analysis, Holders of Class 8 Equity Interests would not receive any recovery under a chapter 7 liquidation, so the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code with respect to Class 8.

## 2.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the plan contemplates a liquidation. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their business.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. Management, with the assistance of its advisors, developed a business plan and prepared financial projections (the "Financial Projections") for fiscal years 2010 through 2013. The Financial Projections, together with the assumptions on which they are based, are attached hereto as **Exhibit C**.

In general, as illustrated by the Financial Projections, the Debtors believe that with the significantly de-leveraged capital structure provided for under the Plan, the Reorganized Debtors should have sufficient Cash flow and availability to pay and service their debt obligations and to fund operations. The Debtors believe that Confirmation and Consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

## 3.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to an unimpaired class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal,

equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of the obligation; or (c) provides that, on the consummation date, the holder of the claim or equity interest receives Cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of the equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Claims in Class 1, 2, 3, 7 and 9 are not Impaired under the Plan, and, as a result, the Holders of these Claims are deemed to have accepted the Plan.

Claims in Classes 4, 5 and 6 are Impaired under the Plan, and as a result, the Holders of Claims in these Classes are entitled to vote on the Plan. Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to these Classes, and without considering whether the Plan "discriminates unfairly" with respect to these Classes, as both standards are described herein. As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

4.      **Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

5.      **Fair and Equitable Test**

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in a class. As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in a class:

- Secured Claims. The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (a) the holders of secured claims retain the liens securing their claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred Cash payments totaling at least the allowed amount of its claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

- Unsecured Claims. The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either: (a) the plan provides that each holder of a claim of a class receive or retain on account of its claim property of a value, as of the effective date of the plan, equal to the allowed amount of its claim; or (b) the holder of any claim or any equity interest that is junior to the claims of the class will not receive or retain under the plan on account of the junior claim or junior equity interest any property.

63

- <u>Equity Interests</u>. The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:

  o the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which the holder is entitled; (b) any fixed redemption price to which the holder is entitled; or (c) the value of the interest; <u>or</u>

  o if the class does not receive the amount required in the paragraph directly above, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

**The Debtors will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by Class 8.** To the extent that any of the Voting Classes vote to reject the Plan, the Debtors further reserve the right to seek (a) Confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XIII.E of the Plan.

The votes of Holders of Equity Interests in Class 8 are not being solicited because, under Article III of the Plan, there will be no distribution to the Holders of Equity Interests in Class 8 and, therefore, Holders of Equity Interests in Class 8 are conclusively deemed to have rejected the Plan pursuant to section 1129(b) of the Bankruptcy Code. All Class 8 Equity Interests will be deemed canceled and will be of no further force and effect, whether surrendered for cancellation or otherwise. All Class 9 Intercompany Interests will be retained, and the legal, equitable and contractual rights to which the Holders of Intercompany Interests are entitled will remain unaltered in connection with the implementation of the Plan.

Notwithstanding the deemed rejection by Class 8 or any Class that votes to reject the Plan, the Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests. The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

6.      **No Unfair Discrimination**

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that the treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

E.      **CONSUMMATION OF THE PLAN**

The Plan will be consummated on the Effective Date. For a more detailed discussion of the conditions precedent to the consummation of the Plan and the impact of failure to meet those conditions, see Article IX.B of the Plan.

## VII.
## PLAN-RELATED RISK FACTORS

BEFORE VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH MUZAK'S BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

### A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

#### 1.    The Debtors May Be Unable to Obtain Exit Financing on Acceptable Terms.

The Debtors and their professionals have been attempting to obtain a commitment for exit financing to refinance the Prepetition Facility.  The Plan contemplates that the proceeds of exit financing will enable the Debtors to pay the Secured Term Loan Claims in full in cash on the Effective Date.  In the event the Debtors are unable to obtain exit financing, the Plan will need to be amended, modified or otherwise restated to address the treatment of the Secured Term Loan Claims.  As of the filing of this Disclosure Statement, the Debtors continue their efforts to locate a lender that is willing to provide exit financing consistent with the terms set forth in the Plan.

#### 2.    Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if the claim or equity interest is substantially similar to the other claims or equity interests in the class.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion, and there is therefore a risk that the Bankruptcy Court will not confirm the Plan.  (*See* Article VII.A.4.)

#### 3.    The Debtors May Fail to Satisfy the Vote Requirement.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan.  There can be no assurance that the terms of any alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan or that the Debtors would be successful in accomplishing any alternative plan.

#### 4.    The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, findings by the bankruptcy court that:  (a) the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of the plan is not likely to be followed by a liquidation or a need for further financial reorganization unless liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims within a particular class under the plan will not be less than the value of distributions that holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A

non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims. If an alternative reorganization could not be agreed to, it is possible that the Debtors would have to liquidate their assets, in which case the Debtors believe the Holders of Allowed Claims would receive substantially less favorable treatment than they would receive under the Plan.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to a non-accepting Class, than the treatment currently provided in the Plan. That less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

5.    **The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where that Claim is subject to an objection. Thus, any Holder of a Claim that is subject to an objection may receive less than its expected share of the estimated distributions described in this Disclosure Statement or no distribution at all.

6.    **Nonconsensual Confirmation of the Plan May Be Necessary.**

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm that a plan at the proponents' request if at least one impaired class has accepted the plan (with that acceptance being determined without including the vote of any "insider" in that class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements and that the Debtors may request nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion, in which case the Plan may not be confirmed.

7.    **Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to that timing, or as to whether the Effective Date will, in fact, occur. Delays in the occurrence of the Effective Date will delay the distributions contemplated by the Plan. To the extent the Effective Date does not occur, distributions contemplated by the Plan will not be made. In addition, parties in interest could seek various forms of relief in the Bankruptcy Court, including but not limited to seeking to compel the Debtors to effectuate the Plan or seeking to convert the case to a chapter 7. Parties in interest and/or the Debtors could commence litigation to effectuate the effectiveness of the Plan or to seek recompense for the failure of the Effective Date to occur.

8.    **Contingencies Will Not Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of such contingencies, which could affect distributions

available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

9. **The Actual Allowed Amounts of Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on Unsecured Claims.**

The estimates of Claims set forth in this Disclosure Statement are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual amounts of Allowed Claims may be significantly lower than the estimated amount of Allowed Claims contained herein.

B.    **RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN AND/OR RECOVERIES UNDER THE PLAN**

1. **The Valuation of the Reorganized Debtors May Not Be Adopted by the Bankruptcy Court.**

The approximate midpoint equity value of the Reorganized Debtors is set forth in the valuation included as **Exhibit D** to this Disclosure Statement. Parties in interest in these Chapter 11 Cases may oppose Confirmation of the Plan by alleging that the midpoint equity value of the Reorganized Debtors is higher or lower than the amount set forth in **Exhibit B** and that the Plan thereby improperly shifts recoveries under the Plan. At the Confirmation Hearing, the Bankruptcy Court will hear evidence regarding the views of the Debtors and opposing parties, if any, with respect to the valuation of the Reorganized Debtors. Based on that evidence, the Bankruptcy Court will determine the appropriate valuation for the Reorganized Debtors for purposes of the Plan. If the Bankruptcy Court determines that the appropriate valuation is less than the amount set forth in **Exhibit B**, there is a risk that it will not confirm the Plan. (*See* Article VII.A.A.4.)

2. **A Liquid Trading Market for the New Common Units May Not Develop.**

The Reorganized Debtors are not obligated to list the New Common Units on a national securities exchange, and the New Common Units will be issued without registration under the Securities Act or any similar federal, state or local law as set forth in greater detail in Section VIII herein, titled "Exemptions From Securities Act Registration." Thus, at least in the short-term, it is not likely that a liquid trading market for the New Common Units will develop. Even if a liquid trading market for the New Common Units were to develop, the liquidity of any market therefor will depend upon, among other things, the number of Holders of New Common Units, the Reorganized Debtors' financial performance and the market for similar securities, none of which can be determined or predicted. Therefore, the Debtors cannot provide assurances that an active trading market will develop, or if a market develops, what the liquidity or pricing characteristics of that market will be.

3. **The Reorganized Debtors May Not Be Able to Achieve Projected Financial Results or Meet Post-Reorganization Debt Obligations and Finance All Operating Expenses, Working Capital Needs or Capital Expenditures.**

The Reorganized Debtors may not be able to meet their projected financial results or achieve projected revenues and Cash flows assumed in projecting future business prospects. To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and Cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due or may not be able to meet their operational needs. Any one of these failures may preclude the Reorganized Debtors from, among other things: (a) enhancing their current customer offerings; (b) taking advantage of future opportunities; (c) growing their business; or (d) responding to competitive pressures. Further, a failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and Cash flows could lead to Cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital. The Reorganized Debtors may not be able to obtain that working capital when it is required. Further, even if the Reorganized Debtors were able to obtain additional working capital, it may only be available on terms that are less favorable to the Reorganized Debtors than those currently available. For example, the Reorganized Debtors may be required to take on additional debt, the interest costs of which could adversely affect the results of operations and the financial condition of the Reorganized

Debtors. If any required capital is obtained in the form of equity, the equity interests of the holders of the then-existing New Common Units could be diluted. Although the Debtors' Financial Projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors, there is no guarantee that the Financial Projections will be realized.

    **4.**        **The Private Sale Values of the New Common Units May be Substantially Lower than the Estimated Recoveries Stated Herein.**

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the private sale values of the Reorganized Debtors' securities. The estimated recoveries are based on numerous assumptions (the realization of many of which is beyond the control of Reorganized Debtors), including, without limitation: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; and (e) the assumption that capital and equity markets remain consistent with current conditions. As a result, the private sale value of the New Common Units may be substantially lower than the estimated recoveries stated herein.

    **5.**        **The Issuance of Equity Interests to Debtors' Management and the Warrants Could Dilute the Equity Ownership Interest of Other Holders of the New Common Units.**

The New Board may issue equity interests, or options to acquire equity interests, to management or employees. If such interests are issued, holders of New Common Units will suffer dilution of their investment. In addition, under the Plan, the Debtors will issue Warrants to purchase New Common Units. If the Warrants are exercised, holders of New Common Units will suffer dilution of their investment.

**C.**        **RISK FACTORS THAT COULD NEGATIVELY IMPACT THE DEBTORS' BUSINESS**

    **1.**        **Prolonged Continuation of the Chapter 11 Cases Is Likely To Harm the Debtors' Business.**

The prolonged continuation of these Chapter 11 Cases is likely to adversely affect the Debtors' business and operations. So long as the Chapter 11 Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations. Prolonged continuation of the Chapter 11 Cases will also make it more difficult to attract and retain management and other key personnel necessary to the success and growth of the Debtors' business. In addition, the longer the Chapter 11 Cases continue, the more likely it is that the Debtors' customers, suppliers, distributors and agents will lose confidence in the Debtors' ability to successfully reorganize their business and seek to establish alternative commercial relationships. Moreover, the nature of the Debtors' business requires customers to make long term investments in equipment and the uncertainty associated with these Chapter 11 Cases may negatively impact certain customers decision making with respect to long term contractual relationships with the Debtors.

Further, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the proceedings. The prolonged continuation of the Chapter 11 Cases will also require the Debtors to seek continued use of cash collateral of the Prepetition Lenders or additional financing to operate their business. The Prepetition Lenders may not consent to the extended use of cash collateral and it may not be possible for the Debtors to obtain additional financing during the pendency of the Chapter 11 Cases on commercially favorable terms or at all. If the Debtors were to require additional financing during the Chapter 11 Cases and were unable to obtain the financing on favorable terms or at all, it is unlikely the Debtors could successfully reorganize.

    **2.**        **The Reorganized Debtors' Operations May Be Restricted by the Terms of the Exit Facility.**

The Exit Facility may include a number of significant restrictive covenants, similar to the covenants that the Debtors are bound by pursuant to the Prepetition Facility. These covenants could impair the Reorganized Debtors' financing and operational flexibility and make it difficult for Reorganized Debtors to react to market

conditions and satisfy their ongoing capital needs and unanticipated Cash requirements.    Specifically, these covenants may restrict the Reorganized Debtors' ability to, among other things:

- incur additional debt;

- make certain investments;

- enter into certain types of transactions with affiliates;

- limit dividends or other payments by or among the Reorganized Debtors;

- use assets as security in other transactions;

- pay dividends on the New Common Units or repurchase equity interests;

- sell certain assets or merge with or into other companies;

- guarantee the debts of others;

- enter into new lines of business;

- make capital expenditures;

- prepay, redeem or exchange the Reorganized Debtors' debt; and

- form any joint ventures or subsidiary investments.

In addition, the Exit Facility may require the Reorganized Debtors to periodically meet various financial ratios and tests, including maximum leverage, minimum net worth and interest coverage levels. These financial covenants and tests could limit the Reorganized Debtors' ability to react to market conditions or satisfy extraordinary capital needs and could otherwise restrict the Reorganized Debtors' financing and operations.

The Reorganized Debtors' ability to comply with the covenants and other terms of the Exit Facility will depend on the Reorganized Debtors' future operating performance. If the Reorganized Debtors fail to comply with that covenants and terms, the Reorganized Debtors would be required to obtain waivers from their lenders to maintain compliance under the Exit Facility. If the Reorganized Debtors are unable to obtain any necessary waivers and the debt under the Exit Facility is accelerated, it would have a material adverse effect on the Reorganized Debtors' financial condition and future operating performance.

3.    **Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of Reorganized Debtors.**

Holders of Allowed Claims should carefully review Section IX herein, "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Reorganized Debtors. Certain tax implications of the Debtors' bankruptcy and reorganization may increase the tax liability of the Reorganized Debtors.

4.    **The Debtors May Be Impacted by Changes In Interest Rates.**

Changes in interest rates and foreign exchange rates may affect the fair market value of the Debtors' assets. Specifically, increases in interest rates will negatively impact the value of the Debtors' assets.

5.    **The Debtors' Ability To Service Debt and Meet Cash Requirements Depends On Many Factors, Some of Which Are Beyond the Debtors' Control.**

The Debtors' ability to satisfy their debt obligations, including obligations related to the Exit Facility and the New Senior Notes will depend on the Debtors' future operating performance and financial results, which will be subject, in part, to factors beyond the Debtors' control, including interest rates and general economic, financial and business conditions. If the Debtors are unable to generate sufficient Cash flow, they may be required to refinance all or a portion of their debt, obtain additional financing in the future for acquisitions, working capital, capital expenditures and general corporate or other purposes, redirect a substantial portion of Cash flow to debt service, which as a result, might not be available for operations or other purposes, sell some assets or operations, reduce or delay capital expenditures, or revise or delay operations or strategic plans. If the Debtors are required to take any of these actions, it could have a material adverse effect on their business, financial condition and results of operations. In addition, the Debtors cannot guarantee they would be able to take any of these actions, that these actions would enable them to continue to satisfy their capital requirements, or that these actions would be permitted under the terms of the Exit Facility and New Senior Notes.

6.    **Significant Increases in Subscriber Turnover May Adversely Effect the Debtors' Financial Condition and Operating Results.**

The Debtors' churn rate has been approximately 9.2% and 11.9% for 2007 and 2008, respectively. The Debtors define their churn rate as the percentage of monthly recurring revenue cancelled as a percentage of the Debtors' recurring revenue base at the beginning of the applicable year. An increase in churn rates may negatively impact the Debtors' cash flows from operations and require the Debtors to make further investments in order to maintain their operating cash flows. Further, high subscriber turnover also has a negative impact on future profitability.

7.    **Failure To Maintain or Upgrade Information Systems Efficiently May Result in Significant Disruption to the Debtors' Business Operations.**

The Debtors depend on a variety of information systems for the efficient functioning of their business. The Debtors rely on certain software vendors to maintain and periodically upgrade many of these systems so that they can continue to support the Debtors' business. The software programs supporting many of the Debtors' systems were licensed to the Debtors by independent software developers. Costs and potential interruptions associated with the implementation of new or upgraded systems and technology or with maintenance or adequate support of existing systems could disrupt or reduce the efficiency of the Debtors' business.

8.    **The Debtors May Be Unable to Keep Pace with Technological Changes Affecting the Production and Delivery of Their Products.**

There are numerous methods by which the Debtors' existing and future competitors can deliver programming, including various forms of recorded media, direct broadcast satellite services, wireless cable, fiber optic cable, digital compression over existing telephone lines, advanced television broadcast channels, Digital Audio Radio Service and the Internet. Competitors may use different forms of delivery for the services that the Debtors offer, and clients may use these alternative delivery methods in place of those provided by the Debtors. The Debtors may not have the financial or technological resources to adapt to changes in available technology and their clients' preferences.

The Debtors cannot provide assurance that they will be able to use, or compete effectively with competitors that adopt new delivery methods and technologies, or keep pace with discoveries or improvements in the communications, media and entertainment industries. The Debtors also cannot provide assurance that the technology they currently rely upon will not become obsolete. Advances in telecommunications technology and Internet music delivery systems have lowered the barriers to entry in the business music industry and have resulted in increased competitive pressure on the Debtors.

9.      **The Debtors Are Dependent on Satellite Delivery Provided by Third Parties.**

There are a limited number of satellites with orbital positions suitable for direct broadcast satellite transmission of our signals and a limited number of available transponders on those satellites. Satellite transponders receive signals, translate signal frequencies and transmit signals to receiving satellite dish antennas. If the Debtors' current transponders experience failures or their current transponders' lessors were unable to provide them with transponder services, the Debtors would have to seek alternative transponder or satellite facilities and to repoint satellite dishes at their clients' locations. However, alternative transponders and facilities may not be available on a timely or cost-effective basis, may be available only on a satellite that is not positioned as favorably as the Debtors' current satellites or may require a change in the frequency currently used to transmit and receive the Debtors' signal. If the Debtors are required to enter into new transponder lease agreements, they cannot provide assurance that they will be able to do so on terms as favorable as those in their current agreements or at all.

In addition, some of the Debtors' clients receive their direct broadcast satellite transmissions via uplink provided by DISH Network. In the event that the disruption, expiration or earlier termination of those services were to require the Debtors to identify alternative broadcast solutions for their affected clients, the Debtors would be further required to make significant capital expenditures to replace such clients' equipment, because DISH Network satellite systems installed at the Debtors' clients' locations are not compatible with other satellite systems.

10.     **The Debtors Are Dependent on Third Parties to License Music Rights.**

The Debtors pay performance royalties to songwriters and publishers through contracts negotiated with performing rights societies such as the ASCAP, BMI and SESAC, Inc. To support their clients who require on-premise, non-broadcast delivery systems, the Debtors also license rights to re-record and distribute music directly from record companies and publishers as well as from collectives that represent their interests. For example, the Debtors license mechanical rights directly from publishers as well as The Harry Fox Agency, a collective that represents publishers and collects royalties on their behalf.

The Debtors' ability to secure rights, licenses, and content is not assured, and the Debtors may not be able to secure such rights, licenses and content on commercially reasonable terms or at all. While the Debtors endeavor to provide their Audio Architects with a wide variety of licensed repertoire, rights-holders may, from time to time, challenge the Debtors' use of their works. Such rights-holders may fail to recognize the promotional value of being part of the Debtors' repertoire of available musical works or may recognize that promotional value but nonetheless insist on unreasonable terms, thereby limiting the availability to the Debtors of certain musical works. Limitations on the availability of certain musical works may result in the discontinuance of certain programs, which may lead to increased client churn, which in turn would have an adverse impact on the Debtors' financial condition and results of operations.

11.     **If the Debtors Are Unable to Protect Intellectual Property Rights, Their Sales and Financial Performance Could be Adversely Affected.**

The Debtors market their products under a variety of brand names and proprietary marks. The market for the Debtors' products depends to a significant extent upon the goodwill associated with the brand names under which products are sold. The Debtors rely on patent, trademark and copyright law to establish and protect their intellectual property rights. The Debtors may be required from time to time to bring lawsuits against third parties to protect intellectual property with respect to products they have created, distributed or otherwise utilized in providing and marketing their services. Similarly, from time to time the Debtors may be party to proceedings in which third parties challenge their rights, including rights to the Debtors' music licenses, distribution rights and patents. Any lawsuits or other actions the Debtors bring to enforce their rights may not be successful, and the Debtors may in fact be found to infringe on the intellectual property rights of others, in either of which case the Debtors may not be able to prevent others from using that intellectual property and/or may be prevented from using that intellectual property.

In addition, in the event that any licenses which the Debtors have with third parties are terminated, the Debtors may lose the right to use or have reduced rights to use the intellectual property covered by that agreement. In that event, the Debtors may not be able to secure licenses to use alternative intellectual property rights in the creation, sales, marketing and delivery of their products, and their products may not be as attractive to customers.

71

Furthermore, certain events, including events beyond the Debtors' control, could make certain of their brand names, or the brand names they license, less attractive to customers, making the Debtors' products less desirable as a result. Any loss in the value of a brand name or loss of a license for a brand name could adversely affect the Debtors' sales volume for affected products.

12.    **The Industry In Which the Debtors Operates Is Competitive and the Debtors May Not Be Able To Compete Successfully.**

The Debtors compete with many local, regional, national and international providers of business music services. National competitors include, but are not limited to, PlayNetworks, In-Store Broadcasting Network, Trusonic, DMX, Premier Retail Networks, Sirius XM Radio, Inc. and the Private Label Radio Division of DMI Music and Media Solutions. Local and regional competitors are typically smaller entities that target businesses with few locations, such as self-described music "consultants" who can be found utilizing technologies such as Apple's IPOD®, MP3 players, and playlist management software.

The Debtors also compete with companies that are not principally focused on providing business music services, such as webcasters and traditional radio broadcasters that encourage workplace listening, video services that provide business establishments with music videos or television programming, and performing rights societies (ASCAP, BMI and SESAC) that license business establishments to play sources such as CD's, tapes, MP3 files, and satellite, terrestrial, and internet radio.

The Debtors compete on the basis of service, the quality and variety of their music programs, the availability of their nonmusic services and, to a lesser extent, price. Even though the Debtors are seldom the lowest-priced provider of business music in any territory, the Debtors believe that they can compete effectively due to the widespread recognition of the Muzak name, their nationwide network, the quality and variety of their music programming, the talent of their audio architects and their multiple delivery systems. While the Debtors believe that they compete effectively, their competitors have established client bases and are continually seeking new ways to expand that client bases and revenue streams. As a result, competition may negatively impact the Debtors' ability to attract new clients and retain existing clients at current profitability levels.

13.    **A Failure To Comply With Existing or Future Government Regulations Could Adversely Affect the Debtors' Financial Condition and Results of Operation.**

The Debtors are subject to laws and governmental regulation in the United States and other countries in which they provide services. Failure to comply with any applicable laws and regulations could subject the Debtors to civil remedies, including fines, injunctions and criminal sanctions, any of which could have a material adverse effect on the Debtors' business, financial condition and results of operations.

Furthermore, the Debtors' business prospects could be adversely affected by the adoption of new laws, policies or regulations that change the present regulatory environment. Such changes could negatively impact the production and distribution of the Debtors' services, and could require the Debtors to make material expenditures or otherwise adversely affect the way the Debtors operate their business, or their financial condition or operating results.

On December 51, 2007, Muzak Holdings LLC and Muzak LLC announced their plans to periodically furnish financial information to the public on their Web site, http://www.muzak.com, and cease furnishing periodic reports with the SEC through the SEC's EDGAR system. To the extent that the Debtors were required to file periodic reporting to the SEC, the Debtors would also be required to comply with the various provisions of the Sarbanes-Oxley Act of 2002, as amended ("SOX"), including Section 404 of SOX that addresses internal controls. The cost to comply with the Section 404 would require significant resources, including the cost of outside consultants, which could have an effect on the Debtors' financial condition or results of operations.

14.     **Labor Disruptions or Increased Labor Costs Could Significantly Interrupt the Debtors' Business Operations.**

As of July 20, 2009, the Debtors had approximately 1,164 employees. The Debtors' employees include a team of approximately 113 installation and services technicians. These personnel belong to 14 bargaining units, 13 of which are represented by the International Brotherhood of Electrical Workers and one of which is represented by the Communication Workers of America. The Debtors consider their relations with their employees to be good. However, the Debtors could experience a material labor disruption or significantly increased labor costs at one or more of their facilities in the future, which would have a material adverse effect on the Debtors' business, financial condition and operating results.

15.     **A Material Disruption at the Debtors' Client Locations or Support Facilities Could Significantly Impact the Debtors' Business Operations.**

The Debtors rely on broadcast technologies to serve the majority of their clients and do not maintain an insurance program that provides coverage on satellite receivers and dishes that the Debtors lease to clients' locations. The Debtors also rely on uplink facilities to coordinate and transmit their broadcast signals. Natural catastrophes could significantly impact the Debtors' investments in client locations and their ability to provide broadcast transmissions.

16.     **The Loss of Certain Senior Management Could Significantly Disrupt the Debtors' Business Operations.**

The Debtors' success depends, in part, on the continued contributions of their executive officers and other key employees. The Debtors' management team has significant industry experience and would be difficult to replace. If the Debtors lose or suffer an extended interruption in the service of one or more of their senior officers, their financial condition and operating results may be adversely affected. Moreover, the market for qualified individuals is highly competitive and the Debtors may not be able to attract and retain qualified personnel to replace or succeed members of their senior management or other key employees, should the need arise. The Debtors do not maintain key man life insurance on any of their senior management personnel.

D.     **DISCLOSURE STATEMENT DISCLAIMER**

1.     **The Information Contained Herein Is for Soliciting Votes Only.**

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

2.     **This Disclosure Statement Was Not Approved by the SEC.**

This Disclosure Statement has not been filed with the SEC or any state regulatory authority. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

3.     **The Debtors Relied on Certain Exemptions from Registration Under the Securities Act.**

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws. The offer of the New Common Units to Holders of Claims in Class 6 has not been registered under the Securities Act or similar state securities or "blue sky" laws. To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable nonbankruptcy law, the issuance of the New Common Units or any units reserved for issuance in connection with the exercise of Warrants or on account of the Management and Director Incentive Program, will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code, Rule 701 promulgated under the Securities Act or a "no sale" under the Securities Act as described herein.

4.      **This Disclosure Statement Contains Forward Looking Statements.**

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology that as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in that forward looking statements. The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

5.      **The Financial Information Contained Herein Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.**

**The financial information contained in this Disclosure Statement has not been audited.** In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of that preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that that financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

6.      **Financial Projections and Other Forward Looking Statements Are Not Assured and Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary.**

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the financial projections.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning:  (a) the timing of Confirmation and Consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Debtors' ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; (e) the Debtors' ability to maintain market strength and receive vendor support by way of favorable purchasing terms; and (f) consumer preferences continuing to support the Debtors' business plan.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the Debtors believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.

7.      **No Legal or Tax Advice Is Provided to You by this Disclosure Statement.**

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or

Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

8.     **No Admissions Are Made by This Disclosure Statement.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity Interest or any other parties in interest.

9.     **No Reliance Should be Placed on any Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors may seek to investigate, File and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies that Claims or Objections to Claims.

10.     **Nothing Herein Constitutes a Waiver of any Right to Object to Claims or Recover Transfers and Assets.**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective estates are specifically or generally identified herein.

11.     **The Information Used Herein Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

12.     **The Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

13.     **No Representations Made Outside the Disclosure Statement Are Authorized.**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the counsel to the Committee and the U.S. Trustee.

# VIII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

**A.    LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

If no chapter 11 plan can be confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtors' assets. A discussion of the effect that a chapter 7 liquidation would have on the recovery of holders of Claims is set forth in Article VI.D herein, titled "Statutory Requirements for Confirmation of the Plan." In performing the liquidation analysis, the Debtors have assumed that all Holders of Claims will be determined to have "claims" that are entitled to share in the proceeds from any that liquidation. The Debtors believes that liquidation under chapter 7 would result in (i) smaller distributions being made to creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist that trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations, and (iii) the failure to realize the greater, going-concern value of all of the Debtors' assets.

**B.    FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION**

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization. That a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets. During the negotiations before the filing of the Plan, the Debtors explored various alternatives to the Plan.

The Debtors believe that the Plan enables the Debtors to emerge from chapter 11 successfully and expeditiously, preserves their business and allows creditors to realize the highest recoveries under the circumstances. In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed. Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation. Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to creditors than the Plan because the Plan provides for a greater return to creditors. In any liquidation, creditors would be paid their distribution in Cash, whereas, under the Plan, some creditors will receive a part of their distribution in the New Common Units.

## IX.
## EXEMPTIONS FROM SECURITIES ACT REGISTRATION

A.    **SECTION 1145 OF THE BANKRUPTCY CODE**

    1.    **New Common Units Issued in Reliance on Section 1145 of the Bankruptcy Code**

Under the Plan, the New Common Units will be issued to Holders of Senior Subordinated Notes Claims. Section 1145 of the Bankruptcy Code provides that the securities registration requirements of federal and state securities laws do not apply to the offer or sale of stock, warrants or other securities by a debtor if: (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of securities hold a claim against, an interest in or claim for administrative expense against the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are reissued principally in that exchange and partly for Cash and property.

That securities may be resold without registration under either (a) state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states or (b) the Securities Act pursuant to an exemption provided by section 4(1) of the Securities Act unless the holder is an "underwriter" (as that term is defined in the Bankruptcy Code) with respect to the securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for that a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (a) with a view to distributing those securities and (b) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in the Securities Act.

The term "issuer" is defined in section 2 (4) of the Securities Act; however, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to section 2 (11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by or are under common control with, an issuer of securities. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of that debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of the securities of a reorganized debtor may be presumed to be a "control person."

To the extent that persons who receive New Common Units are deemed to be "underwriters," resales by those persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Those persons would, however, be permitted to sell New Common Units or other securities without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below, or if that securities are registered with the SEC pursuant to the LLC Agreement or otherwise. Any person who is an "underwriter" but not and "issuer" with respect to an issue of securities is, in addition, entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b)(1) of the Bankruptcy Code.

2.      **Rule 144**

Under certain circumstances, recipients of New Common Units deemed to be "underwriters" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions under Rule 144 of the Securities Act, to the extent available and in compliance with applicable state and foreign securities laws.

Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met.  These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold in any three-month period, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the SEC.

Whether or not any particular person would be deemed to be an "underwriter" of securities to be issued pursuant to the Plan or an "affiliate" of the Reorganized Debtors would depend upon various facts and circumstances applicable to that person.  Accordingly, the Debtors express no view as to whether any that person would be that an "underwriter" or an "affiliate."  In view of the complex, subjective nature of the question of whether a particular person may be an underwriter or an affiliate of the Reorganized Debtors, the Debtors make no representations concerning the right of any person to trade in Plan Securities.  Accordingly, the Debtors recommend that potential recipients of any securities to be issued pursuant to the Plan consult their own counsel concerning whether they may freely trade that securities.

## X.
## CERTAIN U.S. FEDERAL INCOME
## TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to Holders of Allowed Claims and the Debtors. This summary is based on the Internal Revenue Code (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. No rulings or determinations of the IRS or any other taxing authorities have been sought or obtained with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein. Events occurring after the date of this Disclosure Statement, including changes in law and changes in administrative positions, could affect the United States federal income tax consequences of the Plan.

This discussion does not apply to Holders of Claims that are not "U.S. persons" (as such phrase is defined in the IRC) and does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to such Holders in light of their individual circumstances. This discussion does not address tax issues with respect to Holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies and regulated investment companies and those holding the New Common Units as part of a hedge, straddle, conversion or constructive sale transaction) or to Holders that hold more than one class of Claims or Interest. No aspect of state, local, estate, gift, or non-U.S. taxation is addressed.

**THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.**

**IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.    **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF ALLOWED CLAIMS**

1.    **Consequences to Holders of Allowed Class 3 Secured Term Loan Claims**

Upon the Debtors' entry into an Exit Facility that is sufficient to pay the Secured Term Loan Claims in full in Cash on the Effective Date, each holder of Allowed Class 3 Claims shall receive, in full and final satisfaction of such Allowed Class 3 Claims, an amount of Cash equal to the amount of such holder's Allowed Class 3 Claims. The exchange of Allowed Class 3 Claims for Cash should be a taxable exchange under section 1001 of the IRC.

A Holder who receives Cash with respect to an Allowed Class 3 Claim will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received and (b) the Holder's adjusted basis in its Allowed Class 3 Claim. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Class 3 Claims were held for more than one year. To the extent that a portion of the Cash received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income

2.    **Consequences to Holders of Allowed Class 4 Senior Notes Claims**

Pursuant to the Plan, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 4 Claim shall receive, in full and final satisfaction of such Allowed Class 4 Claims, its Pro Rata share of the Debtors' obligations under the New Senior Notes and the New Redeemable PIK Preferred Units.

For U.S. federal income tax purposes, the treatment of the exchange of Allowed Class 4 Claims for the New Senior Notes and the New Redeemable PIK Preferred Units is unclear. Such exchange may be treated (i) as a partial tax-free contribution of property to Muzak Holdings LLC under section 721 of the IRC and a partial taxable exchange under section 1001 of the IRC or, alternatively, (ii) as a taxable exchange under section 1001 of the IRC in its entirety. Under the regulations proposed by Treasury, the exchange would be treated as a partial tax-free contribution and a partial taxable exchange. This treatment may result in a deferral in the recognition of loss or gain and, for some Holders, a change in character of the loss or gain from ordinary to capital. A Holder of Allowed Class 4 Claims would generally be required to treat a portion of the Claims as exchanged for New Redeemable PIK Preferred Units and a portion of the Claims as exchanged for New Senior Notes. The portion of the Claims deemed exchanged for New Redeemable PIK Preferred Units would generally be equal to the aggregate Allowed Class 4 Claims held by the Holder multiplied by a fraction, the numerator of which is the value of the New Redeemable PIK Preferred Units received by the Holder and the denominator of which is the issue price of the New Senior Notes and the aggregate value of the New Redeemable PIK Preferred Units received by such Holder. The balance of the Allowed Class 4 Claims will be deemed exchanged for the New Senior Notes. The amount of gain or loss realized by a Holder for each portion of Claims will be equal to the difference between (a) the issue price of the New Senior Notes or the fair value of the New Redeemable PIK Preferred Units, as applicable, received and (b) the Holder's adjusted basis in its Allowed Class 4 Claim exchanged for such consideration. No gain or loss should be recognized with respect to the exchange of Claims for New Redeemable PIK Preferred Units and a Holder will have an initial tax basis in such New Redeemable PIK Preferred Units equal to the tax basis of the Claims deemed exchanged therefor. A Holder's holding period for the New Redeemable PIK Preferred Units should include the holding period of the Claims deemed exchanged therefor. A Holder should be required to recognize any realized gain or loss with respect to the portion of the Claims deemed exchanged for New Senior Notes. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Class 4 Claims were held for more than one year. To the extent that a portion of the consideration received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income. A Holder's tax basis in New Senior Notes should equal the issue price of the New Senior Notes. A Holder's holding period for the New Senior Notes should begin on the day following the exchange.

If the proposed regulations do not apply and the exchange is treated as a taxable exchange, a Holder who receives New Senior Notes and New Redeemable PIK Preferred Units with respect to an Allowed Class 4 Claim will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the issue price of the New Senior Notes and the fair value of the other consideration received and (b) the Holder's adjusted basis in its Allowed Class 4 Claim. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Class 4 Claims were held for more than one year. To the extent that a portion of the consideration received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income. A Holder's tax basis in New Senior Notes should equal the issue price of the New Senior Notes and the Holder's tax basis in the New Redeemable PIK Preferred Units received should equal the fair market value of such instruments as of the date distributed to the Holder. A Holder's holding period for such instruments should begin on the day following the exchange.

80

3.      **Consequences to Holders of Allowed Class 5 Senior Subordinated Notes Claims**

Pursuant to the Plan, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 5 Claim shall receive, in full and final satisfaction of such Allowed Class 5 Claims, its Pro Rata share of 100% of the New Common Units of the Reorganized Debtors.

For U.S. federal income tax purposes, the treatment of the exchange of Allowed Class 5 Claims for New Common Units is unclear. Such exchange may be treated (i) as a tax-free contribution of property to Muzak Holdings LLC under section 721 of the IRC or, alternatively, (ii) as a taxable exchange under section 1001 of the IRC. The Debtors intend to take the position that the exchange is a tax-free contribution. This treatment may result in a deferral in the recognition of loss or gain and, for some Holders, a change in character of the loss or gain from ordinary to capital. The Claims deemed exchanged for New Common Units would generally be equal to the aggregate Allowed Class 5 Claims. The amount of gain or loss realized by a Holder will be equal to the difference between (a) the fair value of the New Common Units received and (b) the Holder's adjusted basis in its Allowed Class 5 Claim exchanged for such consideration. No gain or loss should be recognized with respect to the exchange of Claims for New Common Units and a Holder will have an initial tax basis in such New Common Units equal to the tax basis of the Claims deemed exchanged therefor. A Holder's holding period for the New Common Units should include the holding period of the Claims deemed exchanged therefor.

If the exchange is not properly characterized as a tax-free contribution, it would likely be treated as a taxable exchange. As such, a Holder who receives New Common Units with respect to an Allowed Class 5 Claim will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the fair value of the consideration received and (b) the Holder's adjusted basis in its Allowed Class 5 Claim. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Class 5 Claims were held for more than one year. To the extent that a portion of the consideration received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income. A Holder's tax basis in New Common Units received should equal the fair market value of the New Common Units as of the date distributed to the Holder, and a Holder's holding period for such instruments should begin on the day following the exchange.

4.      **Consequences to Holders of Allowed Class 6 Discount Notes Claim**

Pursuant to the Plan, on or as soon as reasonable practicable after the Effective Date, each Holder of an Allowed Class 6 Claim shall receive, in full and final satisfaction of such Allowed Class 6 Claims, its Pro Rata share of Warrants for 7.5% of the fully-diluted New Common Units, as more fully set forth in the Warrant Agreement.

For U.S. federal income tax purposes, the exchange of Allowed Class 6 Claims for Warrants should be a taxable exchange under section 1001 of the IRC. A Holder who receives Warrants with respect to an Allowed Class 6 Claim will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the fair value of the consideration received and (b) the Holder's adjusted basis in its Allowed Class 6 Claim. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Class 6 Claims were held for more than one year. To the extent that a portion of the consideration received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income. A Holder's tax basis in Warrants received should equal the fair market value of the Warrants as of the date distributed to the Holder, and a Holder's holding period for the Warrants should begin on the day following the exchange.

5.      **Consequences to Holders of Allowed Class 7 General Unsecured Claims**

Pursuant to the Plan, except to the extent that a Holder of an Allowed General Unsecured Claim has been paid by the Debtors before the Effective Date or agrees to alternate treatment, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of its Allowed Claim, payment of Cash, in an aggregate amount not to exceed $18,000,000, as follows:

(i)      Each Holder of a Class 7 Claim Allowed on or before the Effective Date shall receive payment of the Allowed Class 7 Claim on the Effective Date.

(ii)      Each Holder of a Class 7 Claim Allowed after the Effective Date shall receive payment on the first Periodic Distribution Date immediately following the date on which such Allowed Class 7 Claim is Allowed or deemed Allowed.  Holders of Allowed Class 7 Claims whose Claims are Allowed within 180 days of the Effective Date shall receive payment no later than 185 days after the Effective Date.  To the extent a Class 7 Claim is Allowed on the date that is 180 days after the Effective Date as a result of the Debtors' not filing an objection to such Claim by that date, such Claim will be paid no later than 185 days after the Effective Date.

For U.S. federal income tax purposes, the exchange of Allowed Class 7 Claims for Cash should be a taxable exchange under section 1001 of the IRC.  A Holder who receives Cash with respect to an Allowed Class 7 Claim will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a)  the amount of Cash received and (b) the Holder's adjusted basis in its Allowed Class 7 Claim.  Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Class 7 Claims were held for more than one year.  To the extent that a portion of the Cash received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income.

### 6.      Consequences to Holders of Allowed Class 8 Equity Interests

Pursuant to the Plan, On the Effective Date, all Class 8 Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the Holders of Class 8 Equity Interests.

For U.S. federal income tax purposes,  the tax consequences arising from the cancellation of a Class 8 Equity Interest are complex, and may give rise to a deemed distribution to such holder and/or an allocation of COD Income, as described in more detail below under "Certain U.S. Federal Income Tax Consequences to Reorganized Debtors."  Holders of Class 8 Equity Interests are urged to consult with their own tax advisers regarding such consequences.

### 7.      Equity Ownership in Reorganized Debtors

It is anticipated that Muzak Holdings LLC will be characterized as a partnership for federal income tax purposes following the Effective Date.  As such, a Holder of Claims who receives New Common Units will be treated as partners for tax purposes.  The U.S. federal tax consequences of being a partner in an operating partnership are very complicated.  As an example, a partnership itself does not pay U.S. federal income taxes; instead, its income and deductions are allocated to its partners, who include such amounts on their own tax returns. Holders who will receive equity interests in the Reorganized Debtors are urged to consult with their own tax advisers regarding such consequences.

### 8.      Accrued but Unpaid Interest

A portion of the consideration received by Holders of Claims may be attributable to accrued but unpaid interest on such Claims.  Such amount should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes. Conversely, it is possible that a Holder of Claims may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Claims was previously included in the U.S. holder's gross income but was not paid in full by Debtors. The character of such loss may be ordinary rather than capital, but the tax law is unclear on this issue.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear.  Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such

Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for United States federal income tax purposes. The IRS could take the position, however, that the consideration received by the Holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

9.      **Market Discount**

Holders who exchange Allowed Claims for their Pro Rata share of each of (a) New Senior Notes, (b) New Common Units, and (c) cash, may be affected by the "market discount" provisions of sections 1276 through 1278 of the IRC. Under these provisions, some or all of the gain realized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Allowed Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the IRC, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if the excess is less than a statutory de minimis amount (equal to 0.25% of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property (as may occur here), any market discount that accrued on the Allowed Claims (*i.e.*, up to the time of the exchange) but was not recognized by the Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property is treated as ordinary income to the extent of such accrued market discount.

10.     **Issue Price**

For U.S. federal income tax purposes, the "issue price" of a debt instrument depends on whether such instrument is deemed to be "publicly traded." If, at any time during the 60-day period ending 30 days after the issue date of a debt instrument, a substantial amount of the debt instruments in an issue is "traded on an established market" within the meaning of the applicable Regulations, then the debt instrument will be treated as publicly traded and the issue price of the debt instrument will equal the fair market value of that debt instrument on the date of issuance. In general, a debt instrument will be treated as traded on an established securities market if it is listed on a major securities exchange, appears on a system of general circulation that provides a reasonable basis to determine fair market value or otherwise is, among other things, readily quotable by dealers, brokers or traders. For purposes of applying these rules, each tranche of new debt instruments is treated as a separate issue.

If a tranche of new debt instrument is not publicly traded and the old Claim exchanged for a such new debt instrument in such tranche is also not publicly traded, then the issue price of that new debt instrument generally would equal the stated principal amount of such debt instrument. Holders of Claims should consult their tax advisors regarding the issue prices for the New Senior Notes.

11.     **Information Reporting and Backup Withholding**

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder:

(a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; _provided, however_, that the required information is provided to the IRS.

The Debtors will withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the IRS.

**B.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO REORGANIZED DEBTORS**

     **1.    Cancellation of Debt Income**

In general, absent an exception, a debtor will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, (y) the issue price of debt that is not publicly traded nor deemed exchanged for publicly traded property and (z) the fair market value of any new consideration (including stock) given in satisfaction of such indebtedness at the time of the exchange. Because the Plan provides that Holders of certain Allowed Claims will receive New Common Units, the amount of COD Income will depend on the fair market value of the New Common Units exchanged therefor. This value cannot be known with certainty until after the Effective Date.

Because of the most of the Debtors' indebtedness is owed by entities that are partnerships or disregarded entities for U.S. federal income tax purposes, virtually all of the Debtors' COD Income that will be generated from the Plan will be allocated the members of Muzak Holdings LLC based on their respective percentage ownership interests in Muzak Holdings LLC. Under the U.S. federal income tax rules dealing with COD Income, the tax treatment of that income will be determined with respect to each member at the member level.

A member of Muzak Holdings LLC will not be required to include any amount of COD Income in gross income if the member is (i) under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding or (ii) insolvent before the Effective Date (in which, the COD Income may be excluded to the extent of the insolvency). As a consequence of such exclusion, a member must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) most tax credits and capital loss carryovers; (c) tax basis in assets; and (d) foreign tax credits. A member with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. Nonetheless, any attribute reduction will be applied as of the first day following the taxable year in which a member recognizes COD Income. If a member has a suspended loss with respect to its membership interest in Muzak Holdings LLC, the allocation of COD Income may allow some or all of such suspended losses to be used to offset the COD Income.

A recently enacted amendment to the COD Income rules provides that taxpayers that recognize COD Income in 2009 or 2010 may elect to forgo the COD Income exclusion and attribute reduction rules described above. Instead, the taxpayer may elect to take into taxable income the COD Income with respect to such debt in equal installments in 2014 through 2018 (i.e., the taxpayer would report 20% of the COD Income in each such year). This election to defer COD Income is made separately with respect to each debt instrument on which COD Income is realized, must be made on the taxpayer's tax return for the year that includes the transaction that creates the COD Income, and, in the case of debt of a partnership, is made at the partnership level. The Debtors have not yet determined whether such an election will be made with respect to the COD Income generated in connection with the consummation of the Plan.

> **THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN MANY CASES UNCERTAIN. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S**

CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## XI.
## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than that which is proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

/s/ Stephen P. Villa

Muzak Holdings LLC
(for itself and on behalf of each of the Debtors)

By:      Stephen P. Villa

Title:    Chief Executive Officer

Dated:  October 26, 2009

Prepared by:

**KIRKLAND & ELLIS LLP**
Edward O. Sassower
Joshua A. Sussberg
Sarah H. Seewer
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446–4800
Facsimile:  (212) 446–4900

Attorneys for the Debtors and Debtors in Possession

- and -

**KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP**
Domenic E. Pacitti
Michael W. Yurkewicz
919 Market Street, Suite 1000
Wilmington, Delaware 19801-3062
Telephone:  (302) 426-1189
Facsimile:  (302) 426-9193

Co-Counsel for the Debtors and Debtors in Possession

K&E 15747512.1

# EXHIBIT C

## The Reorganized Debtors' Financial Projections

1.  Pro Forma Projected Balance Sheet (unaudited)

| (\$ in Thousands) | Estimated Pre-Effective Date Balance Sheet | Recapitalization Adjustments | Pro Forma Balance Sheet of Reorganized Debtors |
|---|---|---|---|
| **ASSETS** | | | |
| **Current Assets:** | | | |
| Cash | \$40.8 | (\$28.5) (a) | \$12.3 |
| Accounts Receivable, Net of Allowance | 15.3 | | 15.3 |
| Inventories | 7.7 | | 7.7 |
| Prepaid Expenses and Other Assets | 3.6 | | 3.6 |
| Total current assets | \$67.5 | (\$28.5) | \$38.9 |
| Property and Equipment, Net | 51.4 | | 51.4 |
| Intangible Assets, Net | 165.6 | 89.8 (i) | 255.4 |
| Deferred subscriber acquisition costs, Net | 15.9 | | 15.9 |
| Tax Loss Carryforward | 0.0 | | 0.0 |
| Other Assets, Net (Deferred Financing) | 1.0 | 1.0 (b) | 2.0 |
| **TOTAL ASSETS** | \$301.4 | \$62.3 | \$363.7 |
| | | | |
| **LIABILITIES & SHAREHOLDERS' EQUITY** | | | |
| **Current Liabilities:** | | | |
| Current Portion of Other Liabilities | 2.7 | | 2.7 |
| Accounts Payable | 3.4 | (2.9) | 0.5 |
| Accrued Expenses | 17.7 | (6.6) | 11.1 |
| Advanced Billings | 1.9 | | 1.9 |
| Total Current Liabilities | \$25.7 | (\$9.5) | \$16.2 |
| **Long Term Debt:** | | | |
| New Term Loan | 0.0 | 95.5 (c) | 95.5 |
| Senior Debt | 0.0 | 135.0 (d) | 135.0 |
| Liabilities Subject to Compromise | 503.1 | (503.1) (e) | 0.0 |
| Total Long Term Debt | \$503.1 | (\$272.5) | \$230.5 |
| **Other Liabilities:** | | | |
| Deferred Installation Revenue | 5.6 | | 5.6 |
| Capital Leases | 1.6 | | 1.6 |
| Current Portion of Deferred Revenue & Capital Leases | (2.7) | | (2.7) |
| Other | 0.4 | | 0.4 |
| Total Other Liabilities | \$4.9 | \$0.0 | \$4.9 |
| **Member's Interest** | | | |
| Redeemable Class A Units | 7.8 | (7.8) (f) | 0.0 |
| Redeemable Preferred Stock | 372.9 | (372.9) (f) | 0.0 |
| Member's Interest | (613.0) | 613.0 (f) | 0.0 |
| Total Members' Interest | (\$232.3) | \$232.3 | \$0.0 |
| New Redeemable PIK Preferred Stock | | 85.0 (d) | 85.0 |
| New Common Equity | | 27.0 (g) | 27.0 |
| Other Shareholder Equity | | 0.0 (h,i) | 0.0 |
| **TOTAL LIABILITIES, PREFERRED AND COMMON EQUITY** | \$301.4 | \$62.3 | \$363.7 |

**NOTES TO PRO FORMA PROJECTED BALANCE SHEET**

(a) The \$28.5 million reflects the estimated cash required to emerge. The amount includes cash for professional fees (including success fees), 100% of pre-petition accounts payable, and other miscellaneous fees and expenses related to bankruptcy emergence.

(b) This adjustment reflects \$1.0 million of anticipated fees associated with the origination of an exit facility.

(c) This adjustment reflects the new term loan replacing the Debtor's existing term loan. The Debtor has assumed that the new term loan will be a \$95.5 million loan due 4 years from the emergence date.

(d) This adjustment reflects the new senior notes in an amount of \$135 million replacing, in part, the existing \$220 million of new senior notes. In addition, holders of the existing senior notes will receive new redeemable PIK preferred stock in an amount of \$85 million.

(e) This adjustment represents pre-petition liabilities subject to compromise, including the \$95.5 million existing term loan, the \$220 million senior notes, the \$115 million senior subordinated notes, the \$24.3 million senior

discount notes, $1.5 million in other notes, $43.3 million in accrued interest on the notes accrued since filing but not paid, and $3.4 million in other accounts payable and accrued expenses.

(f) These adjustments reflect the elimination of members' interest.

(g) This adjustment reflects conversion to new common stock of $27.0 million of senior subordinated notes.

(h) This adjustment represents (i) cash exit costs anticipated during the remainder of the case, plus (ii) the conversion of pre-petition debt into the exit facility, new senior notes, new redeemable PIK preferred stock, and new common stock, plus (iii) other liabilities subject to compromise, and (iv) the elimination of equity balances.

(i) The offsetting adjustment for shareholders' equity was applied to goodwill. The adjustment to shareholders' equity was based on the estimated common equity value of the reorganized entity ($27.0 million) in accordance with accounting provision of SOP 90-7.

2. Projected Statement of Operations (unaudited)

| ($ in millions) | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|
| Total Revenue | $233.9 | $248.9 | $271.4 | $295.9 |
| Total Cost of Sales | 101.8 | 110.6 | 119.3 | 127.9 |
| Gross Profit | $132.1 | $138.3 | $152.1 | $168.1 |
| SG&A | 77.2 | 79.6 | 83.2 | 86.9 |
| Depreciation of PP&E | 27.7 | 23.8 | 25.1 | 28.6 |
| Amortization of Intangibles | 13.8 | 13.8 | 13.8 | 13.8 |
| Operating Income | $13.4 | $21.0 | $30.0 | $38.8 |
| Amortization of Deferred Financing Fees | 0.3 | 0.3 | 0.3 | 0.3 |
| Net Interest Expense | 29.7 | 30.6 | 31.8 | 32.0 |
| Pre-tax Income | ($16.5) | ($9.8) | ($2.0) | $6.5 |
| Taxes | 0.0 | 0.0 | 0.0 | 0.0 |
| Net Income (Loss) before PIK Dividends | ($16.5) | ($9.8) | ($2.0) | $6.5 |
| PIK Dividends | 8.5 | 10.3 | 12.5 | 15.1 |
| Net Income | ($25.0) | ($20.0) | ($14.4) | ($8.6) |
| Adjusted EBITDA | $55.0 | $58.7 | $68.9 | $81.2 |

3.  Projected Balance Sheets (unaudited)

| ($ in millions) | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash | $12.3 | $15.0 | $15.0 | $15.0 | $15.0 |
| Accounts Receivable | 15.3 | 18.0 | 20.4 | 21.5 | 23.4 |
| Inventories | 7.7 | 8.9 | 9.9 | 10.9 | 12.0 |
| Prepaid Expenses and Other Assets | 3.6 | 4.6 | 4.8 | 5.2 | 5.5 |
| Total Current Assets | $38.9 | $46.5 | $50.2 | $52.5 | $56.0 |
| | | | | | |
| Property and Equipment, net | 51.4 | 51.2 | 58.1 | 65.1 | 69.3 |
| Goodwill / Intangible Assets, net | 255.4 | 241.7 | 227.9 | 214.1 | 200.3 |
| Deferred Subscriber Acquisition Costs, net | 15.9 | 14.7 | 15.9 | 17.6 | 19.9 |
| Other Assets, net (Deferred Financing) | 2.0 | 1.8 | 1.5 | 1.3 | 1.0 |
| Total Other Assets | $324.7 | $309.4 | $303.4 | $298.0 | $290.6 |
| | | | | | |
| Total Assets | $363.7 | $355.9 | $353.5 | $350.5 | $346.6 |
| | | | | | |
| **Liabilities and Shareholders' Equity** | | | | | |
| Current Portion of Other Liabilities | 2.7 | 2.5 | 2.5 | 2.5 | 2.5 |
| Accounts Payable | 0.5 | 3.6 | 4.0 | 4.4 | 5.1 |
| Accrued Expenses | 11.1 | 14.6 | 15.1 | 15.6 | 16.1 |
| Advanced Billings | 1.9 | 1.5 | 1.5 | 1.5 | 1.4 |
| Total Current Liabilities | $16.2 | $22.3 | $23.2 | $24.0 | $25.1 |
| | | | | | |
| Total Long Term Debt | $230.5 | $231.9 | $236.6 | $232.7 | $219.7 |
| Other Long Term Liabilities | 4.9 | 6.3 | 8.0 | 10.1 | 11.6 |
| Total Other Long Term Liabilities | $235.5 | $238.2 | $244.7 | $242.8 | $231.3 |
| | | | | | |
| Total Liabilities | $251.7 | $260.4 | $267.8 | $266.8 | $256.4 |
| | | | | | |
| New PIK Preferred Stock | 85.0 | 93.5 | 103.8 | 116.2 | 131.4 |
| Common Equity | 27.0 | 2.0 | (18.1) | (32.5) | (41.1) |
| | | | | | |
| Total Liabilities, Preferred and Common Equity | $363.7 | $355.9 | $353.5 | $350.5 | $346.6 |

4. Projected Statement of Cash Flows (unaudited)

| ($ in millions) | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|
| **Operating Activities:** | | | | |
| Net Income (Loss) | ($25.0) | ($20.0) | ($14.4) | ($8.6) |
| | | | | |
| Capitalized Labor Impairment Charge | 2.4 | 2.3 | 2.2 | 2.2 |
| Depreciation and Amortization | 27.7 | 23.8 | 25.1 | 28.6 |
| Amortization of Commissions | 7.8 | 7.3 | 8.4 | 8.9 |
| Amortization of Deferred Subscriber Costs | 13.8 | 13.8 | 13.8 | 13.8 |
| Amortization of Deferred Financing Fees | 0.3 | 0.3 | 0.3 | 0.3 |
| PIK Interest | 9.5 | 10.1 | 10.8 | 11.6 |
| PIK Dividends | 8.5 | 10.3 | 12.5 | 15.1 |
| Changes in Working Capital | 1.2 | (2.7) | (1.5) | (2.4) |
| **Cash Provided by Operating Activities** | $46.1 | $45.1 | $57.0 | $69.4 |
| | | | | |
| **Investing Activities:** | | | | |
| Capital Expenditures - PP&E Additions | (27.6) | (30.7) | (32.0) | (32.9) |
| Capitalized Commissions | (9.0) | (10.8) | (12.3) | (13.4) |
| Change in Other Long-Term Liabilities | 1.4 | 1.8 | 2.0 | 1.5 |
| **Cash Used in Investing Activates** | (35.3) | (39.8) | (42.3) | (44.9) |
| | | | | |
| **Financing Activities:** | | | | |
| Optional Debt Repayment | (8.1) | (5.3) | (14.7) | (24.6) |
| **Cash Used in Financing Activities** | (8.1) | (5.3) | (14.7) | (24.6) |
| | | | | |
| Net Increase in Cash | $2.7 | $0.0 | $0.0 | $0.0 |
| | | | | |
| Beginning Cash | 12.3 | 15.0 | 15.0 | 15.0 |
| Change in Cash | 2.7 | 0.0 | 0.0 | 0.0 |
| **Ending Cash** | $15.0 | $15.0 | $15.0 | $15.0 |

# EXHIBIT D

## The Reorganized Debtors' Valuation

**D.    The Reorganized Debtors' Valuation**

THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE EQUITY VALUE ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. SUCH TRADING VALUE, IF ANY, MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZATION VALUE RANGES ASSOCIATED WITH THE VALUATION ANALYSIS.

Moelis has advised the Debtors with respect to the reorganization value of the Reorganized Debtors on a going concern basis. Solely for purposes of the Plan, the estimated range of reorganization value of the Reorganized Debtors is assumed to be $310 million to $375 million (with a midpoint value of $342.5 million) as of an assumed Effective Date of December 31, 2009. Moelis' estimate of a range of enterprise values does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

THE ESTIMATED RANGE OF THE REORGANIZATION VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF DECEMBER 31, 2009, REFLECTS WORK PERFORMED BY MOELIS ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO MOELIS AS OF JUNE 4, 2009. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT MOELIS' CONCLUSIONS, MOELIS DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS ESTIMATE.

Based upon the estimated range of the reorganization value of the Reorganized Debtors of between $310 million and $375 million and assumed net debt and new redeemable PIK preferred stock of $303.3 million as of the Effective Date, assuming an Effective Date of December 31, 2009, Moelis has estimated the range of new common stock for the Reorganized Debtors between approximately $6.7 million and $71.7 million, with a mid-point value of $39.2 million.

The foregoing estimate of the reorganization value of the Reorganized Debtors is based on a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, the implementation of the Reorganized Debtors business plan, the achievement of the forecasts reflected in the Financial Projections, access to the Exit Facility, the continuing leadership of the existing management team, market conditions as of June 4, 2009 continuing through the assumed Effective Date of December 31, 2009, and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein.

With respect to the Financial Projections prepared by the management of the Debtors and included in **Exhibit C** to this Disclosure Statement, Moelis assumed that

such Financial Projections have been reasonably prepared in good faith and on a basis reflecting the best currently available estimates and judgments of the Debtors as to the future operating and financial performance of the Reorganized Debtors. Moelis' estimate of a range of reorganization values assumes that the Debtors' Financial Projections will be achieved by the Reorganized Debtors in all material respects, including revenue growth and improvements in operating margins, earnings and cash flow. As a result, to the extent that the estimate of enterprise values is dependent upon the Reorganized Debtors performing at the levels set forth in the Financial Projections, such analysis must be considered speculative. If the business performs at levels below those set forth in the Financial Projections, such performance may have a material impact on the Financial Projections and on the estimated range of values derived therefrom.

IN ESTIMATING THE RANGE OF THE REORGANIZATION VALUE AND EQUITY VALUE OF THE REORGANIZED DEBTORS, MOELIS:

- REVIEWED CERTAIN HISTORICAL FINANCIAL INFORMATION OF THE DEBTORS FOR RECENT YEARS AND INTERIM PERIODS;

- REVIEWED CERTAIN INTERNAL FINANCIAL AND OPERATING DATA OF THE DEBTORS, INCLUDING THE FINANCIAL PROJECTIONS, WHICH WERE PREPARED AND PROVIDED TO MOELIS BY THE DEBTORS' MANAGEMENT AND WHICH RELATE TO THE DEBTORS' BUSINESS AND THEIR PROSPECTS;

- MET WITH CERTAIN MEMBERS OF SENIOR MANAGEMENT OF THE DEBTORS TO DISCUSS THE DEBTORS' OPERATIONS AND FUTURE PROSPECTS;

- REVIEWED PUBLICLY AVAILABLE FINANCIAL DATA AND CONSIDERED THE MARKET VALUE OF PUBLIC COMPANIES IN THE MEDIA SECTOR;

- CONSIDERED RELEVANT PRECEDENT TRANSACTIONS IN THE MEDIA SECTOR;

- CONSIDERED CERTAIN ECONOMIC AND INDUSTRY INFORMATION RELEVANT TO THE OPERATING BUSINESS; AND

- CONDUCTED SUCH OTHER STUDIES, ANALYSIS, INQUIRIES, AND INVESTIGATIONS AS IT DEEMED APPROPRIATE.

ALTHOUGH MOELIS CONDUCTED A REVIEW AND ANALYSIS OF THE DEBTORS' BUSINESSES, OPERATING ASSETS AND LIABILITIES AND THE REORGANIZED DEBTORS' BUSINESS PLANS, IT ASSUMED AND RELIED ON THE ACCURACY AND COMPLETENESS OF ALL FINANCIAL AND OTHER INFORMATION FURNISHED TO IT BY THE DEBTORS, AS WELL AS PUBLICLY AVAILABLE INFORMATION. IN ADDITION, MOELIS DID NOT

INDEPENDENTLY VERIFY MANAGEMENT'S FINANCIAL PROJECTIONS IN CONNECTION WITH SUCH ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH.

ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE.

IN THE CASE OF THE REORGANIZED DEBTORS, THE ESTIMATES OF THE REORGANIZATION VALUE PREPARED BY MOELIS REPRESENT THE HYPOTHETICAL REORGANIZATION VALUE OF THE REORGANIZED DEBTORS. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED DEBTORS THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES, OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED DEBTORS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES AND ACTUAL OUTCOMES AND RESULTS MAY DIFFER MATERIALLY FROM THOSE SET FORTH HEREIN. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.

1.    Valuation Methodology.

Moelis performed a variety of analyses and considered a variety of factors in preparing the valuation of the Reorganized Debtors. Several generally accepted valuation techniques for estimating Reorganized Debtors enterprise value were used. Moelis primarily relied on three methodologies: discounted cash flow analysis, comparable

public company analysis and precedent transactions analysis. Moelis weighed each of these analyses based on their relative merits and made judgments as to the significance of each analysis in determining the Reorganized Debtors' indicated enterprise value range. Moelis' valuation must be considered as a whole, and selecting just one methodology or portions of the analyses, without considering the analyses as a whole, could create a misleading or incomplete conclusion as to the Reorganized Debtors' enterprise value.

In preparing its valuation estimate, Moelis performed a variety of analyses and considered a variety of factors, some of which are described herein. The following summary does not purport to be a complete description of the analyses and factors undertaken to support Moelis' conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, as well as the application of those analyses and factors under the particular circumstances. As a result, the process involved in preparing a valuation is not readily summarized.

(a)    **Discounted Cash Flow Approach.** The discounted cash flow ("DCF") valuation methodology relates to the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by a theoretical or observed discount rate determined by calculating the average cost of debt and equity for publicly traded companies that are similar to the Debtors. The expected future cash flows have two components: the present value of the projected unlevered after-tax free cash flows for a determined period and the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the Financial Projections). Moelis' discounted cash flow valuation is based on the business plan projections of the Reorganized Debtors' operating results. Moelis discounted the projected cash flows using the Reorganized Debtors' estimated weighted average cost of capital and calculated a terminal value of the reorganized Debtors.

This approach relies on the company's ability to project future cash flows with some degree of accuracy. Because the Financial Projections reflect significant assumptions made by the Debtors' management concerning anticipated results, the assumptions and judgments used in the Financial Projections may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized. Moelis cannot and does not make any representations or warranties as to the accuracy or completeness of the Reorganized Debtors' Financial Projections.

(b)    **Comparable Public Company Analysis.** A comparable public company analysis estimates value based on a comparison of the target company's financial statistics with the financial statistics of public companies that are similar to the target company. It establishes a benchmark for asset valuation by deriving the value of "comparable" assets, standardized using a common variable such as revenues, earnings, and cash flows. The analysis includes a detailed multi-year financial comparison of each company's income statement, balance sheet, and cash flow statement. In addition, each company's performance, profitability, margins, leverage, and business trends are also

examined. Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects, market presence, size, and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation. The underlying concept, however, is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value. In performing the Comparable Public Company Analysis Moelis evaluated publicly traded companies in the media sector similar to the Debtors in some or all of the factors described above. Moelis analyzed the current trading value for the comparable companies as a multiple of operating metrics.

(c)    **Precedent Transactions Analysis.** Precedent transactions analysis estimates value by examining publicly announced merger and acquisition transactions. An analysis of the disclosed purchase price as a multiple of various operating statistics reveals industry acquisition multiples for companies with similar business and operational characteristics to the Debtors. These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies. In evaluating the comparability of transactions, Moelis considered changes in the macroeconomic operating environment and the capital markets since those transactions were announced.

The valuation in this methodology includes a "control" premium, representing the purchase of a majority or controlling position in a company's assets. Thus, this methodology generally produces higher valuations than the comparable public company analysis. Other aspects of value that manifest themselves in a precedent transaction analysis include the following:

- Circumstances surrounding a sale transaction may introduce "diffusive quantitative results" into the analysis (e.g., an additional premium may be extracted from a buyer in the case of a competitive bidding contest).

- The market environment is not identical for transactions occurring at different periods of time.

- Circumstances pertaining to the financial position of a company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

As with the comparable company analysis, because no acquisition used in any analysis is identical to a target transaction, valuation conclusions cannot be based solely on quantitative results. The reasons for and circumstances surrounding each acquisition

transaction are specific to such transaction, and there are inherent differences between the businesses, operations and prospects of each. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition. The number of completed transactions for which public data is available also limits this analysis.

THE ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DETERMINED BY MOELIS REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE REORGANIZATION EQUITY VALUE OF THE REORGANIZED DEBTORS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POSTREORGANIZATION MARKET VALUE. ANY SUCH VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE REORGANIZATION EQUITY VALUE RANGE FOR THE REORGANIZED DEBTORS ASSOCIATED WITH MOELIS' VALUATION ANALYSIS.

# EXHIBIT E

## Liquidation Analysis

## Liquidation Analysis

### A.    OVERVIEW

The Debtors, with the assistance of their financial advisors, have prepared this hypothetical liquidation analysis (the *"Liquidation Analysis"*) in connection with the filing of the Plan and Disclosure Statement. The Liquidation Analysis indicates the estimated values that may be obtained by Classes of Claims upon disposition of the Debtors' assets, pursuant to a liquidation under chapter 7 of the Bankruptcy Code, as an alternative to continued operation of the Debtors' business, as contemplated under the Plan. Accordingly, asset values discussed herein differ from amounts referred to in the Plan. The Liquidation Analysis is based upon the assumptions discussed herein and in the Disclosure Statement. All capitalized terms used but not defined in this Liquidation Analysis have the meanings ascribed to them in the Disclosure Statement.

The Liquidation Analysis assumes that the Debtors' current Chapter 11 Cases convert to chapter 7 cases on or about October 1, 2009 and that the Debtors' operations are wound down in an orderly manner and their assets are liquidated. The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors. Some assumptions in the Liquidation Analysis may not materialize in an actual chapter 7 liquidation and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation. ACCORDINGLY, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT APPROXIMATE THE ASSUMPTIONS REPRESENTED HEREIN. ACTUAL RESULTS COULD VARY MATERIALLY.

It is assumed, among other things, that the hypothetical liquidation under chapter 7 would commence under the direction of a Court-appointed trustee and would continue for 3 months, during which time all of the Debtors' major assets would be sold and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with the priorities under the Bankruptcy Code.

The liquidation analysis is not intended and should not be used for any other purpose, the liquidation analysis does not purport to be a valuation of the Debtors' assets on a going concern basis, and there may be significant differences between the liquidation analysis and the values that may be realized in an actual liquidation. This analysis assumes "liquidation values" based on appraisals, where available, and the Debtors' business judgment, where appraisals are not available. The recoveries shown do not contemplate a sale or sales of business units on a going concern basis. While the Debtors make no assurances, it is possible that proceeds received from such going concern sale(s) would be more than those in a hypothetical liquidation, the costs associated with the sale(s) would be less, fewer claims would be asserted against the bankruptcy estates and/or certain ordinary course claims would be assumed by the buyer(s) of such business(es).

Neither the debtors nor their advisors make any representation or warranty that actual results would or would not approximate the estimates and assumptions represented in the liquidation analysis. Indeed, actual results could vary materially.

B.      SUMMARY NOTES TO THIS LIQUIDATION ANALYSIS

The Liquidation Analysis should be read in conjunction with the following notes and assumptions:

1.      *Dependence on assumptions.* The Liquidation Analysis depends on estimates and assumptions. The Liquidation Analysis is based on a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management and their advisors, are inherently subject to significant economic, business, regulatory and competitive uncertainties and contingencies beyond the control of the Debtors or their management. The Liquidation Analysis is also based on the Debtors' best judgment of how numerous decisions in the liquidation process would be resolved. Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation and actual results could vary materially and adversely from those contained herein.

2.      *Additional unsecured claims.* The cessation of business in a liquidation will trigger certain claims that otherwise would not exist under the Plan absent a liquidation. Examples of these kinds of claims include various potential employee claims (for such items as severance) and claims arising in connection with the rejection of executory contracts and unexpired leases that have not yet been assumed. Some of these claims could be significant and may be entitled to priority in payment over general unsecured claims. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. No attempt has been made to estimate other additional unsecured claims that may result from such events under a chapter 7 liquidation scenario because no funds are estimated to be available to general unsecured creditors.

3.      *Dependence on unaudited financial statements.* This Liquidation Analysis contains numerous estimates that are still under review and it remains subject to further legal and accounting analysis. It is based upon the Debtors' unaudited balance sheet as of August 31, 2009.

4.      *Preference or fraudulent transfers.* No recovery or related litigation costs attributed to any potential avoidance actions under the Bankruptcy Code, including potential preference or fraudulent transfer actions are assumed within this analysis.

5.      *Chapter 7 liquidation costs and length of liquidation process.* Pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by a chapter 7 trustee, including, but not limited to, expenses affiliated with selling the Debtors' assets, will be entitled to payment in full before any distribution to chapter 11 administrative and other priority claims. The estimate used in the Liquidation Analysis for these expenses includes estimates for certain legal, accounting, and other professionals, as well as an assumed 3% fee based upon liquidated assets payable to a chapter 7 trustee.

C.      LIQUIDATION ANALYSIS

The liquidation analysis below assumes a Chapter 7 orderly liquidation scenario beginning October 1, 2009, with all assets being liquidated and all operations winding down over a three month period. In the high case scenario, all local accounts are terminated immediately, all national accounts are serviced for one month, and some national accounts are serviced for a second month and then sold. In the low

case, all local accounts are terminated immediately, and all national accounts are serviced for one month and then terminated. The medium case scenario represents the midpoint of the high and low cases.

The Debtors used the August 31, 2009 unaudited balance sheet amounts to determine recovery values of assets. It is assumed that the change in asset values will not be materially different from August 31, 2009 amounts to October 1, 2009.

| | August 31, 2009 Book Value (unaudited) | Potential Recovery | | | | | |
|---|---|---|---|---|---|---|---|
| | | Low | | Medium | | High | |
| | $ | $ | % | $ | % | $ | % |
| Cash | 40,447 | 36,334 | 90% | 36,334 | 90% | 36,334 | 90% |
| Accounts receivable | 15,328 | 8,353 | 54% | 10,003 | 65% | 11,653 | 76% |
| Inventory | 7,708 | 1,101 | 14% | 1,903 | 25% | 2,706 | 35% |
| Prepaid expenses | 3,625 | 950 | 26% | 1,500 | 41% | 2,050 | 57% |
| Property & equipment, net | 54,233 | 667 | 1% | 951 | 2% | 1,234 | 2% |
| Intangible assets, net | 170,370 | - | 0% | 5,978 | 4% | 11,955 | 7% |
| Deferred subscriber acquisition costs | 16,468 | - | 0% | - | 0% | - | 0% |
| Other assets, net | 1,084 | 326 | 30% | 678 | 63% | 1,031 | 95% |
| Gross liquidation proceeds | $  309,264 | $  47,731 | | $  57,346 | | $  66,962 | |
| | | | | | | | |
| **Wind-down cash flow** | | | | | | | |
| Cash receipts (Oct 1 - Dec 31) | | 1,800 | | 2,700 | | 3,600 | |
| Post-petition obligations as of Oct 1 (est.) | | (6,404) | | (6,404) | | (6,404) | |
| | | | | | | | |
| Wind-down costs | | (3,957) | | (4,961) | | (5,964) | |
| Assumed leases | | (6,303) | | (6,303) | | (6,303) | |
| Trustee fees | | (365) | | (654) | | (942) | |
| Professional fees | | (7,788) | | (7,978) | | (8,167) | |
| Total liquidation period cash flow | | (23,017) | | (23,598) | | (24,179) | |
| | | | | | | | |
| Proceeds available for distribution to creditors | | $  24,713 | | $  33,748 | | $  42,783 | |

## Cash

Cash consists of $40.4 million of cash and the liquidation of investments with maturities of three months or less. Included in the cash line item is restricted cash of $2.0 million, which represents cash backed lines of credit. In a liquidation scenario, this reserve is not recoverable. In addition, the Debtors have reserves of $2.1 million in a separate account for national account receipts that are owed to independent affiliates. The Debtors holds these receipts in trust for a third party.

## Accounts receivable

The balance sheet accounts receivable line item includes all trade receivables from national and local customers and royalty and market fee receivables from independent affiliates. The Debtors assume 75% to 100% recovery on receivables from independent affiliates. In determining recovery of the remainder of the accounts receivables, the Debtors reviewed the aging of accounts, customers with large amounts outstanding, customers with amounts past due, historically slow-paying customers, disputed amounts, and historical bad debt expense. See table below.

| | August 31, 2009 Book Value (unaudited) | Accounts Receivable Recovery Analysis | | | | | |
|---|---|---|---|---|---|---|---|
| | | Low | | Medium | | High | |
| | | $ | % | $ | % | $ | % |
| **Trade AR - Local** | | | | | | | |
| Current | 107 | 72 | 68% | 87 | 81% | 102 | 95% |
| 31 to 60 days past due | 3,789 | 2,302 | 61% | 2,771 | 73% | 3,240 | 86% |
| 61 - 90 days past due | 1,923 | 974 | 51% | 1,172 | 61% | 1,370 | 71% |
| 91 - 120 days past due | 639 | 96 | 15% | 168 | 26% | 240 | 38% |
| 121 - 150 days past due | 338 | - | 0% | 21 | 6% | 42 | 13% |
| Over 151 days past due | 687 | - | 0% | - | 0% | - | 0% |
| | 7,484 | 3,444 | 46% | 4,219 | 56% | 4,994 | 67% |
| **Trade AR - National** | | | | | | | |
| Current | 324 | 243 | 75% | 284 | 88% | 324 | 100% |
| 31 to 60 days past due | 3,051 | 2,060 | 68% | 2,403 | 79% | 2,746 | 90% |
| 61 - 90 days past due | 867 | 488 | 56% | 569 | 66% | 651 | 75% |
| 91 - 120 days past due | 256 | 72 | 28% | 84 | 33% | 96 | 38% |
| 121 - 150 days past due | 51 | 5 | 9% | 6 | 11% | 6 | 13% |
| Over 151 days past due | 118 | - | 0% | - | 0% | - | 0% |
| | 4,668 | 2,868 | 61% | 3,345 | 72% | 3,823 | 82% |
| Total Trade AR | 12,152 | 6,311 | 52% | 7,564 | 62% | 8,817 | 73% |
| IA royalty and market fee | 2,609 | 1,957 | 75% | 2,283 | 88% | 2,609 | 100% |
| Misc AR (net of allowance) | 567 | 85 | 15% | 156 | 28% | 227 | 40% |
| Total recoverable AR | 15,328 | 8,353 | 54% | 10,003 | 65% | 11,653 | 76% |

## *Inventory*

The Debtors assume the liquidation of Inventory will be done through sales to customers, vendors, and though the secondary market.  Inventory is comprised of amplifiers, speakers, wire and cable, televisions, monitors, and other related equipment and components.  Recovery was estimated by the Debtors based on a review of each inventory category.  Inventory is assumed to have a recovery rate of 35% in the high case and 14% in the low case scenario.

| | August 31, 2009 Book Value (unaudited) | Inventory Recovery Analysis | | | | | |
|---|---|---|---|---|---|---|---|
| | | Low | | Medium | | High | |
| | | $ | % | $ | % | $ | % |
| Drive thru equipment and parts | 1,945 | 195 | 10% | 486 | 25% | 778 | 40% |
| Proprietary receivers & on-premise devic | 1,830 | - | 0% | - | 0% | - | 0% |
| Speakers | 973 | 243 | 25% | 365 | 38% | 486 | 50% |
| Wire/cable/hardware | 944 | 330 | 35% | 519 | 55% | 708 | 75% |
| Sound system equipment | 736 | 37 | 5% | 92 | 13% | 147 | 20% |
| Video equipment | 312 | 31 | 10% | 47 | 15% | 62 | 20% |
| Amplifier | 358 | 72 | 20% | 125 | 35% | 179 | 50% |
| Microphones | 171 | 34 | 20% | 60 | 35% | 86 | 50% |
| Misc. Inventory | 175 | 35 | 20% | 61 | 35% | 88 | 50% |
| Paging equipment | 89 | 18 | 20% | 31 | 35% | 45 | 50% |
| Televisions | 141 | 106 | 75% | 116 | 83% | 127 | 90% |
| Total Inventory, net | 7,675 | 1,101 | 14% | 1,903 | 25% | 2,705 | 35% |

## *Prepaid expenses*

Prepaid expenses consist of prepaid insurance, satellite fees, vendor fees, and other miscellaneous prepaid items. Recovery is assumed based on the Debtors' review of each prepaid item. Prepaid expenses does not include deposits.

## *Property and equipment*

| | August 31, 2009 Book Value | Property and Equipment Recovery Analysis | | | | | |
| | | Low | | Medium | | High | |
| (Net of accumulated depreciation) | (unaudited) | $ | % | $ | % | $ | % |
|---|---|---|---|---|---|---|---|
| Subscriber provided equipment | 22,487 | - | 0% | - | 0% | - | 0% |
| Capitalized labor | 17,393 | - | 0% | - | 0% | - | 0% |
| Building | 246 | 74 | 30% | 123 | 50% | 172 | 70% |
| Leasehold improvements | 1,316 | - | 0% | - | 0% | - | 0% |
| Computer - hardware | 1,491 | 298 | 20% | 373 | 25% | 447 | 30% |
| Computer - software | 1,065 | - | 0% | - | 0% | - | 0% |
| Computer - other | 2,169 | - | 0% | - | 0% | - | 0% |
| Machinery & equipment | 498 | 75 | 15% | 100 | 20% | 125 | 25% |
| Furniture & fixtures | 1,830 | 91 | 5% | 183 | 10% | 274 | 15% |
| Vehicles | 1,548 | - | 0% | - | 0% | - | 0% |
| Demo equipment | 94 | - | 0% | - | 0% | - | 0% |
| DTOC issued parts | 3,235 | - | 0% | - | 0% | - | 0% |
| Purchased library | 861 | 129 | 15% | 172 | 20% | 215 | 25% |
| Total property and equipment, Net | 54,233 | 667 | 1% | 951 | 2% | 1,234 | 2% |

*Subscriber provided equipment:* Subscriber provided equipment includes the value of proprietary receiving equipment and other equipment used in the operation of the business. The equipment is located at client locations. The Debtors assume no recovery.

*Capitalized labor:* The Debtors capitalized labor associated with installed equipment under contract at a client location. There is no recovery for capitalized labor associated with equipment installed at client locations.

*Buildings and leasehold improvements:* The Debtors own a building in Texas. Leasehold improvements are located at a variety of the Debtor's leased locations throughout the country. The Debtors assume the building can be liquidated for a recovery of 30% to 70%. Leasehold improvements will not recover any value.

*Computer equipment, (hardware, software, other):* Computer equipment includes hardware, software, and capitalized enhancements to the Debtors' operating system used for the operation of the business. The Debtors computer software is designed for the business operations and assumes no recovery in liquidation. Computer hardware, such as servers and telephone equipment, is assumed to have a recovery of 20 % to 30%.

*Furniture and fixtures:* The furniture and fixtures category includes office equipment and field service equipment used in the operation of the business.

*Vehicles:* The vehicles category includes a fleet of service vans held under capital leases. In a liquidation scenario, the Debtors' will default on the capital lease agreement and the vans will be repossessed by the leasing agent. No recovery.

*DTOC issued parts:* Drive thru operation spare center (DTOC) category includes a pool of replacement parts used to support the Debtors' drive thru repair business. Parts have been issued to clients and are assumed to have no recovery.

### Intangible assets

Intangible assets consist of income producing contracts, purchased music, licensing agreements, trademarks, and goodwill. Except for the sales contracts, the Debtor has determined that there is no liquidation value of any intangible assets. In the high case, the Debtors have assumed that certain sales contracts with national customers could be packaged together and sold. The Debtors' assumption is that the sale will be consummated at the end of the first month of the liquidation period and service of those customers will be transitioned to the buyer by the end of the second month. The Debtors have valued the salable contracts based on the remaining monthly revenue and the remaining contract term. In the low case scenario, the Debtors have assumed there will be no buyer and thus no recovery.

### Deferred subscriber acquisition costs

This category is mostly commissions paid to the Debtors' representatives at the initiation of service to a client and at the renewal of a contract. Capitalized commissions will not be recovered in liquidation.

### Other

Represents utility and landlord deposits. Deposits with landlords might be offset by damages due to breech of contract. The Debtors have assumed recovery to be between 30% and 95%.

### Cash receipts (Oct 1 to Dec 31)

Operational cash receipts represent the cash that will be generated from operations during the 3 month liquidation period. It does not capture the collection of accounts receivable on the balance sheet at the beginning of the liquidation period. These amounts are captured in the accounts receivable line item of the asset recovery section of the analysis. In both the high and low scenario, it is assumed that there will be no receipts for local accounts. In the high case, national accounts (excluding revenue for equipment and labor) will generate a full month of revenue in September and the salable contracts will generate revenue in October. In the low case, less than one month of revenue from national accounts (excluding revenue for equipment and labor) is assumed to be collected due to the potential for customers claiming damages due to breech of contract.

### Post petition obligations

Post-petition obligations represent the assumed post petition accounts payable, wages payable, and taxes payable as of October 1, 2009. All additional obligations accrued during the wind-down period are captured in the wind-down costs line item.

### Wind-down costs

Wind-down costs represent a detailed build-up of overhead and labor by department. The high case scenario assumes an additional month of servicing national accounts while the low case assumes the national accounts are serviced for only one month.

### Assumed Leases

In connection with a liquidation, and following the rejection of previously assumed unexpired nonresidential real property leases, a sum equal to all monetary obligations due, excluding those arising from or relating to a failure to operate or a penalty provision, for the period of 2 years following the later of the rejection date or the date of actual turnover of the premises, will be accorded administrative expense status under section 503(b)(7) of the Bankruptcy Code. The Debtors' estimate this amount to be approximately $6.3 million.

### Trustee fees

The Debtors assumes they would pay commissions as calculated pursuant to section 326 of the US Bankruptcy Code as a percentage of gross proceeds not including cash.

### Professional fees

Professional fees consist of all accrued amounts not paid as of August 31, 2009 plus projected amounts for September through December ($1.9 million in the high case scenario and $1.5 million in the low case scenario). The high case scenario assumes a longer liquidation period than the low case scenario and thus professional fees in the high case are higher than in the low case.